UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY
CAMDEN DIVISION

| | |
|---|---|
| VINCENT P. ALEXIS,<br>    Plaintiff<br><br>v.<br><br>Ravi Sood, MD,<br>Sam Syjongtian,<br>Christina Mello,<br>P. Tyas,<br>T. Hoey,<br>N. Turner-Foster, MD,<br>G. Travers,<br>J. Wilk,<br>Mr. Haczynski,<br>Jane/John Doe No. 1,<br>David Ortiz, Warden,<br>J. Hollingsworth, Former Warden,<br>J.L. Norwood,<br>Ian Connors,<br>Hugh Hurwitz,<br>Jane/John Doe No. 2 (Operations Lieutenant), Ft. Dix,<br>    Defendants; | AMENDED COMPLAINT<br>Civil No.<br>18-cv-02099-RBK-<br>KMW.<br><br><br>Jury Trial Demand<br><br><br>July 31, 2019 |

## I. JURISDICTION, VENUE AND EXHAUSTION OF REMEDIES

[1]   Jurisdiction of the Court

This is a civil action authorized by Bivens to redress the deprivation, under color of the United States, of the rights secured by the Constitution of the United States. Bivens v. Six Unknown Fed. Narcotics Agents, 403 U.S. 388 (1971).  The Plaintiff complains that the below referenced defendants federal officers deprived him of his constitutionally guaranteed rights under the Eighth Amendment (Cruel and Unusual Punishment Clause), and Fifth Amendment (Substantive and Procedural Due Process Clause) of the U.S. Constitution.

This Honorable Court has jurisdiction under 28 U.S.C. Section 1331 (Federal Question). Damage action, including action for punitive damages, is available in Federal Courts against Federal officials for violations of inmate's established Constitutional Rights. Carlson v. Green, 446 U.S. 14 (1980). This includes the availability of preliminary injunctions, even if a prisoner did not provide an advance notice to the prison (medical) officials, Farmer v. Brennan, 511 U.S. 825 (1994).

In addition to injunctive relief, the Plaintiff also seeks a declaratory relief under 28 U.S.C. Sections 2201 and 2202.

[2]   Venue

Venue is proper as per 28 U.S.C. Section 1391(b)(2), as all of the acts, or omissions, complained of in this action occurred in the district of the U.S. District Court for New Jersey, Camden Division.

[3]   PLRA Exhaustion

In accordance with provisions of the Prison Litigation Reform Act (PLRA, 42 U.S.C. Section 1997e(a)), prior to commencing this action, the Plaintiff fully exhausted all available administrative remedies, but to no avail. See Exhibits: 11, 13, 16, & 23.

## II. PARTIES TO THE ACTION - PLAINTIFF

[4]   Vincent P. Alexis, 19213-052, is a Federal prisoner currently incarcerated at the Federal Correctional Institution (hereinafter FCI), Fort Dix, New Jersey.

2

### III. PARTIES TO THE ACTION – DEFENDANTS

[5]   Medical Staff:

A) Ravi Sood, MD, at all relevant times served as medical doctor at FCI Fort Dix;

B) Sam Syjongtian, at all relevant times served as Physician Assistant – Mid-Level Provider (hereinafter MLP) at FCI Ft. Dix;

C) Christina Mello, at all relevant times served as Physician Assistant at FCI Fort Dix;

D) P. Tyas, at all relevant times served as Physician Assistant at FCI Ft. Dix;

E) T. Hoey, at all relevant times served as Emergency Medical Technician (hereinafter EMT) at FCI Ft. Dix;

F) N. Turner-Foster, MD, at all relevant times served as Chief Medical Doctor/Clinical Director at FCI Ft. Dix;

G) G. Travers, at all relevant times served as Associate Health Service Administrator at FCI Ft. Dix;

H) J. Wilk, at all relevant times served as Associate Health Care Administrator at FCI Ft. Dix;

I) Mr. Haczynski, at all relevant times served as Head of Ft. Dix Health Service Office/Administration at FCI Ft. Dix;

J) Jane/John Doe No. 1, at all relevant times served as a Health Care Professional at FCI Ft. Dix;

[6]   Non-Medical Officials:

K) Warden David Ortiz, at all relevant times from approximately 2016 has been serving as Warden of FCI Fort Dix;

3

L) Former Warden J. Hollingsworth, from 2014 up to 2016, served as Warden of FCI Fort Dix;

M) J.L. Norwood, at all relevant times served as Regional Director of the U.S. Bureau of Prisons (hereinafter B.O.P.) Northeast Operations, located in the City of Philadelphia, Pennsylvania;

N) Ian Connors, at all relevant times served as a National Inmate Appeals Administrator, B.O.P. Head Office, Washington, D.C.;

O) Director Hugh Hurwitz, at all relevant times has been serving as a Director of B.O.P., Washington, D.C.;

P) Jane/John Doe No. 2, at all relevant times served as Fort Dix Operations Lieutenant;

[7]  Capacity:

Each and every defendant is sued individually and in his or her official capacity.

[8]  At all relevant times in this complaint, each and every defendant listed above, acted under the color of the United States.  Defendants were either employed as full-time employees of the federal government agencies (B.O.P., U.S. Dep't of Justice, United States Government), or as full-time federal government contractors (federal statutory employees) whose day-to-day operations were supervised by the federal government, worked on federal premises and used federal government equipment, etc. U.S. v. Orleans, 425 U.S. 807 (1976).

## IV. FACTUAL STATEMENT

[9]  General Factual Background:

While designated as a federal low-security prison facility, supposedly a place of reformation, rehabilitation, and integration

4

of inmates into the society, FCI Fort Dix is everything but such a place.  It is the practice, policy and custom of the management of Fort Dix prison to engage in collective punishment, retributive lock-downs, various forms of intentional harassment, degradation and humil-iation of inmates, swift retaliations for any inmate complaints, and closures of the prison's inmate educational (including the law library) and recreational facilities under any available subterfuge.  The Unit Counselors act hostile, creating an environment of intimidation & fear when inmates attempt to submit PLRA Administrative Remedies (BP-8/BP-9), to get copies made when the law library is closed or has no copier. There are no emergency phones and signals installed in the prison cells (rooms), and not even on the prison building floors.  The prison main-tains an antiquated, ineffective, public communication system which does not cover the entire prison area, often serving as a perfect ex-cuse for massive inmate recalls, spreading confusion, risk of harm, unnecessary harassment and collective punishment when inmates do not understand, or properly respond to public announcements (not to mention that the inmate population includes hundreds of Spanish-speaking in-mates who do not understand English).  Fort Dix is severely overcrowded with over 4,000 federal inmates located in dilapidated military barracks (which are poorly maintained) located next to the Air Force runways with no air conditioning, making already overcrowded conditions unbearable on any day, and particularly on the Jersey shore 100 degree hot and humid summer days.  A large number of prison guards are either former Afghanistan and Iraqi war veterans, or former, terminated, state and local law enforcement officials with severe PTSD problems, almost all of them hating inmates (instead of assisting them in rehabilitation), and truly enjoying in inflicting unnecessary pain & punishment. Against this backdrop, we now proceed.

5

I was then told that my name would be placed on a call-out sheet for further medical appointments in the future. I was then instructed to return to my prison cell again.

[12] Approximately two hours later, as I sat in my prison cell, my condition started worsening progressively. I began to experience significant chest pain and shortness of breath. I struggled to maintain consciousness and almost fainted a number of times. Since, as stated above, there are no emergency phones or signals in the prison cells, or even on the entire prison floor holding well over 100 inmates, one of the prisoners had to run downstairs to find the prison guard, who is equipped with a two-way radio in order to call for emergency medical help. After calling for help and finding such help, I was transported, on an emergency basis and unable to walk without assistance, back to the Fort Dix Medical Service. There I was examined by defendant Syjongtian, a prison mid-level medical provider (MLP). I informed defendant Syjongtian that I was denied medical treatment the day before, and earlier that same morning. We discussed my overall level of pain and condition, as well as my history of chronic Lyme Disease. Given the amount of pain and shortness of breath and facial swelling (which by then had become quite obvious) I asked the defendant to send me to the hospital Emergency Room (ER) right away. MLP Syjongtian refused to do so, however. After examining me, defendant Syjongtian ordered paranasal sinus radiographs, which he told me would not be done until the following day. Then he told me that I needed to see my primary prison doctor, defendant Sood, who happened to be there but "Was busy with other patients."

7

I waited several hours, as defendant Sood continued to see all of his regularly scheduled, routine, appointments. During this time, I continued to feel more ill, as the facial swelling became even more pronounced (I could glimpse the swelling about my right eye through my peripheral vision, and I could feel the swelling pulling tightly at my skin at the site). The pain also continued unabated.

[13] Finally, after waiting several hours, close to the end of prison office hours at 4 PM, I was examined by defendant Sood, who noted that all of his medical staff had left for the day and there was nothing else he could do. So, once again I was instructed to return to my cell. I was seriously ill and I knew it. I repeatedly asked defendant Sood to send me to the hospital ER, but he refused to do so. He refused to provide any further treatment, and ordered me to return to my prison cell reassuring me, "It's nothing serious." I had no choice but to once again return to my cell.

[14] The next day, on March 21, 2014 as my condition continued to worsen, I again returned to the Fort Dix Medical Service. The infection had worsened significantly, and the facial swelling was causing dis-figurement, making it increasingly difficult for me to even open my right eye. Defendant Sood examined me once again. He noted that my chest pain was "Atypical" as it had been going on for two days, and he noted "Painful swelling with bluish discoloration of skin right maxilla extending to the nose and to the lower eyelid x2 days." I complained to defendant Sood that I was still experiencing chest pain and light-headedness, and that the pain was not improving and that the facial swelling was clearly worsening, despite the medications given to me. I again asked him to send me to the ER, but Dr. Sood refused. Instead,

8

defendant Sood advised me that I needed "Lifestyle changes, mindful awareness or meditation, and YOGA." The paranasal sinus radiographs which were ordered the day before were not done at all (indeed they were done, after my numerous requests, no less than six months later, in November 2014, well after my hospitalization and numerous surgeries). Defendant Sood also tried to convince me that the root of my problems was psychological, and discussed starting me on psychotropic medications, or that I should read a book about mindful awareness which he recommended. He also advised that I should take the Anger Management class offered by the Psychology Department. It was indeed a mockery, not a medical service.

Despite my clearly worsening condition and horrifying facial dis-figurement and pain that I was experiencing, defendant Sood once again instructed me to return to my cell. And when defendant Sood did so, he did so with the knowledge that my condition was rapidly becoming worse and that the very next day was Saturday, and that there would be no MD or MLP on duty at Fort Dix over the weekend (there would be only a para-medic on, despite the mass incarceration of over 4,000 federal inmates, many of whom are elderly and chronically sick). (Exhibit:3).

[15]  By Saturday March 22, 2014 my condition became critical. I was unable to open my right eye, the facial swelling and the pain worsened, and there was a fair amount of intermittent bleeding from my right nares. I was still experiencing chest pain and shortness of breath, and felt quite feverish.

At approximately 4 AM, I was assisted by one of my roomates to the unit officer's office. I knocked on the door and entered his

9

office.  As I entered the room I stated, "I need to go to the hospital." He took one look at me and exclaimed, "My God."  He then immediately picked up the phone and called the operations lieutenant, defendant Jane/John Doe No. 2.  As I was present in front of the guard, I over-heard the entire conversation.  Their conversation was brief (approx-imately 10 seconds).  The unit officer then hung up the phone and in-formed me that no medical assistance would be provided to me then, and that I should go to the Fort Dix Medical Service when they opened sev-eral hours later at 6:30 AM.

[16]  Two and one-half hours later, I was again assisted to medical. My face was even more swollen, and I was having even more trouble breathing and felt as though I was about to pass out.  My chest was painful, and my entire body ached from a high fever.  I was examined by an EMT at approximately 6:45 AM.

[17]  One hour later, prison officials finally relented and decided to transport me to the hospital ER.  They did not call an ambulance, as they usually do in Fort Dix medical emergencies.  They decided to transport me in a regular prison van, which is not equipped with an EMT/Paramedic, medications, life-saving medical equipment, or emer-gency traffic signals.  This prolonged my agony and delayed medical assistance, increasing my pain and suffering.

The real reason for the prison officials transporting me in their B.O.P. van instead of in an ambulance, was in the fact that they did not fully expect me to live to the hospital ER.  They expected me to die in that van (outside of prison walls) and they did not

10

want any record of it in the prison. Had they called an ambulance, there would have been a record of my medical condition at the moment I was taken from the prison, as an EMT/Paramedic would have certainly created such a written record.  But no such record exists of my trip in the B.O.P. van, or of my condition during that trip.  Had I died in that van on the way to the hospital, the B.O.P. would have simply claimed that I died outside the prison walls, outside their jurisdiction. Had I died in an ambulance, the record of my condition at the time of the pick up from Fort Dix prison would have shown total and intentional denial of medical care (not to mention that the Paramedics would have been able to attempt CPR if my body went into respiratory arrest). This and many other acts of willful, deliberate concealment, as well as the entire picture of refusal of treatment, and the infliction of sadistic, cruel, punishment, fully emerged many years later.

[18]  I was examined in the ER of Saint Francis Medical Center at approximately noon on Saturday March 22, 2014.  I underwent a battery of diagnostic tests, including blood work, urinalysis, radiographs, CT scans, EKG's, and blood cultures.  Medical records which I received many years later showed, "Multiple focal ill-defined opacities in both lung fields suspicious for an acute inflammatory or infectious process" and an Infectious Disease Specialist, Syed A. Husain, MD clearly noted in his medical records that, "The prognosis of the patient remains guarded," (Exhibit: 4 ).

11

[19] After the ER procedures, I was admitted to the hospital on the evening of March 22, 2014. I spent approximately 45 days there. Upon admission, I looked in the mirror in my room's bathroom. What I saw was horrifying - the facial disfigurement about my nose and right eye was so severe that I truly did not recognize who I saw in the mirror.

[20] The swelling and inflammation about my right eye further caused significant involvement of the nerves and muscles which control the movement of the eye. Within days, I experienced pronounced double vision, as my right eye was unable to function normally.

In order to gain control over the sepsis (which was not fully controlled by the aggressive hospital treatments, and would soon start causing organ failures), and its secondary effects (the severe soft-tissue inflammation and swelling), the hospital's physicians and Dr. Samir Undavia (an ENT Specialist/Surgeon) recommended that I undergo sinus surgery in order to establish drainage and remove the nidus for the infection.

[21] On March 27, 2014 I had surgery on my right maxillary sinus. Dr. Undavia performed this surgery. He clearly mentions in his surgery report (Exhibit: 5) that there was, "Tremendous inflammation and granulation tissue," and that "The case became very difficult given how much necrotic tissue was everywhere..." These pathologic changes clearly indicate chronicity and prior lack of treatment.

[22] Despite the hospital's best efforts and aggressive treatments, I began to experience major organ failure when on March 31, 2014 the sepsis caused both of my lungs to collapse. Emergency chest tubes

12

were placed, in an attempt to remove the air and pus from the pleural space, so that my lungs could expand and I could breathe. The right chest tube failed to clear the air and pus, so on the following day it had to be repositioned during a second procedure. Unfortunately, the right hemi-thorax did not clear at all, and Dr. Seinfeld (Thoracic Surgeon) recommended that I undergo major thoracic surgery in order to fully evacuate the pneumothorax and pus involving my right pleural space.

[23] On April 7, 2014 I underwent major thoracic surgery and a blood transfusion. The surgery was performed by Drs. Shariff & Seinfeld. The surgeons opened and operated on my right lung, trying to clean it of mortifying septic infections. The surgery report (which I was unable to obtain until December 8, 2017) shows that I underwent a right thoracotomy, decortication of the right lung, and drainage of lung abscesses. The surgery report clearly notes that I had, "Multiple lung abscesses involving the right middle lung lobe & the right upper lobe has golf [ball] size abscesses," and that upon entering the pleural cavity, the surgeons encountered, "A pocket of pus in the chest cavity" (Exhibit: 6).

Nobody ever informed me that my lungs were filled with multiple abscesses, many of which were the size of golf balls. For over three years, I complained to the defendants (particularly to defendant Sood) that I was short of breath and was experiencing an alarming degree of light-headedness when I exerted myself. That entire time, this important information was intentionally withheld from me, and the critical

13

report was not provided to me by the Fort Dix Medical Records Dep't when I initially obtained my medical records in 2015.

While the surgery almost certainly saved my life, as I would learn years later, it was only partially successful. The damage caused by the large abscesses was extensive. As these abscesses formed and grew in size, normal lung parynchyma was destroyed. That normal alveolar tissue was replaced with scar tissue, and this scar tissue is unable to participate in normal oxygen exchange. As a result, I have experienced a serious, and permanent, impairment of pulmonary function. This will make it impossible for me to be engaged in the practice of veterinary medicine at the level required in the future.

[24]  I was discharged from the hospital on May 5, 2014. Defendant Sood did not even examine me until May 8, 2014. During that exam, he declined to provide me with a copy of the hospital discharge instructions, he declined to provide me with a medication which the hospital physician prescribed for me because I was still anemic – the medication was Ferrous Gluconate (Iron), he declined to provide me with an anti-inflammatory corticosteroid which the hospital phy-sician prescribed for the ongoing inflammation – the medication was Sennosidas-Docusate, and he completely ignored my complaint that I was having substantial difficulty breathing through my right nostril (which of course, was operated on while I was hospitalized). Defendant Sood quickly dismissed that concern and instructed me to wait for a call out for chest radiographs (doing nothing for my right nostril). (Exhibit: 7).

14

[25]   On May 14, 2014 I had chest radiographs taken at the Fort Dix Medical Service.   Those radiographs revealed significant pathology. The radiology report states, "Abnormal.   interval development of nodular densities in both mid and upper lung zones - ?infection, ?septic emboli, less likely metastases - rec further evaluation." I continued to complain to defendant Sood about my continued breathing difficulties (particularly through the right nostril), severe exercise intolerance and chest pain.   Despite my complaints, and with the knowledge of clear radiographic abnormalities on the chest radiographs, defendant Sood declined to provide any medical treatments, and he declined to do any further evaluation, as the radiologist (Charles White, MD) required (Exhibit: 8).

Most shockingly, defendant Sood also refused to extend my medical idle/leave, which gave me time off from my prison job so that I could recover and heal from such a major thoracic surgery.   He sent me back to work just a few weeks later, despite my continued complaints that I had substantial difficulty breathing through my right nostril (which had not improved at all), was experiencing severe chest pain, and also an alarming degree of light-headedness whenever I exerted myself.

[26]   At approximately 2 PM on June 25, 2014, while at work, I began to experience severe right nasal pressure and pain.   My boss, prison correctional officer Cusick, urgently called the Fort Dix Medical Service, and EMT Gibb instructed me to come right in.   Mr. Gibb placed me on a 14 day course of antibiotics (Amoxicillin 500 mg).   Within hours of beginning the antibiotic, pus & blood clots began to drain from my right nostril.

15

[27]  Two weeks later, on July 8, 2014, as the infection and its sequela continued, when I looked for the refill of my antibiotic, I was denied the medication.  I was informed that I should, "Look for a call-out" and I was told to return to my cell, still ill and in pain.

[28]  That call-out appointment did not take place for another two months, on September 11, 2014.  At that appointment, I was examined by defendant Tyas, a physician assistant, who told me that I was actually fine, denied any further care or examination, and informed me that if I was having some nose congestion that I should "Buy a decongestant from commissary."  Oddly enough, the Fort Dix Commissary does not sell any nasal decongestants, and even if it did, as I learned many years later, no over-the-counter medications would have helped my condition anyway. Once again, I was instructed to return to my cell, still ill (Exhibit: 9).

[29]  On November 4, 2014, seven months after my sinus surgery, and after my numerous requests and complaints, radiographs of both my chest and sinus were finally taken.  The technician who took the radiographs let me view the sinus radiographs on the screen.  I was horrified by what I saw, particularly regarding my right maxillary sinus.  While it did not show the entire problem and all of the origins of the problem, I realized that I was in deep medical trouble, and I began filing formal complaints with the higher prison officials.  I filed my first written complaint (the so called Form BP-8) on November 6, 2014. (Radiology Report - Exhibit: 10).

16

[30]   Also on November 4, 2014 I was given a more powerful antibiotic, Augmentin.   However, as a product of my complaints to the higher prison staff, on the subsequent visit to see defendant Sood, on November 10, 2014 defendant Sood discontinued that medication with the full knowledge that I was still experiencing sinus pain and pressure, as well as draining of blood clots and pus.   The deliberate deprivation of the antibiotic left me in pain and untreated, and it allowed the infection to go unchecked. Indeed, defendant Sood told me that, "There is nothing I can do," and instructed me to return to my cell.

[31]   On November 14, 2014 I ran out of antibiotics, so on the following day, November 15, 2014 I again returned to the Fort Dix Medical Service.   Once again, I was denied the medication and told to return to my cell.

[32]   On November 17, 2014 I received a response to the BP-8. Defendant Travers made no mention of defendant Sood's treatment plan. It was an unresponsive answer (a denial) which concealed the truth of the matter and all of my (permanent) injuries. (Exhibit: 11).

[33]   As my pain and nasal sinus bleeding & discharge continued to worsen, I once again returned to the Fort Dix Medical Service on December 4, 2014.   I was examined by defendant Syjongtian, MLP. I repeated to him all of my concerns, including the pathologic findings from the November sinus radiographs, but defendant Syjongtian declined to provide any medical treatment, and then informed me that, "I only have 18 months left, I don't care," and he instructed me to return to my cell. (Exhibit: 12).

17

[34]    Days later, on December 13, 2014, I suffered prolonged bleeding from my right nares while in my cell.  After approximately 4 hours of intermittent bleeding, I informed the unit officer and was taken to the Fort Dix Medical Service.  While waiting for the medical help, the bleeding stopped and I was sent back to my prison cell with no further treatment.

[35]    On December 16, 2014 I was seen by defendant Christina Mello. She examined me and noted that I had swollen tonsilur lymph nodes. She informed me that she would schedule a follow up with me every 30 days, but never did so.

[36]    Also on December 16, 2014 defendant Sood prescribed a 14 day treatment of Augmentin (an antibiotic), but neither defendant Mello nor defendant Sood informed me about the treatment, since I had left the Fort Dix Medical Service hours earlier.  The prescription was handed to me 7 days later, on December 23, 2014, when I went to pill-line to pick up other medications.  This delayed my treatment for a week, leaving me with sinus and facial pain and headaches.

[37]    On December 22, 2014 I again saw defendant Sood.  As I was explaining to him my concerns about the severe right nasal sinus congestion and drainage, defendant Sood looked up at me from his computer and asked, "Is this a new problem?"  He did not prescribe any new medications or treatments, and he omitted to tell me about the Augmentin, which I accidentally discovered the following day at the prison pill-line.

18

[38]    On January 5, 2015 I finished the Augmentin.  I was once again off antibiotics, with no new refills authorized, despite the obvious fact that I was still ill and experiencing severe right nasal sinus congestion and intermittent drainage from the nares and bad sinus headaches.

[39]    On January 6, 2015 I received a response to my BP-9 complaint from defendant Hollingsworth (who was Warden at the time).  While my complaint was very fact specific and well documented, defendant Hollingsworth completely ignored all of my complaints, including his staff's intentional failures, refusals, and denials of service and medications. Defendant Hollingsworth concluded in his reply that the Fort Dix "Health Services Unit has been responsive to your medical condition..." (Exhibit:13).

[40]    On January 16, 2015 I was examined by Joseph R. Steeger, MD (a pulmonologist).  Dr. Steeger also examined me on March 26, 2015 and July 16, 2015.  Defendants Sood and Wilk twice failed to provide Dr. Steeger with the chest radiographs which were taken of me, so that he could more thoroughly and accurately evaluate my condition and my persistent chest pain.  Despite this handicap, Dr. Steeger diagnosed that I had, "Atypical chest pain secondary to involvement of the nerve during the thoracotomy on the right hemithorax causing pain and discomfort along the dermatome of that intercostal nerve" and "Recurrent pleuritic chest pain/costochondritis," (Exhibit:14).

19

When I expressed my concern to Dr. Steeger that I was having constant chest pain 15 months after the surgery (thoracotomy), he replied "If the pain is still present one year after the thoracotomy, it's likely permanent." Many years later, combined with other reports listed below and the radiology report written by Jeffrey Galvin, MD (University of Maryland) (Exhibit: 8 ), I learned that the pain which I continued to feel at that time (and still feel today), was indeed permanent.

[41]   On January 22, 2015 I had a CT scan of my sinuses performed at RWJ University Hospital (Hamilton, NJ).   The radiology report (which I received years later) noted significant pathology involving my right maxillary sinus,  (Exhibit: 15).

[42] On January 29, 2015 I once again experienced bleeding from my right nares for 13 hours.  And on February 2, 2015 I experienced a 5 hour nose bleed with draining pus.  That evening, I spoke to EMT Gibb at pill-line and he examined me.  Mr. Gibb restarted the Augmentin and Ibuprofen for 21 days.

[43]   On February 27, 2015 I went to the Fort Dix Medical Service for a refill of the Augmentin.  The bottle which was handed to me contained only 2 pills.  Once again, I was taken off antibiotics while a serious infection persisted in my body.

[44]   On February 25, 2015 I received a response to the BP-10 complaint (Exhibit:16).  Defendant Norwood defended the actions of defendant Hollingsworth.  Despite my clear and very specific medical complaint, defendant Norwood ignored the treatment denials and delays which

20

are clearly outlined here and in my medical records.  He ignored the staff's failures to perform diagnostics and he ignored their failures to follow up on abnormalities found on diagnostics.  Despite being fully informed and fully aware of these issues based on my submissions to him, defendant Norwood intentionally ignored a clear pattern and practice of denials and delays in treating my serious illness (before and after my hospitalization) in a manner which meets current and acceptable civilized standards.

[45]  On March 16, 2015, I was taken to Princeton Eye & Ear (Lawrenceville, NJ) for an exam.  Unfortunately, the Fort Dix Medical Service failed to schedule the appointment with Dr. Samir Undavia (the ENT Specialist/Surgeon who performed my sinus surgery 12 months previously at the hospital).  I was examined by Dean Drezner, MD.  Dr. Drezner did document abnormalities, and he instructed me to continue using the Flonase and the nasal saline spray.  Dr. Drezner stated that it was essential for me to recheck with Dr. Undavia.  He advised that this follow up should have occurred within 1 month (Exhibit:17).  Defendants Sood, Syjongtian, Travers, Hollingsworth, and Norwood were deliberately indifferent to my serious medical needs because I still had not been rechecked by my surgeon after 12 months of sinus illness, and they were deliberately indifferent in their failure to follow Dr. Drezner's instructions - the April 2015 recheck with Dr. Undavia was never scheduled.

[46]  On April 17, 2015 I was again examined by defendant Sood.  In addition to the chronic sinus and pulmonary problems I had been dealing with, I was now experiencing paresis of my right index finger. I awoke a few days earlier with an intense tingle/numbness in the joint, & it was

21

quite painful.  Since I've been afflicted by chronic Lyme Disease for approximately 20 years, I was well aware of how my body reacted when the disease flared (which it tends to do when I'm stressed).  This intense tingle and joint paresis is something that I've experienced many times before.  And there could be no doubt that my chronic Lyme Disease was no longer quiescent, and I clearly explained this concern to defendant Sood.

When defendant Sood examined me, and when I explained to him details of paresis I had experienced in the past because of Lyme Disease (including paralysis of my right knee, paresis of my left knee & elbow, and frequent joint pain), he paused and then commented, "I don't know anything about Lyme Disease causing joint problems like that."

Defendant Sood refused to put me on a course of antibiotics, and he intentionally ignored the fact that MDC Brooklyn placed me on 'chronic care' when I entered the BOP/Federal system, because I have chronic Lyme Disease. (Exhibit: 18).

In addition, on April 17, 2015 defendant Sood showed that he was plainly incompetent and ignorant of basic medical issues like sinus & pulmonary disease.  When we discussed the pulmonologist, defendant Sood asked me, "What did the pulmonologist do?"  And when we discussed the ENT, defendant Sood asked me, "What did the ENT do?"  Those exams were done the previous month, & defendant Sood had more than enough time to review my medical records. He should have known what the specialists did.  And he should have known that I was using hypertonic saline nasal spray because Dr. Drezner and defendant Mello instructed me to do so.  Instead, defendant Sood instructed me to stop using the nasal spray (Exhibit:18).

22

Also that day, defendant Sood once again deliberately ignored my concerns of, "Right nasal obstruction, pain right face in maxillery region, and fresh blood from nose," (Exhibit:18). He knew about the chronicity, he knew that the CT scan from January 22, 2015 showed significant pathology (Exhibit: 15), and he knew that Dr. Drezner had advised that I needed to recheck with my surgeon, Dr. Undavia, the very same month (Exhibit:17). That April 2015 recheck was never scheduled.

[47] On May 6, 2015 I saw defendant Sood, after reporting to sick-call, two days previously, that there was no improvement in my right index finger paresis, and that I was 3 weeks overdue for my recheck with Dr. Undavia. On this day, defendant Sood appeared to be perplexed by the paresis which continued to to affect my right index finger. As he was examining my finger, he looked up at me and accused me of intentionally not taking the Ibuprofen. And when I reminded defendant Sood that I wasn't on antibiotics for chronic Lyme Disease, and that for me in the past the paresis has always quickly resolved with a course of antibiotics, defendant Sood said, "You're faking it, you don't have Lyme Disease." (Exhibit: 19).

Once again, defendant Sood refused to provide medical care, and I was sent back to my cell without any medical treatment. And the recheck with Dr. Undavia was now 2 months overdue (Exhibit:17).

[48] On June 3, 2015 I returned to Princeton Eye & Ear for an exam. Once again, defendants Sood, Syjongtian, Travers, Haczynski, Hollingsworth, & Norwood were indifferent to my care. They failed to schedule my appointment with Dr. Undavia - he wasn't in the office. I was seen

23

by Chetan S. Shah, MD (Exhibit:17).  Dr. Shah advised that I continue using the Flonase and the nasal rinse.  He, and his staff, again insisted that it was essential for me to recheck with Dr. Undavia. And upon returning to the Fort Dix Medical Service, I clearly voiced my concern to defendant Hoey that, for the second time, the Fort Dix Medical Service failed to schedule my appointment at Princeton Eye & Ear with the ENT who performed my sinus surgery in March 2014, Dr. Undavia. I also clearly voiced this concern to the two BOP officers who escorted me on the medical trip.  Still, somehow this important, and legitimate, concern wasn't mentioned in the notes for the medical trip return encounter.  Instead, defendant Hoey reported "Inmate walked into Health Services without complaints returning from a medical trip to see ENT," (Exhibit:20), which is a complete cover-up and a fabrication.

[49]  On June 25, 2015 I was examined again by defendant Sood (Exhibit:21). I was still experiencing pain and paresis in my right index finger.  In addition, the pain had extended to my left elbow, and I was now experiencing a 'brain fogginess' and was having difficulty concentrating.  I explained to defendant Sood that Dr. Ron Wilson (Denton, Texas) had treated me for the same central nervous system (CNS) signs in December 2012 (I was on Doxycycline for over 13 months).  Defendant Sood completely ignored my comments about the CNS signs. He again appeared perplexed and he continued to insinuate that there must have been an exacerbating factor such as weight lifting (this was simply not true – I don't lift weights and there was no exacerbating factor other than a small spirochete bacterium, Borrelia burgdorferi).  Once again, I was denied treatment with a course of antibiotics for the chronic Lyme Disease.

24

In addition, I also discussed my chronic sinus disease with defendant Sood. I clearly explained to him that I was very disappointed that he had not scheduled my recheck with Dr. Undavia. And I reminded defendant Sood that the severe congestion, sinus pressure and pain, headaches, and drainage were still present, and that I was very uncomfortable But once again, I was instructed to return to my cell, and nothing was done to alleviate my pain and suffering.

[50]  On August 21, 2015 I was taken to Princeton Eye & Ear for an exam. Once again, defendants Sood, Syjongtian, Wilk,  Haczynski, Hollingsworth, & Norwood were indifferent to my care. They failed to schedule my recheck appointment specifically with my surgeon, Dr. Undavia. This was the third such blunder since my BP-9 & BP-10 complaints were filed.

I was again examined by another staff physician. He stated that it was essential for me to recheck with my surgeon, Dr. Undavia. He prescribed Ciprofloxacin (a powerful antibiotic)(Exhibit:17), but defendant Sood once again interfered with a prescribed plan of treatment and refused to issue the antibiotic to me.

[51]  Also on August 21, 2015 I submitted another written complaint to the Fort Dix Medical Service HSA (Exhibit: 22). In that complaint, I again complained that my medical appointments were not being scheduled. And I again requested that I be scheduled with Dr. Undavia, my surgeon. Defendant Wilk responded, "There is no guarantee you will see the same doctor who performed your surgery."

Defendant Wilk knew very well that Dr. Drezner, Dr. Shah, and the staff at Princeton Eye & Ear were directing, over and over, that I needed to recheck with my surgeon, Dr. Undavia. Still, defendant Wilk

chose to leave to chance which MD I would see, instead of simply picking up the phone and calling Princeton Eye & Ear to request an appointment specifically with Dr. Undavia. Defendants Sood, Wilk, Haczynski, Hollingsworth, Norwood, and Turner-Foster intentionally continued to interrupt a prescribed plan of treatment, as shown over and over in the medical notes from Princeton Eye & Ear.

[52] On or about September 7, 2015 I received a response from the BOP Central Office (National Appeals) to the BP-11 complaint which I filed (Exhibit:23). Despite being fully informed of my concerns, defendant Connors defended the actions of his subordinates, as well as their practice & policies. In an attempt at damage control, defendant Connors denied the refusal of treatment & medication. Defendant Connors ignored the treatment delays and refusals which are clearly outlined here, and in my medical notes (and these were not for medical reasons). And defendant Connors ignored the Fort Dix Medical Service's staff failures to perform the appropriate diagnostics at the appropriate times, and he ignored the failure of defendants Sood, Syjongtian, Tyas, and Mello to follow up on abnormalitites found on diagnostics. Despite being fully informed, defendant Connors also intentionally ignored the obvious fact that defendants Sood, Syjongtian, Tyas, and Mello repeatedly denied me necessary medications for my serious medical condition.

Defendant Connors was quick to point out that I was seen by an ENT, but he ignored the very real fact that it took far too long for me to recheck with my surgeon (in fact, on the day defendant Connors signed the BP-11 response [September 2, 2015] I had not yet seen Dr. Undavia), and that other defendants had either delayed or refused treatments which were prescribed.

All of them exhibited a clear pattern of failures to properly treat my serious illness (before and after my hospitalization and sugeries) in a manner which meets current and acceptable medical standards of the civilized world.

[53]  On September 15, 2015 I was examined by defendant Sood.  Once again, we discussed my ailments - the chronic sinus disease, as well as the chronic Lyme Disease.  My clinical signs had not changed, and I had yet to recheck with Dr. Undavia.  Only one change was made to my treatment - defendant Sood discontinued the Ranitidine (the acid-blocker he prescribed to me in March 2014 when he exhibited plain incompetence and a complete ignorance by claiming that I had chronic esophageal reflux disease instead of a life-threatening septic infection).  Defendant Sood had prescribed an unnecessary medication to me for 18 months, for a disease I did not have.

[54]  On November 9, 2015 I was taken to Princeton Eye & Ear.  For the fourth consecutive time since March 16, 2015 the Fort Dix Medical Service and defendants Sood, Syjongtian, Wilk, Haczynski, Hollingsworth, Norwood, and Connors were intentionally indifferent to my serious medical needs and did not schedule my recheck appointment specifically with my surgeon, Dr. Undavia.  I was seen again by Dean Drezner, MD.  Dr. Drezner once again stated that Alexis "Needs to F/u with Dr. Undavia who did the first surgery to see if additional surgery is needed" (Exhibit: 17).

27

[55]    When Dr. Sceusa examined me on November 25, 2015, he needed to add Lyme Disease (chronic) back onto my Axis III Assessment. Defendant Sood, at some point, intentionally doctored my medical record, removing my Lyme Disease diagnosis entirely from the record.

I have included here, the medical records from February 6, 2014 (from MDC Brooklyn, Exhibit: 24), & the March 4, 2014 Inmate Intra-system Transfer (for my transfer from MDC Brooklyn to FCI Ft. Dix, Exhibit: 24).  These documents clearly show that Lyme Disease chronic was listed as an ailment for me (on the Axis III Assessment), & that I was being treated for chronic Lyme Disease, before arriving at Ft. Dix.  I have also included the Health Problems list which was generated on October 30, 2014 (Exhibit:24).  This document clearly shows that Lyme Disease chronic was listed as an ailment for me (on Axis III) while I was here at Ft. Dix.

[56]  On February 11, 2016 I was finally examined by Dr. Undavia. This was the first time since my hospitalization, a long 22 months prior, where I was rechecked by my surgeon.  Dr. Undavia expressed his grave concern that I had not been brought in for any post-op rechecks in 2014.  He stated that this after-care was essential in order to minimize scar tissue formation and post-op problems.

Dr. Undavia performed a minor procedure inside my right nostril to remove scar tissue.  His medical record states, "Synechia were noted from the posterior septum to inferior turbinate.  Synechia were incised with a 15 blade scapel" (Exhibit:17).

Dr. Undavia stated that he believed the synechia (scar tissue/ adhesions) were the cause of my discomfort.  He commented that I, "Should notice a big difference now," after removal of the adhesions. He ordered a nasal/sinus CT scan & directed that I recheck with him immediately upon its completion (Exhibit:17).

[57]  On **April 6, 2016** I had a CT scan done of my sinus at Ft. Dix. The radiology report, written by Charles Muchnak MD clearly shows evidence of right Maxillary sinus pathology (Exhibit: 25).  This scan did not indicate obstruction, it clearly did reveal "Diffuse mucosal thickening right maxillary sinus," however.

29

[58]   On September 12, 2016, after waiting over 5 months for my post-CT scan recheck with Dr. Undavia, I submitted another complaint to defendant Wilk (Exhibit: 26).   I clearly voiced my concern that my serious medical needs weren't being addresses in a timely manner, and also about the numerous delays in treatment for non-medical reasons. Then I continued to wait, as defendants Sood, Turner-Foster, Haczynski, Wilk, Ortiz, Norwood, and Connors were clearly in no hurry to arrange for the second surgery.   Due to disorganization, laziness, cost-savings and retaliation, the recheck with Dr. Undavia did not occur until December 1, 2016 - 10 long months after my February 11, 2016 appointment.

[59]   On December 1, 2016 I was again examined by Dr. Undavia (Exhibit: 17). After reviewing the CT scan from April 6, 2016, and after examining my nasal cavity, Dr. Undavia and I discussed the option of pursuing a second sinus surgery.   We discussed the pros and cons of such a procedure. Concerns about additional scarring were discussed at length - we were both concerned that I had not been brought in to do the routine post-operative rechecks in 2014.   If there was a repeat of that failure, there would be even further scarring with a second surgery.   We also discussed the severity of my symptoms - the severe congestion, sinus pressure and pain, headaches, fatigue, inability to sleep well, prolonged & frequent nose bleeding, and the stress & anxiety.   These clinical symptoms had plagued me for 31 months at the time of this discussion.

It was during this appointment when Dr. Undavia recommended that I should have a second surgery, in order to alleviate my suffering. Upon hearing this recommendation, I began to realize that my condition was far more serious than I previously thought.

30

[60]  On March 9, 2017 I was taken to Princeton Eye & Ear for the pre-operative office call (Exhibit:17).  Unfortunately, for the 5th time in 7 visits, defendants Sood, Turner-Foster, Haczynski, Wilk, Ortiz, Norwood, and Connors did not schedule my appointment with my surgeon, Dr. Undavia, again interrupting a prescribed plan of treatment, clearly indifferent to my serious medical and surgical needs.

I was seen by Aleen Lee, MD, who advised that I needed to see Dr. Undavia for my pre-operative visit.

[61]  On April 27, 2017 I saw Dr. Undavia for my pre-operative exam (Exhibit:17).  Dr. Undavia scheduled me for a second sinus surgery. He prescribed Prednisone (an anti-inflammatory corticosteroid), and Keflex (an antibiotic).

[62]  On May 4, 2017 I was taken to Saint Francis Medical Center for my second sinus surgery (fourth major surgery overall). Dr. Undavia clearly states in his surgery report that I "Had endoscopic sinus surgery, septoplasty & inferior turbinate reduction with me a few years ago.  He was unable to follow up.  Postoperatively, he developed significant scar banding & recurrence of nasal polyps."  Dr. Undavia also informed me on February 11, 2016 in his Lawrenceville office that it's absolutely essential (for surgical procedures like the one I had on April 27, 2014) for the patient (me) to recheck with him early & often post-operatively, in order to avoid such scarring, and further pain and medical complications.

However, I was unable to follow up. Unfortunately, as I've shown here in my complaint - defendants Sood, Turner-Foster, Haczynski, Wilk,

31

Travers, Syjongtian, Tyas, Mello, Hoey, Hollingsworth, Ortiz, Norwood, and Connors intentionally failed (on no less than five occasions) to arrange for my follow up care with my operating surgeon, Dr. Undavia. These defendants were busy attempting damage control, which only delayed proper medical and surgical care further, for non-medical reasons.

Dr. Undavia also comments that I "Forgot to bring his [my] CT. Because of this, I felt it was difficult to perform the operation." Once again, the above named defendants intentionally failed to provide a specialist with necessary diagnostic test results. This resulted in my surgery being an, "Extremely difficult case." In fact, when I read Dr. Undavia's surgery report, I very much got the impression that, because he wasn't given my most recent CT at the time of surgery, Dr. Undavia contemplated cancelling/re-scheduling my surgery (Exhibit:27).

Intra-operatively, Dr. Undavia encountered extensive scar tissue formation. And this scarring was a direct result of the delay & denial of my treatments and medications. Defendants Sood, Turner-Foster, Wilk, Travers, Haczynski, Syjongtian, Tyas, Mello, Hoey, Hollingsworth, Ortiz, Norwood, and Connors intentionally delayed treatments which meet current and acceptable medical standards. And their delays were not justifed by any medical reasons, as I've clearly outlined in this complaint.

As my condition was clearly worsening rapidly in March 2104, and with the full knowledge that the Fort Dix Medical Service had no MD or PA available Friday March 21, 2014 after 3 PM, Saturday March 22,2014, Sunday March 23, 2014, and Monday March 24, 2014 until 6 AM, I was sent back to my cell by defendant Sood, still ill and in pain. I faced a period of 63 hours during which I could not receive medical care.

32

Moreover, when my condition became critical, at approximately 4 AM on Saturday March 22, 2014, defendant Jane/John Doe No. 2 refused to call an ambulance and deliberately ignored the BOP policy regarding Urgent Medical and Dental Care (Exhibit: 32) for After Hours Urgent Care. Instead of calling an ambulance at 4 AM, approximately 7 hours later, I was sent to the hospital ER by BOP van. This deliberate act, delayed my receiving critical IV treatments until arrival at the ER, at approximately Noon that afternoon - a delay of approximately $7\frac{1}{2}$ hours. These deliberate delays allowed the sepsis far too much time to ravage my lungs and body. Irreparable harm was done to my body as a result.

In the surgery report, which I received years later, Dr. Undavia also noted, "I was unable to see the opening of the maxillary sinus," and he went on to report, "The maxillary sinus antrum was then probed. There was no opening. A surgical opening using a ball tipped seeker probe was made. Then, thick purulent material was expressed from this area." And he notes that, "The ethmoid air cells had extensive scar tissue," (Exhibit: 27). These significant changes are proof that my complaints to the defendants, month after month for a period of 3 years, were genuine, and a serious medical need. Unfortunately, defendants Sood, Turner-Foster, Travers, Wilk, Haczynski, Syjongtian, Tyas, Mello, Hollingsworth, Ortiz, Norwood, Connors, and Hoey refused to perform their duties. The constant, intentional, treatment delays and denials of care, and plain incompetence, lead directly to me experiencing an enormous amount of pain and suffering, and caused permanent injuries and disabilities. The defendants were indifferent to whether I lived or died.

33

For 3 years, I lived with a pus-filled (infected) right maxillary sinus. In no way does this level of care meet any acceptable civilized standards of care. I remember saying to defendant Travers when he called me to medical to discuss my BP-9 complaint, "I may be an inmate, but I'm still a human being." Quite obviously, none of the defendants, or the BOP, was interested whether I lived or died.

[63] When I awoke in the recovery room on May 4, 2017 Dr. Undavia came in to speak with me. He informed me that the right maxillary sinus was completely obstructed, and that upon creating a surgical opening he found that the sinus was, "Filled with insupated pus." For me, that comment was a game-changer. At that moment, I was made aware of the existence of that injury. There had been no prior discussions with anybody (not Dr. Undavia, or any of the defendants) about the sinus being fully obstructed and pus-filled. And certainly, I could not know of this injury until after the surgery. Dr. Undavia did also mention that he encountered, "Extensive scar tissue." He stated with confidence that by opening the obstructed sinus and removing the pus, I would soon feel better. The scar tissue, he said, was a "Permanent change."

[64] On December 8, 2017 I finally received the thoracic surgery report from Saint Francis Medical Center. I had attempted previously (on numerous occasions since 2014) to obtain this report, but was not successful (Exhibit:6, 28). The Fort Dix Medical Service previously intentionally withheld this report from me.

34

I was shocked when I read Dr. Shariff's surgery report! Its contents were a game changer for me, since nobody ever informed me that my lungs were filled with multiple golf-ball sized abscesses (Exhibit:6 ).

For years, I thought that the chest pain, exercise intollerance, and light-headedness which I experienced were simply part of the post-thoracotomy recovery process. Afterall, it's a very serious, major, procedure. I had never experienced any major surgery before, and I was mislead by defendant Sood. I began to think that this was just part of a very slow healing process.

But, at the moment of reading the thoracic surgery report, I became aware of the existence of a far more serious injury - abscesses within the lung parynchyma! Defendant Sood had only mentioned to me that my pulmonary illness was the result of <u>pleural effusion</u>, which is entirely different than abscesses within the lung. Pleural effusion, once drained and properly treated, should have no/minimal lasting effects upon the patient. And clearly, I suffered from significant, lasting effects. The news that my lungs were filled with multiple, large, abscesses changed everything. It finally explained why my body had not recovered from the illness and from the surgery. It explained that my inability to exert myself without becoming alarmingly light-headed was due to destruction of normal lung parynchyma/alveolar tissue. This tissue was replaced by scar tissue, which is unable to participate in normal oxygen exchange. And I now realized that my light-headedness was not a result of the post-operative recovery process, but a very permanent change caused by massive lung tissue destruction & scarring.

35

[65]    On **May 30, 2018** I was notified through the inmate Tru-Links computer system that my **June 2018** recheck with Dr. Undavia was disapproved & would not be scheduled.  The notification stated:

> "The consultation request submitted by
> Sood, Ravi MD on 11/21/17 for
> Otolaryngology, ENT follow up was
> Disapproved on 5/30/18. Your Sinusitis
> has been addressed previously by the
> Ear Nose & Throat subspecialist.
> Consequently, this consult is not
> medically necessary at this time."

This recheck was already approved last Summer, after my **June 15, 2017** post-operative exam with Dr. Undavia (this was posted on the same Tru-Links, weeks after **June 15th**). At that time, Dr. Undavia documented abnormalities & symptoms of "Nasal obstruction & facial pressure," & he clearly recommended that I, "Follow up in 1 year" (Exhibit:17).  Dr. Undavia has <u>not</u> "Resolved" the Chronic Sinusitis in his medical record – it's still an <u>active medical problem</u> which needs his expert medical attention (Exhibit:17).

The May 30, 2018 decision by defendants Sood, Haczynski, Wilk, Turner-Foster, Ortiz, Norwood, and Connors to cancel an already approved recheck appointment just days after I notified the BOP that I filed a lawsuit in Camden District Court (I mailed the BOP Office of Internal Affairs a letter on May 16, 2018), is clearly intentional retaliation against me for exercising my Constitutional Rights. And clearly this action resulted in additional treatment delays/refusals for non-medical reasons.  In this respect, the defendants have claimed that I, "Had a post-surgical follow-up on June 15, 2017, at which time it was noted his condition had resolved," (Exhibit:29).

[66]  On August 11, 2018 I notified New Jersey Senator Cory A. Booker of my plight.  On September 4, 2018, defendant Ortiz responded to Senator Booker's contact with the BOP, saying that "It was noted his [Alexis's] condition had resolved," (Exhibit: 29). And on October 24, 2018, defendant Ortiz again responded to Senator Booker, saying "The ENT's impression was that his problem was resolved and no further inter- vention [is/was] required," (Exhibit:29).

When one examines Dr. Undavia's medical record from that June 15, 2017 post-operative recheck (Exhibit: 17), it is quite clear that defen- dant Ortiz intentionally <u>lied</u> to Senator Booker!  Dr. Undavia's notes clearly state:

A) "Follow up in 1 year."

B) "Deviated nasal septum." (a minor problem)

     – "Plan: Resolved"

C) "Sinusitis, chronic."

     – Followed by a detailed plan/treatment, with absolutely

       no comment that this (my major problem) is resolved.

D) "Synechia of nasal cavity." (a minor problem)

     – "Plan: Resolved"

As one can easily see, the sinusitis has <u>not</u> been resolved. And once again a cover-up and a delay, which were clearly motivated by non- medical factors and was obviously very deliberate, has interrupted a prescribed plan of treatment, failing to treat my serious medical needs.

[67]  On July 23, 2018 I wrote directly to the BOP Director, Hugh Hurwitz (Exhibit:30.).  This letter was sent to him so that he would understand my situation, and so that he would have the opportunity to

37

ensure that I would not loose the continuity of care with my surgeon, after the defendants intentional decision to ignore my need for continued medical care.

[68]    On July 27, 2018 I finally received all of my medical records from Princeton Eye and Ear.  This was after multiple requests over a period of approximately 3 years, and only with the help of the New Jersey Board of Medical Examiners (Exhibit:28).

[69]    I have experienced an enormous amount of pain and suffering, & I continue to experience pain and suffering from serious, permanent, injuries caused because of the terrible deliberate indifference, and the actions and inactions of defendants Sood, Turner-Foster, Haczynski, Travers, Wilk, Syjongtian, Tyas, Mello, Hoey, Hollingsworth, Ortiz, Norwood, Connors, Jane/John Doe No.1, Jane/John Doe No.2, and Hurwitz. These defendants made intentional decisions about the conditions of my confinement/medical care, the conditions put me at substantial risk of serious harm and physically injured me, and these defendants didn't take available measures to abate the harm.  By not taking medical measures, and delaying them, and retaliating against me, these defendants caused my serious, permanent, injuries.

[70]    On November 30, 2018 I was removed from my 2-man preferred housing into a 12-man cell.  As I left BOP Counselor Bautiste's office he stated that the move was because of my lawsuits.  This action is clear retaliation against me because of my pursuing my legal rights through the Court.

[71]     On Thursday May 2, 2019 I was taken to see Dr. Undavia at Princeton Eye & Ear.   This recheck appointment was 11 months over-due because of the continual interruptions of the prescribed plans of treatment by the BOP & Fort Dix staff. Dr. Undavia ordered a different nasal spray, and placed me on Prednisolone (for 6 days, to control the inflammation).  The Prednisolone instantly help relieve the pressure & burning sensation, so that I was more comfortable.

Dr. Undavia did have a discussion with me about my having a third surgery, in order to remove additional scar tissue.  Unfortunately, he felt as though this procedure would have to be performed by a Nevada ENT, since I would soon be home/in halfway house.  He would not be able to perform the procedure because of the 11 month delay in my recheck appointment (originally scheduled for June of 2018).

The new nasal spray medication (Azelastine)  was deliberately withheld from me by the defendants/BOP. They denied me this necessary medication on at least 4 occasions, once again interrupting a pre-scribed plan of treatment, leaving me un-treated and in pain for non-medical reasons. A full eighty days after Dr. Undavia prescribed my medication, on July 21, 2019, I was finally issued the medication, but with zero refills, (Exhibit:33).

[72]   Medical ethics, good business practices, and legislation dictate that, when a patient requests a copy of their medical records, it should be provided within a certain, reasonable, time-frame.  For quite some time, I didn't understand why my requests for copies of my medical records (sent to Saint Francis Medical Center and Princeton Eye and Ear) went unanswered.  Until now...

On July 12, 2019, a phone call was placed to the Medical Records Department at Princeton Eye and Ear.  A medical records technician named Lisa stated that their records did <u>not</u> show any request submitted by Vincent Alexis for copies of his medical record(s) during 2019.

This is alarming because I have mailed written requests to Princeton Eye and Ear for a copy of my medical record from the May 2, 2019 exam with Dr. Undavia, on four different occasions:

1) My first request was written and placed in the 5803 Unit mailbox on the evening of May 2, 2019 exam.  I was unable to copy this letter.

2) My second request was written and placed in the 5803 Unit mailbox on the evening of May 20, 2019 (Exhibit: 31).

3) My third request was written & placed in the 5803 Unit mailbox on the evening of June 20, 2019 (Exhibit: 31).

4) My fourth request was written & placed in the 5803 Unit mailbox on the evening of July 5th, 2019 (Exhibit: 31).

It seems that not one of my mailings sent from Fort Dix prison reached its destination.

That July 12, 2019 phone call exposed the BOP's deceitful actions. It seems as though my requests for medical records, sent through the Fort Dix inmate mail system, were methodically and deliberately intercepted by Fort Dix staff, one or more of the defendants &/or the BOP.

This foolish, and illegal, practice would most certainly explain why I had such incredible difficulties in obtaining medical records from Saint Francis Medical Center and from Princeton Eye and Ear.  And this deception made it impossible for me to be educated enough that I could make timely, accurate, decisions about my options - particularly my legal options, as I filed two actions in this Honorable Court.

I am most confident that ample evidence of this deception and corruption will surface through the Discovery process, and through interviews of Princeton Eye and Ear medical records department staff, and management.

## V. LEGAL CLAIMS

[73]   Constitutional Violations

Violations of the Eighth Amendment's proscription against cruel and unusual punishment constitute a cause of action under Bivens v. Six Unknown Fed. Narcotics Agents, 403 U.S. 388 (1971).  In Estelle v. Gamble, the Supreme Court held that deliberate indifference to a prisoner's serious medical needs constituted cruel and unusual punishment and gave rise to a civil rights cause of action, regardless of whether the indifference was manifested by prison doctors or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with treatment once prescribed, 50 L.Ed 2d 251 (1976).  See also Ziglar v. Abbasi, 198 L.Ed 2d 290 (2017).

41

To state a claim for deliberate indifference, a prisoner must make (1) a subjective showing that the defendants were deliberately indifferent to his or her medical needs, and (2) an objective showing that those needs were serious. Brathwaite v. Warden Phelps, 734 Fed. Appx. 114 (3rd Cir.2018).

As for the Fifth Amendment violations, "prisoners enjoy the protection of due process." Hudson v. Palmer, 82 L Ed 2d 393 (1994). Acts of retaliation, intimidation, various forms of cover-ups, fabrications, false statements, obstructionism and similar malicious acts by the prison officials alleged herein, all calculated to prevent plaintiff from pursuing his legitimate medical, personal injury and other grievances, are clear violations of the Fifth Amendment's Due Process Clause and legitimate cause of action under Bivens, particularly when directly affecting prisoner's ability to file or prosecute his Bivens claim. Also, "in the prison environment, a specific incident might be symptomatic rather than aberrational." Porter v. Nussle, 152 L Ed 2d 12 (2002).

[74]   Serious Medical Need - Objective Factors (For All Claims)

A serious medical need is one that has been diagnosed by a physician as mandating treatment, or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention. Gutierrez v. Peters, 111 F.3d 1364 (7th Cir.1997).

In certain cases there is not even need for expert testimony. "Expert testimony is not required to demonstrate serious medical needs where the prisoner can show that his medical need is one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a

42

doctor's attention."   Brathwaite v. Warden Phelps, 734 Fed. Appx. 114 (3d Cir.2018).

Just "the (mere) threat of tangible residual injury can establish deliberate indifference to a prisoner's medical needs." Spruill v. Gillis, 372 F.3d 218 (3d Cir.2004), comment added.

Unfortunately, in this matter, the issue is more than just a "threat" and particularly more than just a mere threat of a tangible injury.  The injury suffered by the plaintiff, due to the defendant's refusal to provide medical care, and other constitutional violations listed below, is very serious and permanent.  As for a need to be diagnosed by a physician, as detailed in the factual statement above, the plaintiff went through no less than four major surgical procedures, blood transfusions, 45 days of hospitalization, and had numerous treatment plans mandated by the hospital physician(s), the operating ENT surgeon, and other specialist physicians, (see Factual Statement & Exhibits).

[75]   Claim One - Complete Denial of Medical Care (Subjective Factors)

As the Sixth Circuit has just recently stated, "a prison official who has been alerted to a prisoner's serious medical needs is under an obligation to offer medical care to such a prisoner." Richmond v.Huq, 885 F.3d 928 (6th Cir.2018).  This is due to the fact the "the Eighth Amendment prohibits the imposition of unnecessary and wanton infliction of pain contrary to contemporary standards of decency." Rouse v. Plaintier, 182 F.3d 192 (3d Cir.1999).

In addition to the existence of an objective factor, e.g., a serious medical need, the plaintiff must establish that "prison officials ignored that evidence....." Folk v. Prime Care Medical, 741 Fed. Appx. 47 (3d Cir. 2018), or "some evidence that defendant knew or was aware of the risk

43

to the plaintiff." Natale v. Camden County Correctional Facility, 318 F.3d 575 (3d Cir.2003).  Our Circuit has found the prison officials to be deliberately indifferent where "the prison official (1) knows of a prisoner's need for medical treatment but intentionally refuses to provide it.." Miller v. Steele-Smith, 713 Fed. Appx. 74 (3d Cir.2017).

Defendant Sood - As shown in the Factual Statement, defendant Sood denied medical care on many occasions.  He repeatedly denied treatment for my very serious medical condition before and after my hospitalization and he denied treatment (on at least two occasions) for my chronic Lyme Disease recurrance.  Defendant Sood repeatedly, deliberately, chose to deny medical treatment, despite having the knowledge of my very serious medical and surgical needs;

Defendant Syjongtian - As shown in the Factual Statement, defendant Syjongtian denied medical care for my very serious medical condition on December 4, 2014.  He deliberately chose to deny treatment, despite having the knowledge of my very serious medical needs;

Defendant Tyas - As shown in the Factual Statement, defendant Tyas intentionally denied treatment for my serious medical needs on September 11, 2014.  She deliberately chose to deny medical treatment, despite having the knowledge of my very serious medical needs;

Defendant Jane/John Doe No. 1, Health Care Professional - As shown in the Factual Statement, this defendant denied medical care on Wednesday March 19, 2014.  She/he deliberately chose to deny medical treatment, despite having the knowledge of my serious medical needs;

44

Defendant Jane/John Doe No. 2, Operations Lieutenant - As shown in the Factual Statement, this Lieutenant denied medical care at approximately 4 AM on Saturday March 22, 2014. She/he deliberately elected to ignore BOP Policy on After Hours Urgent Care (Exhibit:32), intentionally not calling the PA/MD on duty (on call), and then made the deliberate, egregious, decision to not call an ambulance. She/he made these deliberate, conscious, decisions with the knowledge that I was very ill and that I was bleeding from a horribly disfigured and swollen face;

Defendant Travers - As shown in the Factual Statement, defendant Travers denied my BP-8 complaint, denying medical treatment despite having the knowledge of my serious medical needs (which was clearly detailed to him in my complaint);

Defendant Wilk - As shown in the Factual Statement, defendant Wilk deliberately ignored my many complaints and refused to arrange for proper medical and surgical care with my ENT Specialist/Surgeon (Dr. Samir Undavia). He engaged in a pattern of treatment refusals and delays, despite having the knowledge of my very serious medical and surgical needs;

Defendant Haczynski - As shown in the Factual Statement, in his role as Head Health Service Administrator, defendant Haczynski deliberately refused to arrange for proper medical and surgical care with my ENT Specialist/Surgeon (Dr. Samir Undavia). He engaged in a pattern of treatment refusals and delays, despite having the knowledge of my very serious medical and surgical needs;

45

<u>Defendant Hollingsworth</u> - As shown in the Factual Statement, defendant Hollingsworth denied my BP-9 complaint, denying medical treatment despite having the knowledge of my serious medical needs (which was clearly detailed to him in my complaint);

<u>Defendant Norwood</u> - As shown in the Factual Statement, defendant Norwood denied my BP-10 complaint, denying medical treatment despite having the knowledge of my serious medical needs (which was clearly detailed to him in my complaint);

<u>Defendant Connors</u> - As shown in the Factual Statement, defendant Connors denied my BP-11 complaint, denying medical treatment despite having the knowledge of my serious medical needs (which was clearly detailed to him in my complaint);

<u>Defendant Ortiz</u> - As shown in the Factual Statement, defendant Ortiz deliberately denied medical treatment and then attempted to cover up his action by intentionally lying to New Jersey Senator Cory A. Booker about the status of my illness and medical care (particularly in regards to my follow up care with my ENT Surgeon). Defendant Ortiz was clearly well aware of my serious medical and surgical needs (see Exhibit:29), but he chose to deliberately deny medical treatment and then lie to Senator Booker and leave me untreated and in pain.

46

[76]   Claim Two - Delay in the Provision of Medical Services for Various Non-Medical Reasons

"Delay in access to medical attention can violate U.S. Constitutional Amendment VIII when it is tantamount to unnecessary and wanton infliction of pain... Where the delay results in an inmate's suffering a life-long handicap or permanent loss, the medical need is considered serious." Hill v. Dekalb, 40 F.3d 1176 (11th Cir.1994), see also Estien v. Showalter, 723 Fed. Appx. 93 (3d Cir.2018).

"To wait until an inmate with a DOCUMENTED history of....illness has an ... episode so severe that it requires inpatient treatment before providing her with any ... medications will inevitably result in unnecessary suffering by the inmate.  This is the very type of suffering the Eighth Amendment aims to prevent." Richmond v. Huq, 885 F.3d 928 (6th Cir.2018), emphasis added.  Treatment delays (for non-medical reasons) are Eighth Amendment violations, "not because cavities are always painful or otherwise dangerous, but because a cavity that is not treated will probably become so." Brock v. Wright, 315 F.3d 158 (2d Cir.2003).

Defendant Jane/John Doe No. 2 (Operations Lieutenant)-- As shown in the Factual Statement, the Operations Lieutenant deliberately ignored BOP Policy for After-Hours Urgent Care (Exhibit:32).  He/she deliberately elected to not call the PA/MD on duty (on call) on March 22, 2014, he/she also deliberately chose to not call an ambulance, and he/she made these intentional decisions with the knowledge that I was very ill, and that I was bleeding from a horribly disfigured and swollen face;

47

Defendant Syjongtian - As shown in the Factual Statement, defendant Syjongtian refused to treat my serious medical condition on December 4, 2014, telling me "I only have 18 months left. I don't care," as he instructed me to return to my cell (without treatment). He deliberately chose to deny treatment, despite having the knowledge of my serious medical needs;

Defendant Sood - As shown in the Factual Statement, defendant Sood deliberately refused to treat my serious medical condition on Friday March 21, 2014. Despite my clearly worsening condition and horrifying facial disfigurement, he instructed me to try YOGA and then directed me to return to my cell (without treatment). He deliberately chose to deny treatment despite having the knowledge of my very serious medical needs;

Defendant Turner-Foster - As shown in the Factual Statement, defendant Turner-Foster, in her role as Fort Dix Medical Services Clinical Director, ignored the treatment denials of her subordinates and she ignored their refusal to follow BOP Policy and Procedure, despite having the knowledge of my very serious medical and surgical needs;

Defendant Wilk - As shown in the Factual Statement, defendant Wilk deliberately refused to arrange for proper medical and surgical care with my ENT Specialist/Surgeon (Dr. Samir Undavia). He engaged in a pattern of treatment refusals and delays, despite having the knowledge of my very serious medical and surgical needs;

Defendant Haczynski - As shown in the Factual Statement, in his role as Head Health Service Administrator, defendant Haczynski deliberately refused to arrange for proper medical and surgical care with my ENT Specialist/Surgeon (Dr. Samir Undavia). He engaged in a pattern of treatment refusals and delays, despite having the knowledge of my very serious medical and surgical needs.

48

[77]  Claim Three – Intentional Infliction of Wanton, Completely Unnecessary, Inhumane Physical Pain, Mental Pain and Suffering and Extrajudicial Punishment Resulting in Permanent Injuries and Disabilities

"Indifference may be shown by the way in which prison physicians provide medical care." Jett v. Penner, 439 F.3d 1091 (9th Cir.2006). Our Circuit Court of Appeals "believes the custodial setting ... presents a situation where forethought about a resident's welfare is not only feasible but obligatory." A.M. v. Luzerne County, 372 F.3d 572 (3d Cir. 2004).

Moreover, while a plenty of intentional acts were alleged in this complaint (all of which easily provable to the jury), "an express intent to inflict unnecessary pain is not required. Rather, obduracy and wantonness are required to make a showing of deliberate indifference." Richmond v. Huq, 885, F.3d 928 (6th Cir.2018).

Defendant Jane/John Doe No. 2, Operations Lieutenant – As shown in the Factual Statement, this lieutenant intentionally denied medical care at approximately 4 AM on Saturday March 22, 2014. She/he elected to ignore BOP Policy on After Hours Urgent Care (Exhibit:32), intentionally not calling the PA/MD on duty (on call) and then made the deliberate, egregious, decision to not call an ambulance. She/he made these deliberate, conscious, decisions with the knowledge that I was very ill and that I was bleeding from a horribly disfigured and swollen face. This egregious behavior directly resulted in my experiencing an enormous amount of pain and suffering;

Defendant Wilk - As shown in the Factual Statement, defendant Wilk deliberately ignored my many complaints and repeatedly refused to arrange for proper medical and surgical care with my ENT Specialist/ Surgeon (Dr. Samir Undavia).  He engaged in a pattern of treatment refusals and delays, despite having the knowledge of my very serious medical and surgical needs.  This egregious behavior directly resulted in my experiencing an enormous amount of pain and suffering;

Defendant Haczynski - As shown in the Factual Statement, in his role as Head Health Service Administrator, defendant Haczynski repeatedly refused to arrange for proper medical and surgical care with my ENT Specialist/Surgeon (Dr. Samir Undavia).  He engaged in a calculated, behind-the-scene, pattern of treatment refusals and delays, despite having the knowledge of my very serious medical and surgical needs.  This egregious behavior directly resulted in my experiencing an enormous amount of pain and suffering;

Defendant Syjongtian - As shown in the Factual Statement, defendant Syjongtian refused to treat my serious medical condition on December 4, 2014, telling me "I only have 18 months left.  I don't care," as he instructed me to return to my cell, without treatment.  He deliberately chose to deny treatment, despite having the knowledge of my serious medical needs.  His egregious behavior directly resulted in my experiencing an enormous amount of pain and suffering;

Defendant Sood - As shown in the Factual Statement, defendant Sood repeatedly, deliberately, refused to treat my very serious medical and surgical condition.  He engaged in a pattern of intentional denial of

50

medications and appropriate diagnostics, as well as doctoring of my medical record (removing entirely the diagnosis of chronic Lyme Disease from my Axis III Assessment in order to cover-up his refusal to properly treat my recurrance). And he did so despite having the knowledge of my very serious medical and surgical needs.  His egregious behavior directly resulted in my experiencing an enormous amount of pain and suffering;

Defendant Ortiz - As shown in the Factual Statement, defandant Ortiz deliberately denied medical and surgical treatment and then attempted to cover up his actions (and those of his staff) by intentionally lying to New Jersey Senator Cory A. Booker about the status of my illness and medical care (particularly in regards to my follow up care with my ENT surgeon).  Defendant Ortiz was clearly well aware of my serious medical and surgical needs (see Exhibit:29), but he chose to engage in a calculated pattern of deception and deliberately denied medical and surgical treatments.  This egregious behavior directly resulted in my experiencing an enormous amount of pain and suffering.

51

[78]   Claim Four - Systemic Failure to Provide Adequate, Civilized, Medical Care

The Eighth Amendment requires that jails provide their inmates with adequate medical care. Miller v. Steele-Smith, 713 Fed. Appx. 74 (3d Cir.2017).  Even if some "nominal treatment" exists, "nevertheless, treatment may be constitutionally IMPERMISSIBLE when it is so woefully inadequate as to amount to no treatment at all." Richmond v. Huq, 885 F.3d 928 (6th Cir.2018).  Namely, deliberate indifference may also be "shown by the way in which prison physicians provide medical care." Jett v. Penner, 439 F.3d 1091 (9th Cir.2006). "The Eighth Amendment forbids not only deprivations of medical care that produce physical torture and lingering death, but also less serious denials which cause or PERPETUATE pain." Brock v. Wright, 315 F.3d 158 (2nd Cir.2003).

Like any other federal prison medical services, Fort Dix Medical Service has at its disposal enormous (federal) budgetary resources. Not only that Congress established no budgetary limit for the purposes of medical help and treatment of federal inmates, Congress appropriated massive financial resources for the care and subsistence of federal inmates.  Defendants cannot claim poverty, lack of resources or budgetary constraints for their deliberate and malevolent acts of refusal or delays in care or a systemic failure to provide adequate care.

Defendant Sood - As shown in the Factual Statement, defendant Sood repeatedly, deliberately, refused to treat my very serious medical and surgical conditions.  He engaged in a pattern of intentional denial of medications and appropriate diagnostics, as well as doctoring of my medical records (removing entirely the diagnosis of chronic Lyme Disease

from my Axis III Assessment in order to cover up his refusals to properly treat my recurrance). And he did so despite having the knowledge of my very serious medical and surgical needs. His egregious behavior was fully supported &/or covered up by his superiors and fellow defendants, in a calculated, systemic, pattern of treatment denials which directly resulted in my experiencing an enormous amount of pain and suffering;

Defendant Turner-Foster - As shown in the Factual Statement, defendant Turner-Foster, in her role as Fort Dix Medical Services Clinical Director, ignored the treatment denials of her subordinates and she ignored their refusal to follow BOP Policy and Procedure, despite having the knowledge of my very serious medical and surgical needs. Her egregious behavior was fully supported &/or covered up by her superiors and fellow defendants, in a calculated, systemic, pattern of treatment denials which directly resulted in my experiencing an enormous amount of pain and suffering;

Defendant Syjongtian - As shown in the Factual Statement, defendant Syjongtian deliberately refused to treat my very serious medical and surgical condition. And he did so despite having the knowledge of my very serious medical and surgical needs. His egregious behavior was fully supported &/or covered up by his superiors and fellow defendants, in a calculated, systemic, pattern of treatment denials which directly resulted in my experiencing an enormous amount of pain and suffering;

Defendant Tyas - As shown in the Factual Statement, defendant Tyas deliberately refused to treat my very serious medical and surgical condition. And she did so despite having the knowledge of my very serious

53

medical and surgical needs.  Her egregious behavior was fully supported &/or covered up by her superiors and fellow defendants, in a calculated, systemic, pattern of treatment denials which directly resulted in my experiencing an enormous amount of pain and suffering;

Defendant Travers - As shown in the Factual Statement, defendant Travers deliberately refused to arrange treatment for my very serious medical and surgical condition.  And he did so despite having the know-ledge of my very serious medical and surgical needs.  His egregious behavior was fully supported &/or covered up by his superiors and fellow defendants, in a calculated, systemic, pattern of treatment denials which directly resulted in my experiencing an enormous amount of pain and suffering;

Defendant Wilk - As shown in the Factual Statement, defendant Wilk repeatedly, deliberately, refused to arrange treatment for my very serious medical and surgical conditions.  And he did so despite having the knowledge of my very serious medical and surgical needs.  His egregious behavior was fully supported &/or covered up by his superiors and fellow defendants, in a calculated, systemic, pattern of treatment denials which directly resulted in my experiencing an enormous amount of pain and suffering;

Defendant Haczynski - As shown in the Factual Statement, in his role as Head Health Service Administrator, defendant Haczynski repeatedly, deliberately, refused to arrange treatment for my very serious medical and surgical conditions.  And he did so despite having the knowledge of my very serious medical and surgical needs.  His egregious, behind-the-scene, behavior was fully supported &/or covered up by his superiors and fellow defendants, in a calculated, systemic, pattern of treatment denials which directly resulted in my experiencing an enormous amount of pain and suffering;

54

<u>Defendant Hollingsworth</u> - As shown in the Factual Statement, defendant Hollingsworth denied my BP-9 complaint, ignoring the treatment denials of his staff, as well as their refusal to follow BOP Policy and Procedure, despite having the knowledge of my very serious medical and surgical needs.  His egregious behavior was fully supported &/or covered up by his superiors and fellow defendants, in a calculated, systemic, pattern of treatment denials which directly resulted in my experiencing an enormous amount of pain and suffering;

<u>Defendant Ortiz</u> - As shown in the Factual Statement, defendant Ortiz deliberately denied medical and surgical treatment and then attempted to cover up his actions (and those of his staff) by intentionally lying to New Jersey Senator Cory A. Booker about the status of my illness and medical care (particularly in regards to my follow up care with my ENT surgeon).  Defendant Ortiz was clearly well aware of my serious medical and surgical needs (see Exhibit:29), but he chose to engage in a calculated pattern of deception and deliberately denied medical and surgical treatment, leaving me untreated and in pain.  His egregious behavior was fully supported &/or covered up by his superiors and fellow defendants, in a calculated, systemic, pattern of treatment denials which directly resulted in my experiencing an enormous amount of pain and suffering;

<u>Defendant Norwood</u> - As shown in the Factual Statement, defendant Norwood denied my BP-10 complaint, denying medical treatment despite having the knowledge of my serious medical needs (which was clearly detailed to him in my complaint).  In his role as Northeast Regional Director, he intentionally ignored the treatment denials of his subordinates and he ignored their refusal to follow BOP Policy and

55

Procedure.  His egregious behavior was fully supported &/or covered up by his superiors and fellow defendants, in a calculated, systemic, pattern of treatment denials which directly resulted in my experiencing an enormous amount of pain and suffering;

Defendant Connors - As shown in the Factual Statement, defendant Connors denied my BP-11 complaint, denying medical treatment despite having the knowledge of my serious medical needs (which was clearly detailed to him in my complaint).  In his role as BOP Central Office National Appeals Administrator, he intentionally ignored the treatment denials of his subordinates and he ignored their refusal to follow BOP Policy and Procedure.  His egregious behavior was fully supported &/or covered up by his superiors and fellow defendants, in a calculated, systemic, pattern of treatment denials which directly resulted in my experiencing an enormous amount of pain and suffering;

Defendant Hurwitz - As shown in the Factual Statement, defendant Hurwitz was made aware of my serious medical and surgical needs (see Exhibit:30).  In his role as Director of the Federal Bureau of Prisons, he intentionally ignored the treatment denials of his subordinates and he ignored their refusal to follow BOP Policy and Procedure.  His egregious behavior was fully supported &/or covered up by his colleagues and fellow defendants, in a calculated, systemic, pattern of treatment denials which directly resulted in my experiencing an enormous amount of pain and suffering.

56

[79]   Claim Five - Denial of Any Medications

"The surgery (plaintiff) received would not have been necessary, had defendants protected and cared for (plaintiff) as their affirmative duties impose." Hunter v. Chigozie, 2019 U.S. Dist. LEXIS 21330 (D.NJ., 2019).   In addition, "prison officials may not ignore medical conditions that are very likely to cause serious illness and needless suffering in the future even if the prisoner has NO serious current symptoms." Smith v. Carpenter, 316 F.3d 178 (2d Cir.2003), emphasis added.

Unfortunatley, the plaintiff in this action had very obvious "current symptoms" (e.g. facial disfigurement, chest pain, collapsed lungs, frank pus and blood from the right nostril, and many others noted above) and still on numerous occasions received no care and no medications.

Defendant Jane/John Doe No. 2, Operations Lieutenant - As shown in the Factual Statement, this lieutenant deliberately elected to not follow BOP Policy on After Hours Urgent Care.  She/he did not call the on-call PA/MD when I was critically ill on the morning of March 22, 2014, and she/he did not call an ambulance (which of course is equipped with a paramedic, as well as essential medications and treatment options, such as IV catheters, fluids, IV antibiotics, IV corticosteroids/anti-inflammatories, IV analgesics, etc.).  These egregious, deliberate, decisions denied medical treatment and medications, which were critically necessary at that moment;

Defendant Syjongtian - As shown in the Factual Statement, defendant Syjongtian intentionally refused to treat my serious medical condition on December 4, 2014, telling me "I only have 18 months left, I don't care"

as he instructed me to return to my cell, without treatment.  He deliberately chose to deny treatment and medications, despite having the knowledge of my serious medical needs;

Defendant Tyas - As shown in the Factual Statement, defendant Tyas intentionally refused to treat my serious medical condition on September 11, 2014.  She sent me back to my cell, untreated, and instructed me to purchase medications at the commissary which were not sold there. She deliberately chose to deny treatment and medications, despite having the knowledge of my serious medical needs;

Defendant Sood - As shown in the Factual Statement, defendant Sood deliberately refused to treat my very serious medical and surgical condition(s) on numerous occasions.  He refused to issue medications for my very serious sinus infection over and over, despite the obvious fact that there was pus and fresh blood draining from my right mostril.  He refused to issue prescribed medications:

- Ferrous gluconate (Iron) on May 6, 2014.

- Sennosidas-docusate sodium on May 6, 2014.

- Ciprofloxacin on August 21, 2015.

- Flonase nasal spray on/about December 17, 2018.

- Azelastine nasal spray on May 2, 2019.

Defendant Sood also refused on at least three occasions, to treat my Lyme Disease recurrance with antibiotics.  Defendant Sood engaged in a pattern of intentional denial of medications, despite having the knowledge of my very serious medical and surgical needs.  And his egregious behavior repeatedly left me without treatment and in pain;

58

Defendant Travers - As shown in the Factual Statement, defendant Travers denied my BP-8 complaint, denying medical treatment despite having the knowledge of my serious medical needs (which was clearly detailed to him in my complaint and in person);

Defendant Wilk - As shown in the Factual Statement, defendant Wilk deliberately ignored my many complaints and refused to arrange for proper medical and surgical care with my ENT Specialist/Surgeon (Dr. Samir Undavia).  He engaged in a pattern of treatment refusals, medication refusals, and delays of treatment, despite having the knowledge of my very serious medical and surgical needs (which was clearly detailed to him in my complaints and in person);

Defendant Haczynski - As shown in the Factual Statement, in his role as Head Health Service Administrator, defendant Haczynski deliberately, repeatedly, refused to arrange for proper medical and surgical care with my ENT Specialist/Surgeon (Dr. Samir Undavia).  He engaged in a behind-the-scene pattern of treatment refusals, medication refusals, and treatment delays, despite having the knowledge of my very serious medical and surgical needs (which was clearly detailed to him in my complaints).

59

[80] Claim Six - Intentional Interference with a Prescribed Plan of Treatment and Medical Schedule

"Failure by a jail medical staff to adhere to a prescribed course of treatment may satisfy the subjective component of an Eighth Amendment violation." Richmond v. Huq, 885 F.3d 928 (6th Cir.2018). "Further, (just) NEGLECTING a prisoner's medical need and interrupting a prescribed plan of treatment can constitute a constitutional violation." Id. at 930. emphasis added. Moreover, in Pierce v. Superintendent, our Circuit has clearly stated the "preventing a prisoner from receiving needed or recommended treatment" rises to a violation of the Eighth Amendment, 520 Fed. Appx. 64 (3d Cir.2013).

Defendant Hoey - As shown in the Factual Statement, defendant Hoey deliberately interfered with a prescribed plan of treatment when, on June 3, 2015, he intentionally ignored my clearly voiced complaint that my necessary recheck exams with my ENT surgeon were not being scheduled properly;

Defendant Wilk - As shown in the Factual Statement, defendant Wilk deliberately ignored my many complaints and refused to arrange for proper medical and surgical care with my ENT Specialist/Surgeon. He engaged in a pattern of intentional interference with prescribed plans of treatment, despite having the knowledge of my very serious medical and surgical needs (which were clearly detailed to him in writing and in person). His egregious behavior repeatedly left me without treatment and in pain;

Defendant Haczynski - As shown in the Factual Statement, defendant Haczynski, in his role as Head Health Service Administrator, deliberately ignored my many complaints and refused to arrange for proper medical and surgical care with my ENT Specialist/Surgeon.  He engaged in a behind-the-scene pattern of intentional interference with prescribed plans of treatment, despite having the knowledge of my very serious medical and surgical needs.  His egregious behavior repeatedly left me without treatment and in pain;

Defendant Sood - As shown in the Factual Statement, defendant Sood repeatedly, deliberately, interfered with prescribed plans of treatment by refusing to issue necessary prescribed medications:

  - Ferrous gluconate (Iron) on May 6, 2014.

  - Sennosidas-docusate sodium on May 6, 2014.

  - Ciprofloxacin on August 21, 2015.

  - Flonase nasal spray on/about December 17, 2018.

  - Azelastine nasal spray on May 2, 2019.

Defendant Sood engaged in a pattern of intentional interference with prescribed plans of treatment, despite having the knowledge of my very serious medical and surgical needs.  And his egregious behavior re-peatedly left me without treatment and in pain;

Defendant Turner-Foster - As shown in the Factual Statement, defendant Turner-Foster, in her role as Fort Dix Medical Services Clinical Director, interfered with prescribed plans of treatment by intentionally ignoring the many treatment denials of her subordinates, as well as their refusals to follow BOP Policy and Procedure.  Her conscious, deliberate, decisions left me without treatment and in pain;

61

Defendant Norwood - As shown in the Factual Statement, defendant Norwood denied my BP-10 complaint, denying medical treatment and interfering with the prescribed plan of treatment for ENT follow up care. He made this conscious, deliberate, decision to interfere with the prescribed plan of treatment, despite having the knowledge of my serious medical and surgical needs (which was clearly detailed to him in my complaint);

Defendant Connors - As shown in the Factual Statement, defendant Connors denied my BP-11 complaint, denying medical treatment and interfering with the prescribed plan of treatment for ENT follow up care. He made this conscious, deliberate, decision to interfere with the prescribed plan of treatment, despite having the knowledge of my serious medical and surgical needs (which was clearly detailed to him in my complaint);

Defendant Ortiz - As shown in the Factual Statement, defendant Ortiz deliberately interfered with prescribed plans of treatment for ENT follow up care by intentionally ignoring the actions and omissions of his staff. He then attempted to cover up his (and his staff's) actions by intentionally lying to New Jersey Senator Cory A. Booker about the status of my illness and medical care (particularly in regards to my follow up care with my ENT surgeon);

Defendant Hurwitz - As shown in the Factual Statement, defendant Hurwitz was made aware of my serious medical and surgical needs (see Exhibit:30). Nevertheless, he interfered with the ENT's prescribed plans of treatment by deliberately ignoring my complaint and by deliberately ignoring his staff's egregious and continual interruptions of prescribed plans of treatment. Defendant Hurwitz's deliberate actions denied medical care and surgical treatment, leaving me untreated and in pain.

[81]   Claim Seven - Retaliation, Cover-Up, Procedural and Substantive Due Process Violations

"Analysis of substantive due process claims requires full consideration of all the circumstances of a given case." A.M. v. Luzerne County, 372 F.3d 572 (3d Cir.2004).  To establish due process claim, a prisoner is required to show that (1) the state (e.g. prison), through the duration and conditions of his confinement, imposed atypical and significant hardship on him giving rise to a protected liberty interest, and (2) the state (e.g. prison administration) deprived him of the process he was due to protect that interest.  Brathwaite v. Warden Phelps, 734 Fed. Appx. 114 (3d Cir.2018).

Defendants can also "be held liable for violating (plaintiff's) due process rights if they "misled or coerced the intervening decision-maker such that the decision maker's conduct was tainted." Bermudez v. City of New York, 790 F.3d 368 (2d Cir.2015), quoting Wray v. City of New York, 490 F.3d 189 (2d Cir.2007).

If nothing else, it is the Warden's September 4, 2018 letter, and his October 24, 2018 follow up letter, replying to U.S. Senator Cory A. Booker's query into my medical care at Fort Dix that proves an outrageous and extensive cover-up, concealment of records and the plaintiff's procedural and substantive due process rights violations. Warden Ortiz claims that during the plaintiff's post-operative June 2017 medical visit  to the ENT surgeon/specialist, "the ENT's impression was that the problem was resolved and no further intervention required."  And Warden Ortiz claims that the plaintiff "has raised no concerns about his sinuses since May 2017 surgical procedure." Nothing is further from the truth.  These are blatant lies and plain fabrication of records.

63

Defendant Ortiz - As shown in the Factual Statement, defendant Ortiz deliberately lied (on at least three occasions) to New Jersey Senator Cory A. Booker about the status of my illness despite having the knowledge of my serious medical issues and treatment denials;

Defendant Hollingsworth - As shown in the Factual Statement, defendant Hollingsworth answered my BP-9 complaint and denied the complaint, despite having the knowledge of my serious medical issues and treatment denials, which I described to him in great detail;

Defendant Norwood - As shown in the Factual Statement, defendant Norwood answered my BP-10 complaint and denied the complaint, despite having the knowledge of my serious medical issues and treatment denials, which I described to him in great detail;

Defendant Connors - As shown in the Factual Statement, defendant Connors answered my BP-11 complaint and denied the complaint, despite having the knowledge of my serious medical issues and treatment denials, which I described to him in great detail;

Defendant Hurwitz - As shown in the Factual Statement, defendant Hurwitz ignored my July 23, 2018 letter in which I provided to him great details about my serious medical issues and treatment denials;

Defendant Haczynski - As shown in the Factual Statement, defendant Haczynski ignored my many complaints, despite having the knowledge of my serious medical issues and treatment denials, which I described to him in great detail;

Defendant Wilk - As shown in the Factual Statement, defendant Wilk ignored my many complaints, despite having the knowledge of my serious medical issues and treatment denials, which I described to him in great detail.

64

[82]   Claim Eight - Direct Involvement of Non-Medical Higher Prison Officials and Their Knowledge of Constitutional Violations

When it comes to key constitutional protections, a prisoner is under no obligation to even give advance notice to officials of risk of harm (not dispositive).  Farmer v. Brennan, 511 U.S. 825 (1994). Prison officials are under a well established federal statutory obligation to "provide for the safekeeping, CARE and subsistence..." of prisoners, 18 U.S.C. Section 4042(a)(2), emphasis added.  In addition, the officials may not escape the liability if the evidence shows that they refused to verify underlying facts, or declined to confirm inferences of risk, Brennan at 830.

"In the context of the Eighth Amendment, a defendant may be held liable if a jury could reasonably find that he created a policy or custom under which unconstitutional practices occurred or that he allowed the continuance of such a policy or custom."  Brock v. Wright, 315 F.3d 158 (2nd Cir.2003).

As long as the causal link between the alleged policy or custom and the constitutional injury is not too tenuous, the question whether the (official's) policy or custom proximately caused the constitutional infringement should be left to the jury.

"Failure to train, discipline or control can only form the basis for Section 1983 (municipal) liability if the plaintiff can show both contemporary knowledge of the offending incident or knowledge of a prior pattern of similar incidents and circumstances under which the supervisor's actions or inactions could be found to have communicated a message of approval to the offending subordinate." Montgomery v. Desimone, 159 F.3d 120 (3d Cir.1998).

65

Last but not the least, as to the higher government (government agency) officials, "liability can arise and deliberate indifference can be shown by proof that the city or county knows that inmates face a substantial risk of serious harm and disregarding the risk by failing to take reasonable measures to abate it." Richmond v. Huq, 885 F.3d 928 (6th Cir.2018).

Defendant Jane/John Doe No. 2, Operations Lieutenant - As shown in the Factual Statement, this lieutenant denied medical care at approximately 4 AM on Saturday March 22, 2014. She/he deliberately elected to ignore BOP Policy on After Hours Urgent Care (Exhibit:32), intentionally not calling the PA/MD on duty (on-call), and then made the deliberate, egregious, decision to not call an ambulance. She/he made these deliberate, conscious, decisions with the knowledge that I was very ill and that I was bleeding from a horribly disfigured and swollen face;

Defendant Haczynski - As shown in the Factual Statement, in his role as Head Health Service Administrator, defendant Haczynski deliberately refused to arrange for proper medical and surgical care with my ENT Specialist/Surgeon (Dr. Samir Undavia). He engaged in a calculated, behind-the-scene, pattern of treatment refusals and delays, despite having the knowledge of my very serious medical and surgical needs;

Defendant Hollingsworth - As shown in the Factual Statement, defendant Hollingsworth denied my BP-9 complaint, denying medical treatment despite having the knowledge of my very serious medical and surgical needs (which was clearly detailed to him in my complaint);

66

Defendant Norwood - As shown in the Factual Statement, defendant Norwood denied my BP-10 complaint, denying medical treatment despite having the knowledge of my serious medical needs (which was clearly detailed to him in my complaint);

Defendant Connors - As shown in the Factual Statement, defendant Connors denied my BP-11 complaint, denying medical treatment despite having the knowledge of my serious medical needs (which was clearly detailed to him in my complaint);

Defendant Ortiz - As shown in the Factual Statement, defendant Ortiz deliberately denied medical and surgical treatment and then attempted to cover up his actions (and those of his staff) by intentionally lying to New Jersey Senator Cory A. Booker about the status of my illness and medical care (particularly in regards to my follow up care with my ENT surgeon). Defendant Ortiz was clearly well aware of my serious medical and surgical needs (see Exhibit:29), but he chose to engage in a calculated pattern of deception and deliberately denied medical and surgical treatment, leaving me untreated and in pain;

Defendant Hurwitz - As shown in the Factual Statement, defendant Hurwitz was made well aware of my serious medical and surgical needs (Exhibit:30). He deliberately elected to ignore my complaint, and intentionally ignored his staff's egregious, and continual, interruptions of prescribed plans of treatment. Defendant Hurwitz's deliberate actions denied medical and surgical treatment, leaving me untreated and in pain.

67

[83]   Preliminary Injunction

"In order to establish eligibility for an injunction, the prisoner must demonstrate the continuance of that disregard during the remainder of the litigation and into the future and, in so doing, may rely, in a federal court's discretion, on developments that post-date the pleadings and pretrial motions." Farmer v. Brennan, 511 U.S. 825 (1994).

Plaintiff respectfully requests that this Honorable Court issue an Injunction and order the defendants/BOP/U.S. Department of Justice to provide medical and surgical care for his proven, historical, serious medical problems described herein (chronic Lyme Disease, chronic Maxillary Sinusitis, and Pulmonary/Lung Disease). Plaintiff requests the following:

A) Strict adherence to Alexis's ENT Specialist/Surgeon's prescribed plan(s) of treatment until Plaintiff is no longer in BOP custody;

B) All costs associated with Alexis's mecical and surgical care must be paid for by the defendants/BOP/U.S. Department of Justice for his entire duration of incarceration (including any and all time plaintiff is in custody at a halfway house or home confinement/home detention).

68

[84]   Loss of Qualified Immunity: Plainly Incompetent or Knowingly Violating The Established Law

Qualified immunity protects all but plainly incompetent or those who knowingly violate the law.  An officer might lose qualified immunity even if there is no reported case directly on point.  Ziglar v. Abbasi, 198 L Ed 2d 290 (2017).  Government officials are shielded from liability for civil damages insofar as "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Rouse v. Plantier, 182 F.3d 192 (3d Cir. 1999).  The doctrine of qualified immunity shields officials from civil liability so long as their conduct does not violate clearly established constitutional rights of which a reasonable person would have known.  "The dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."  Hernandez v. Mesa, 198 L Ed 2d 625 (2017).

No defendant here is entitled to a qualified immunity.  As shown in the Factual Statement, each and every defendant exhibited conduct which violated clearly established statutory or constitutional rights of which a reasonable person would have known.  And these defendants did so with the full knowledge that such action (or omission) would most certainly result in a denial and/or delay in provision of medical or surgical care for my very serious medical condition, and would directly result in my experiencing significant pain and suffering.

[85]   Statute of Limitations

The statute of limitations for Bivens claim is taken from the forum state's personal injury statute.  New Jersey's statute of limitation for personal injury causes of action is two years. N.J. Stat. Ann. Section 2A:14-2.  Hughes v. Knieblher, 341 Fed. Appx. 749 (3d Cir. 2009).  However, "while state law provides the applicable statute of limitations, federal law controls when a Bivens claim accrues.  Accrual occurs when the plaintiff has a COMPLETE and PRESENT cause of action" (emphasis added).  Peguero v. Meyer, 520 Fed. Appx. 58 (3d Cir. 2013). In other words, "the cause of action for Bivens claim accrues when the plaintiff knows or has reason to know of the injury." Hughes v. Knieblher, 341 Fed. App 749 (3d Cir. 2009).

So when a patient is injured (e.g. forcibly sterilized without her knowledge) at the age of 16 and discovers that fact when she is 30 years old (after getting married and trying to get pregnant), "her cause of action accrued when she knew or should have known of the injury upon which her action is based." Ostuni v. Wawa's Mart, 532 Fed. Appx. 110 (3d Cir. 2013), quoting Sameric Corp v. City of Philadelphia, 142 F.3d 582 (3d Cir. 1998).  The discovery rule tolls the statute of limitations until a plaintiff actually discovers the harm caused by an earlier inflicted but latent injury.  Lake v. Arnold, 232 F.3d 360 (3d Cir. 2000).  The plaintiff is still asking for further discoveries, please see below.

Moreover, even more applicable to this case, "when the defendants have intentionally misinformed the plaintiff or concealed info from her they are estopped from invoking the statute of limitations.  Equitable

tolling is appropriate in three general scenarios: (1) where a defendant actively misleads a plaintiff with respect to her cause of action; (2) where the plaintiff has been prevented from asserting her claim as a result of other extraordinary circumstances; or (3) where the plaintiff asserts her claim in a timely manner but has done so in the wrong forum." Lake v. Arnold, 232 F.3d 360 (3d Cir.2000).

In this respect, the plaintiff's complaint is timely. While the plaintiff was initially injured by the defendant's various intentional and malicious acts of constitutional violations such as complete denial or delay in his medical care in March 2014, and ever since then – during and throughout the years 2015, 2016, 2017 and 2018, up to the present day, as the plaintiff was not provided with hospital discharge instructions, personal medical reports, and relevant medical documents, he was unaware of the medical injuries caused by the defendants and of the existence of the constitutional violations until at least the conversation with his operating surgeon regarding his fourth surgery in December 2016, and the post-operative conversation with his surgeon in the recovery room on May 4, 2017. Indeed he was unaware of the permanent lung injuries and the true reasons for these injuries until after he received a full and accurate medical report of his thoracic/lung surgery on December 8, 2017. Therefore, his filing of the Bivens claim on February 14, 2018 is timely as the Bivens claim was filed within two years of the discovery of the harm caused by the defendants.

In addition, defendants' shocking and outrageous acts of concealment, intentional cover-up, open lying and fabrications even to the

71

Congressional (Senatorial) inquiries, as presented herein, equitably toll the statute of limitations until the discovery is fully completed and the plaintiff has a "complete and present cause of action," Peguaro at 60.

Last but not the least, defendants' egregious retaliatory actions, refusals and delays of medications and services, constant and intentional interference with the prescribed course of treatment, delays in the provision of medical services for non-medical reasons are all, also unfortunately, of the very recent origin, so any defendant's acts, or omissions, alleged herein which occurred two years prior to the filing of the Bivens claim, plus another six months for the purpose of exhaustion of mandatory PLRA administrative remedies, see Pearson v. Secretary, 775 F.3d 598 (3d Cir.2015),(a total of 30 months), covers all of the defendant's wrongs not only at least since August 2015 (30 months prior to the filing of the Bivens claim in February 2018), even if not from the very beginning of this tragic and completely unnecessary case and episode in March 2014 (which it does based on other rules presented above).

[86]   Further Discoveries Request

As the plaintiff is still "in the dark" concerning numerous medical matters and issues in this matter, pursuant to the applicable provisions of the Fed.R.Civ.P., the plaintiff requests the following discovery:

Discovery

Federal Bureau of Prisons/FCI Fort Dix/U.S. Department of Justice:

A) Alexis's medical records from the Fort Dix Medical Service from January 1, 2017, through current day;

B) Copies (on disc or radiology film, unaltered & original image) of all radiographs taken of me at FCI Fort Dix from March 6, 2014 through current day;

C) Copies of any and all correspondences between the BOP/Warden/ U.S. Department of Justice and New Jersey Senator Cory A. Booker regarding Alexis's health care or illness;

D) Any and all documents or records generated or referenced between June 1, 2017 and June 30, 2018 related to the cancellation of Alexis's already approved recheck exam with Dr. Samir Undavia, which was scheduled for June of 2018;

E) A copy of Alexis's May 16, 2018 letter to the BOP Office of Internal Affairs in which Alexis complained of his concerns regarding his medical care at FCI Fort Dix, and notified their office of the filing of the Bivens complaint;

F) A copy of any and all communications within the BOP/Department of Justice in regards to/in response to Alexis's July 23, 2018 letter to BOP Director Hurwitz.  This includes, but is not limited to: e-mail, fax, text, recorded phone calls, video conferences, skype, etc.

G) Any and all BOP records showing which operations lieutenant was on duty at FCI Fort Dix (West Compound) at approximately 4 AM on Saturday March 22, 2014;

73

H) Any and all BOP records showing which correctional officer was on duty at FCI Fort Dix (West compound), working unit 5802, at approximately 4 AM on Saturday March 22, 2014;

I) Any and all BOP records showing which health care profess-ional was on duty and running sick-call/triage at FCI Fort Dix (West compound) from 6 AM through 4 PM on Wednesday March 19, 2014;

J) Any and all BOP/U.S. Dep't of Justice records which relate to Dr. Ravi Sood's disciplinary history with the BOP/U.S. Dep't of Justice/Fort Dix;

K) Any and all BOP/U.S. Dep't of Justice records which relate to Administrative Remedy Action (BP-8, BP-9, BP-10, BP-11, and SF-95) taken against Dr. Sood by inmates.

L) Any and all BOP/U.S. Dep't of Justice records which relate to any legal action/lawsuits, which were filed in any Federal Court, naming Dr. Sood as a defendant.

M) A complete copy of the BOP/Fort Dix Mail Room Policy and Procedure Program Statement.

N) Copies of any and all BOP/Fort Dix Mail Logs with the following:

1) All regular inmate outgoing mail sent by Vincent Alexis;

2) All regular inmate incoming mail sent to Vincent Alexis;

3) All outgoing legal mail sent by Vincent Alexis;

4) All incoming legal mail sent to Vincent Alexis;

(This documentation is requested for the time period from March 5, 2014 through current day).

74

O) A copy of the Fort Dix Medical records from my December 4, 2014 appointment with defendant Syjongtian;

P) A complete copy of the BOP Formulary, listing "approved" BOP medications, from March 5, 2014 through current day (this should include any and all updates, to reflect the addition &/or deletion of medications over the above 64 month time period);

Q) A complete copy of the BOP Policy regarding "chronic care" inmates and their medical care;

Princeton Eye and Ear:

A) Copy of the medical record from Alexis's May 2, 2019 office call with Dr. Samir Undavia;

B) A complete copy of any and all records in the possession of Princeton Eye and Ear which show any and all requests received for copies of medical records, by Vincent Alexis, from March 1, 2014 through current day;

C) The full name of the following Princeton Eye and Ear employees, during the time period of January 1, 2015 through current day:

- Office Manager(s)

- All Medical Records Technicians;

D) Copies of any and all photographs taken of me while I was hospitalized at Saint Francis Medical Center and underwent nasal sinus surgery with Dr. Undavia in March of 2014 (including any and all endo-scopic video/photographs);

Saint Francis Medical Center

A) Copies of any and all photographs taken of me during my hosp-italization from March 22, 2014 through May 5, 2014 (including any and all endoscopic video/photographs).

75

[87]   All Paragraphs Incorporated

Plaintiff reallege and incorporate by reference all paragraphs above from 1 - 86 Plaintiff has been and will continue to be irreparably injured by the conduct of the defendants unless this Court grants the declaratory and injunctive relief which plaintiff seeks.


## VI. PRAYER FOR RELIEF

WHEREFORE, plaintiff respectfully prays that this Court enters judgement granting plaintiff the following relief:

[88]   A Declaration that the acts and omissions described herein violated plaintiff's rights under the Eighth and Fifth Amendments of the U.S. Constitution and laws of the United States;

[89]   Compensatory Damages in the amount of $2 million against each defendant, jointly and severally, as per Schedule in Exhibit No. 34 .

[90]   Punitive Damages in the amount of $3 million against each defendant, jointly and severally;

[91]   A jury trial on all issues triable by jury;

[92]   Plaintiff's costs in this suit in the amount of $2,000.00 for copies, typing costs, postage, printing, and law library assistance, etc;

[93]   Order the BOP/U.S. Department of Justice to pay any and all costs associated with a third nasal sinus surgery, which may be necessary to remove additional scar tissue;

[94]  Order the BOP/U.S. Department of Justice to provide Alexis with free, life-long, health insurance/Medicaid/Medicare, in order to cover all costs associated with future medical care for his permanent sinus and lung injuries;

[95]  Any additional relief this Court deems just, proper, and equitable.

Dated: July 20, 2019

Respectfully Submitted,

VINCENT P. ALEXIS
19213-052
FCI Fort Dix
Box 2000
J.B. MDL, NJ 08640

VERIFICATION

I have read the foregoing complaint and hereby verify that the matters alleged therein are true, except as to matters alleged on information and belief, and as to those, I believe them to be true. I certify under the oenalty of perjury that the foregoing is true and correct.

Executed at Fort Dix, New Jersey, on July 20, 2019

77