UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY
CAMDEN DIVISION

| | |
|---|---|
| Vincent Paul Alexis<br>    Plaintiff,<br><br>v.<br><br>Ravi Sood, MD;<br>N. Turner-Foster, MD;<br>David Ortiz, Warden;<br>J. Hollingsworth, Warden;<br>Mr. Haczynski;<br>J. Wilk;<br>J.L. Norwood;<br>Ian Connors;<br>Hugh Hurwitz, Director FBOP;<br>    Defendants. | Amended Complaint<br>18-cv-02099-RBK-KMW<br><br><br>Honorable Robert B. Kugler, USDJ<br>Jury Trial Demand<br><br>April 7, 2021 |

**I. JURISDICTION, VENUE AND EXHAUSTION OF REMEDIES**

[1]    Jurisdiction of the Court

This is a civil action, wherein the Plaintiff complains that the below referenced defendants caused the Plaintiff significant (permanent) injuries, and pain and suffering, through repeated violations of Plaintiff's Eighth Amendment Constitutional Rights, while the Plaintiff was incarcerated at Federal Correctional Institute (hereinafter FCI) Fort Dix, New Jersey.

This Honorable Court has jurisdiction in this complaint because the defendant is the United States Government, Government employees/contractors, and because all of the acts, or omissions, complained of in this action occurred in the District of the U.S. District Court for New Jersey, Camden Division.

[2]    Venue

Venue is proper, as all of the acts, or omissions, complained of in this action occurred in the district of the U.S. District Court for New Jersey, Camden Division.

[3]    PLRA Exhaustion

In Accordance with provisions of the Prison Litigation Reform Act (PLRA, 42 U.S.C. Section 1997e(a)), prior to commencing this action, the Plaintiff fully exhausted all available administrative remedies, but to no avail (Exhibits; 1, 2, 3, & 4).

## II. PARTIES TO THE ACTION – PLAINTIFF

[4]    Vincent P. Alexis, 19213-052, is a Federal prisoner who was incarcerated at FCI Fort Dix from March 5, 2014 through September 18, 2019.  Plaintiff Alexis was released from BOP custody on March 10, 2020.  He resides at 1401 Watercreek Drive in North Las Vegas, Nevada 89032.

### III. PARTIES TO THE ACTION – DEFENDANTS

[5]    Medical Staff:

A) Ravi Sood, MD – at all relevant times served as Plaintiff's medical doctor at FCI Ft.Dix;

B) N. Turner-Foster, MD – at all relevant times served as Chief Medical Doctor/Clinical Director at FCI Fort Dix;

C) J. Wilk – at all relevant times served as Associate Health Service Administrator at FCI Fort Dix;

D) Mr. Haczynski – at all relevant times served as Head of Fort Dix Health Service Office/Administration at FCI Fort Dix;

[6]    Non-Medical Officials:

E) Warden David Ortiz – at all relevant times from approximately 2016, had been serving as Warden of FCI Fort Dix;

F) Warden J. Hollingsworth – from 2014 up to 2016 (approximately), served as Warden of FCI Fort Dix;

G) J.L. Norwood – at all relevant times served as Regional Director of the U.S. Federal Bureau of Prisons (hereinafter BOP) Northeast Operations, located in the City of Philadelphia, Pennsylvania;

H) <u>Ian Connors</u> – at all relevant times served as a National Inmate Appeals

Administrator within the BOP's Central Office, located in Washington, DC;

I) <u>Director Hugh Hurwitz</u> – at all relevant times has been serving as Director of the BOP,

in Washington, DC;


[7]     Capacity:

Each and every defendant is sued individually, and in his or her official capacity.


[8]     At all relevant times in this complaint, each and every Defendant listed above acted

under the color of the United States.  Defendants were either employed as full-time employees

of the federal government agencies (BOP, U.S. Department of Justice, United States

Government), or as full-time federal government contractors (federal statutory employees)

who's day-to-day operations were supervised by the federal government, worked on federal

premises and used federal government equipment, etc. U.S. v. Orleans, 425 U.S. 807 (1976).

4

## IV. FACTUAL STATEMENT
### GENERAL BACKGROUND INFORMATION

The following information is provided in order to show

that Plaintiff Alexis's serious medical and surgical needs

were very well documented, and that the

Defendants were well aware of his illnesses.

[9]     On March 19, 2014 I became ill with what was later determined to be a highly septic, life-threatening, sinus infection.  I began to feel increased pressure about and behind my right eye and quickly developed an excruciating headache which was particularly painful about my right eye and forehead.  The pain extended to my nose, and to the right side of my upper jaw.

I immediately sought help and went to the Fort Dix Medical Service for care.  I presented my problem to the health care professional on duty, and was told to wait in the inmate waiting room.  After approximately thirty minutes, I was instructed by the staff that there was an institution-wide recall of all prisoners, and that I should return back to my prison cell.  I returned to my prison cell as directed.

[10]     The next day, March 20, 2014, I returned to the Fort Dix Medical Service for care.  I was again told to wait in the inmate waiting room, and after a few hours I was examined by a nurse

5

who informed me that he had consulted with my regular physician, Dr. Ravi Sood, regarding my case. I informed the nurse that I was denied medical treatment the day before, that I was in pain. The nurse instructed me to increase the amount of fluids I drank, and was given Tylenol for pain/discomfort (Exhibit: 5). I was then told that my name would be placed on a call-out sheet for further medical care in the future. I was then instructed to return to my prison cell.

[11]    Approximately two hours later, as I sat in my prison cell, my condition started worsening progressively. I began to experience significant chest pain and shortness of breath. I struggled to maintain consciousness and almost passed out a number of times. Another prisoner had to run downstairs to find the prison guard, in order to call for emergency medical help. I was transported, on an emergency basis and unable to walk without assistance, back to the Fort Dix Medical Service. There I was examined by Sam Syjongtian, a prison mid-level medical provider (MLP).

I informed Mr. Syjongtian that I was denied medical treatment the day before, and earlier that same morning. We discussed my overall level of pain and my condition. Given the amount of pain and shortness of breath and facial swelling (which by then had become quite obvious) I asked Mr. Syjongtian to send me to the hospital Emergency Room (ER) right away. MLP Syjongtian refused to do so, however. After examining me, Mr. Syjongtian ordered paranasal sinus radiographs. He delayed the diagnostics until the following day. He then told me that I needed to see my primary prison doctor, Ravi Sood. I waited many hours, as Dr. Sood continued to see all of his regularly scheduled, routine, appointments. During this time, I continued to feel more ill, as the facial swelling became even more pronounced (I could glimpse

the swelling about my right eye through my peripheral vision, and I could feel the swelling pulling tightly at my skin at the site). The pain continued unabated.

[12]   Finally, after waiting hours, close to the end of prison office hours at 4 PM, I was examined by Dr. Sood, who noted that all of his medical staff had left for the day and there was nothing else he could do. So, once again I was instructed to return to my cell. I was seriously ill and I knew it. I repeatedly asked Dr. Sood to send me to the hospital ER, but he refused to do so. He refused to provide any further treatment, and ordered me to return to my prison cell, reassuring me "It's nothing serious."

[13]   The next day, on March 21, 2014, as my condition continued to rapidly worsen, I again returned to the Fort Dix Medical Service (Exhibit: 6). The infection had worsened significantly, and the facial swelling was causing disfigurement, making it increasingly difficult for me to even open my right eye. Dr. Sood examined me once again. He noted that my chest pain was "Atypical" as it had been going on for two days, and he noted "Painful swelling with bluish discoloration of skin right maxilla extending to the nose and to the lower eyelid x2 days." I complained to Dr. Sood that I was still experiencing chest pain and light-headedness, and that the pain was not improving and that the facial swelling was clearly worsening despite the medications given to me. I again asked him to send me to the ER, but Dr. Sood refused to do so. Instead, Dr. Sood advised me that I needed "Lifestyle changes, mindful awareness or meditation, and yoga." The paranasal sinus radiographs which were ordered the day before

7

were not done at all (indeed they were done, after my numerous requests, no less than six months later, in November 2014, well after my hospitalization and numerous surgeries).

Despite my clearly worsening condition and facial disfigurement & pain that I was experiencing, Dr. Sood once again instructed me to return to my cell.

[14]   By Saturday March 22, 2014, my condition became critical. I was unable to open my right eye, the facial swelling and the pain worsened, and there was a fair amount of intermittent bleeding from my right nares. I was still experiencing chest pain and shortness of breath, and felt quite feverish.

At approximately 4 AM, I was assisted by one of my roommates to the unit officer's office. I knocked on the door and entered his office. As I entered the room I stated, "I need to go to the hospital." The office on duty took one look at me and exclaimed, "My God." He then immediately picked up the phone and called the operations lieutenant on duty. Their conversation was very brief. The unit officer then hung up the phone and informed me that the operation's lieutenant instructed me to return to my cell and to go to the Fort Dix Medical Service when they opened at 6:30 that morning.

I was examined by an EMT at approximately 6:45 on Saturday March 22, 2014. Once he saw me, he immediately realized how ill I was, and he called Dr. Sood to receive authorization to send me to the hospital ER. I was finally sent to Saint Francis Medical Center ER (in Trenton, New Jersey) that afternoon.

8

[15]    I was examined in the ER of Saint Francis Medical Center at approximately noon on Saturday March 22, 2014.  I underwent a battery of diagnostic tests, including blood work, urinalysis, radiographs, CT scans, EKG's, and blood cultures.  Medical records which I received many years later showed, "Multiple focal ill-defined opacities in both lung fields suspicious for an acute inflammatory or infectious process" and an Infectious Disease Specialist, Syed A. Husain, MD clearly noted in his medical records that, "The prognosis of the patient remains guarded" (Exhibit: 7).

[16]    After the ER procedures, I was admitted to the hospital on the evening of March 22, 2014.  I spent approximately 45 days there.  Upon admission, I looked in the mirror in my room's bathroom.  What I saw was horrifying – the facial disfigurement about my nose and right eye was so severe that I truly did not recognize who I saw in the mirror.

[17]    The swelling and inflammation about my right eye further caused significant involvement of the nerves and muscles which control the movement of the eye.  Within days, I experienced pronounced double-vision, as my right eye was unable to function normally.

In order to gain control over the sepsis (which was not fully controlled by the aggressive hospital treatments, and would soon start causing organ failure), and its secondary effects (the severe soft-tissue inflammation and swelling), the hospital's physicians and Dr. Samir Undavia (an ENT specialist/surgeon) recommended that I undergo sinus surgery in order to establish drainage and remove the nidus for the infection.

9

[18]   On March 27, 2014 I had surgery on my right maxillary sinus.  Dr. Undavia performed this surgery.  He clearly mentions in his surgery report (Exhibit: 8) that there was, "Tremendous inflammation and granulation tissue," and that, "The case became very difficult given how much necrotic tissue was everywhere…" These pathologic changes clearly indicate that the infection had grown out of control, resulting in massive tissue death.

[19]   Despite the hospital's best efforts and aggressive treatments, I began to experience major organ failure when on March 31, 2014 the sepsis caused both of my lungs to collapse.  Emergency chest tubes were placed in an attempt to remove the air and pus from the pleural space, so that my lungs could expand and I could breathe.  The right chest tube failed to clear the air and pus, so on the following day it had to be repositioned during a second procedure.  Unfortunately, the right hemi-thorax did not clear at all, and Dr. Seinfeld (thoracic surgeon) recommended that I undergo major thoracic surgery in order to fully evacuate the pneumothorax and pus involving my right pleural space.

[20]   On April 7, 2014 I underwent major thoracic surgery and a blood transfusion.  The surgery was performed by Drs. Shariff & Seinfeld.  The surgeons opened and operated on my right lung, trying to clean it of mortifying septic infections.  The surgery report (which I was unable to obtain until December 8, 2017) shows that I underwent a right thoracotomy, decortication of the right lung, and drainage of lung abscesses.  The surgery report clearly notes that I had, "Multiple lung abscesses involving the right middle lung lobe & the right upper lobe

has golf [ball] size abscesses," and that upon entering the pleural cavity, the surgeons encountered, "A pocket of pus in the chest cavity" (Exhibit: 9).

While the surgery almost certainly saved my life, as I would learn years later, it was only partially successful. The damage caused by the large abscesses was extensive. As these abscesses formed and grew in size, normal lung parenchyma was destroyed. That normal alveolar tissue was replaced with scar tissue, and this scar tissue is unable to participate in normal oxygen exchange. As a result, I have experienced a serious, and permanent, impairment of pulmonary function.

[21]   I was discharged from the hospital on May 5, 2014. Dr. Sood did not examine me until May 8, 2014. During that exam, Dr. Sood failed to provide me with a copy of the hospital discharge instructions, and he ignored my complaint the I was having substantial difficulty breathing through my right nostril (which of course, was operated on while I was hospitalized). Dr. Sood quickly dismissed that concern and instructed me to wait for a call-out for chest radiographs (Exhibit: 10).

[22]   On May 14, 2014 I had chest radiographs taken at the Fort Dix Medical Service (Exhibit: 11). Those radiographs revealed significant pathology. The radiology report states, "Abnormal. interval development of nodular densities in both mid and upper lung zones - ?infection, ?septic emboli, less likely metastases – rec further evaluation."

I continued to complain to Dr. Sood about my continued breathing difficulties (particularly through my right nostril), severe exercise intolerance and chest pain. Despite my

11

complaints, and with the knowledge of clear radiographic abnormalities on the chest radiographs, Dr. Sood failed to provide any medical treatments, and he failed to do any further evaluation, as the radiologist (Charles White, MD) required.

Dr. Sood also refused to extend my medical idle/leave, which gave me time off from my prison job so that I could recover and heal from such a major thoracic surgery. He sent me back to work just a few weeks later, despite my continued complaints that I had substantial difficulty breathing through my right nostril (which had not improved at all), was experiencing severe chest pain, and also an alarming degree of light-headedness whenever I exerted myself.

[23]   At approximately 2 PM on June 25, 2014, while at work, I began to experience severe right nasal pressure and pain. My boss, correctional officer Cusick, urgently called the Fort Dix Medical Service, and EMT Gibb instructed me to come right in. Mr. Gibb placed me on a 14-day course of antibiotics (Amoxicillin 500mg). Within one hour of beginning the antibiotic, pus and blood clots began to drain from my right nostril.

[24]   Two weeks later, on July 8, 2014, as the infection and its sequela continued, when I returned to the Fort Dix Medical Service for the refill of my antibiotic, I was denied the medication. I was informed that I should "Look for a call-out" and was told to return to my cell.

[25]   That call-out appointment did not take place for another two months, on September 11, 2014. At that appointment, I was examined by a physician's assistant, P. Tyas. She told me that I was not ill, denied any further care or examination, and informed me that if I was having some

12

nose congestion that I should "Buy a decongestant from commissary." Oddly enough, the Fort Dix commissary did not sell any nasal decongestants, and even if it did, as I learned many years later, no over-the-counter medications could have helped my condition anyway. Once again, I was once again instructed to return to my cell (Exhibit: 12).

[26]    On November 4, 2014, seven months after my sinus surgery, and after my numerous requests and complaints, radiographs of my sinus (and chest) were finally taken. The radiology report clearly revealed significant pathology. The radiology report stated, "Opacification of the right maxillary sinus." (Exhibit: 13).

While it did not show the entire problem and all of the origins of the problem, the radiographs did clearly show that I was still seriously ill. I immediately began filing formal complaints with the higher prison officials, because I clearly was not receiving adequate medical care. I filed my first written complaint (the so-called Form BP-8) on November 6, 2014.

[27]    Also on November 4, 2014 I was given a more powerful antibiotic, Augmentin. However, as a product of my complaints to the higher prison staff, on the subsequent visit to the Fort Dix Medical Service on November 10, 2014, Dr. Sood discontinued that much needed antibiotic with the full knowledge that there were significant radiographic sinus abnormalities, and that I was still experiencing sinus pain and pressure, as well as draining of pus and blood clots. This deliberate act left me in pain and untreated, and it allowed the infection to again go unchecked. Indeed, Dr. Sood told me that, "There is nothing I can do," and instructed me to return to my cell.

[28]    On November 14, 2014 I ran out of antibiotics, so on the following day, November 15, 2014 I again returned to the Fort Dix Medical Service.  Once again, I was denied treatment and told to return to my cell.

[29]    On November 17, 2014 I received a response to the BP-8 complaint.  Health Service Administrator (hereinafter HSA) Travers made no mention of Dr. Sood's treatment plan.  It was an unresponsive answer (a denial) which ignored the truth of the matter and all of my (permanent) injuries (Exhibit: 1).

[30]    As my pain and nasal sinus bleeding and discharge continued to worsen, I once again returned to the Fort Dix Medical Service on December 4, 2014.  I was examined by MLP Syjongtian.  I repeated to him all of my concerns, including the pathologic findings from the November sinus radiographs.  Mr. Syjongtian refused to provide any medical treatment, and then stated to me, "I [Mr. Syjongtian] only have 18 months left, I don't care," and he instructed me to return to my cell, still ill (Exhibit: 14).

[31]    Days later, on December 13, 2014, I suffered prolonged bleeding from my right nares while in my cell.  After approximately 4 hours of intermittent bleeding, I informed the unit officer and was taken to the Fort Dix Medical Service.  While waiting for the medical staff to see me, the bleeding stopped and I was sent back to my cell with no further treatment.

[32]    On December 16, 2014 I was seen by physician's assistant Christina Mello.  She examined me and noted that I had swollen tonsillar lymph nodes.  She informed me that she would schedule a follow up with me every 30 days, but never did so.

[33]    Also on December 16, 2014 Dr. Sood prescribed a 14-day course of Augmentin (an antibiotic), but Ms. Mello and Dr. Sood failed to inform me about the treatment.  Since I had left the Fort Dix Medical Service hours earlier, I had no way of knowing about the medication.  The prescription was handed to me 7 days later, on December 23, 2014, when I went to pill-line to pick up other medications.

[34]    On December 22, 2014 I was again examined by Dr. Sood.  As I was explaining to him my concerns about the severe right nasal sinus congestion and drainage, Dr. Sood looked up at me from his computer and asked, "Is this a new problem?"  Dr. Sood failed to prescribe any new medications or treatments, and he failed to tell me about the Augmentin (which I accidentally discovered the following day at the prison pill-line).

[35]    On January 5, 2015 I finished the Augmentin.  I was once again off antibiotics, with no refills authorized, despite the obvious fact that I was still ill and experiencing severe right nasal sinus congestion and intermittent drainage from the nares and painful sinus headaches.

[36]    On January 6, 2015 I received a response to my BP-9 complaint from Warden Hollingsworth (Warden at the time).  While my complaint was very fact specific and well

15

documented, Warden Hollingsworth ignored all of my concerns, including his staff's intentional failures, and refusals and denials of services and medications. Warden Hollingsworth concluded in his reply that the Fort Dix "Health Services Unit has been responsive to your medical condition..." (Exhibit: 2).

[37]   On January 16, 2015 I was examined by Joseph R. Steeger, MD (a pulmonologist). Dr. Steeger also examined me on March 26, 2015 and July 16, 2015. Dr. Steeger diagnosed that I had, "Atypical chest pain secondary to involvement of the nerve during thoracotomy on the right hemithorax causing pain and discomfort along the dermatome of that intercostal nerve" and "Recurrent pleuritic chest pain/costochondritis," (Exhibit: 15).

When I expressed my concern to Dr. Steeger that I was having constant chest pain 15 months after the surgery (thoracotomy), he replied "If the pain is still present one year after the thoracotomy, it's likely permanent." Many years later, combined with other reports listed below & the radiology report written by Jeffrey Galvin, MD (University of Maryland, Exhibit:11), I learned that the pain which I continued to feel at that time (and still feel today), was indeed permanent.

[38]   On January 22, 2015 I had a CT scan of my sinuses performed at RWJ University Hospital (Hamilton, New Jersey). The radiology report (which I received years later) noted significant pathology involving my right maxillary sinus, including "Frothy secretions within the right maxillary sinus with posterior mucosal thickening" and clear evidence of occlusion (Exhibit: 16).

[39]    On January 29, 2015 I once again experienced bleeding from my right nares for 13 hours.  And on February 2, 2015 I experienced a 5-hour nosebleed with draining pus.  That evening, I spoke to EMT Gibb at pill-line and he examined me.  Mr. Gibb restarted the Augmentin and Ibuprofen for 21 days.

[40]    On February 27, 2015 I went to the Fort Dix Medical Service for a refill of the Augmentin.  The bottle which was handed to me contained only 2 pills.  Once again, I was off antibiotics while a serious infection persisted in my body.

[41]    On February 25, 2015 I received a response to the BP-10 complaint (Exhibit: 3).  Administrator Norwood defended the actions of Warden Hollingsworth.  Despite my clear and very specific medical complaint, Mr. Norwood deliberately ignored the repeated treatment denials and delays which are clearly outlined here and in my medical records.  He ignored the staff's failures to perform diagnostics when I presented with obvious clinical abnormalities, and he ignored their failures to follow-up on abnormalities found on diagnostics.  Despite being fully informed and fully aware of these issued based on my submissions to him, Mr. Norwood intentionally ignored a clear pattern and practice of treatment denials and delays in treating my serious illness (before and after my hospitalization) in a manner which meets current and acceptable civilized medical standards.

[42]    On March 16, 2015, I was taken to Princeton Eye & Ear (Lawrenceville, New Jersey) for an exam.  Unfortunately, the Fort Dix Medical Service failed to schedule the appointment with

17

Dr. Samir Undavia (the ENT specialist/surgeon who performed my sinus surgery 12 months previously at the hospital). I was examined by Dean Drezner, MD. Dr. Drezner did document abnormalities, and he instructed me to continue using the Flonase nasal spray medication and the nasal saline spray. Dr. Drezner stated that it was essential for me to recheck with Dr. Undavia. He stated that this follow-up should occur within 1 month (Exhibit: 17).

The defendant(s) failed to schedule any post-operative recheck during the summer of 2014, and I was now 12 months out from my surgery and clearly still having serious complications. The defendant(s) then failed to follow Dr. Drezner's instructions – the April 2015 recheck with Dr. Undavia was never scheduled.

[43]    On April 17, 2015 I was again examined by Dr. Sood (Exhibit: 18). When we discussed the pulmonologist, Dr. Sood asked me, "What did the pulmonologist do?" And when we discussed the ENT, Dr. Sood asked me, "What did the ENT do?" Those exams were done the previous month, and Dr. Sood had more than enough time to review my medical records. He should have known what the specialists did. And he should have known that I was using hypertonic saline nasal spray because Dr. Drezner instructed me to do so. Instead, Dr. Sood instructed me to stop using the nasal spray.

Also that day, Dr. Sood once again ignored my concerns of "Right nasal obstruction, pain right face in maxillary region, and fresh blood from nose" (Exhibit: 18). He knew about the chronicity, he knew that the CT scan from January 22, 2015 showed significant pathology (Exhibit: 16), and he knew that Dr. Drezner had instructed that I needed to recheck with my surgeon, Dr. Undavia, that very same month (Exhibit: 17). Still, Dr. Sood failed to make

18

arrangements for proper treatment of my illness – that April 2015 recheck was never scheduled.

[44]    On May 6, 2015 I was examined by Dr. Sood (Exhibit: 19).  Once again, Dr. Sood refused to provide medical care, despite his acknowledgement that I was still suffering from nasal obstruction & facial pain.  I was sent back to my cell without any medical treatment.

[45]    On June 3, 2015 I returned to Princeton Eye & Ear for an exam.  Once again, the defendants failed to schedule my appointment with Dr. Undavia – he was not in the office.  I was seen by Chetan S. Shah, MD (Exhibit: 17).  Dr. Shah advised that I continue using the Flonase nasal spray medication and the nasal saline rinse.  He, and his staff, again insisted that it was essential for me to recheck with Dr. Undavia.  And upon returning to the Fort Dix Medical Service, I clearly voiced my concern to EMT Hoey that, for the second time, the Fort Dix Medical Service failed to schedule my recheck appointment at Princeton Eye & Ear with the ENT who performed my sinus surgery in March 2014, Dr. Undavia.  I also clearly voiced this concern to the two BOP officers who escorted me on the medical trip. Still, somehow this important, and legitimate, concern was not mentioned in the notes for the medical trip return encounter. Instead, Mr. Hoey reported, "Inmate walked into Health Services without complaints returning from a medical trip to see ENT," (Exhibit: 20) which is a complete cover-up and a fabrication.

[46]    On June 25, 2015 I was examined again by Dr. Sood (Exhibit: 21).  I discussed my chronic sinus disease with Dr. Sood.  I clearly explained to him that I was very concerned that they had

19

not scheduled my recheck with my surgeon, Dr. Undavia. And I reminded Dr. Sood that the severe congestion, sinus pressure and pain, headaches, and drainage were still present, and that I was in pain. But once again, Dr. Sood refused to treat my chronic illnesses, and I was instructed to return to my cell, still ill and in pain.

[47]    On August 21, 2015 I was taken to Princeton Eye & Ear for an exam. Once again, the defendant(s) failed to schedule my recheck appointment specifically with my surgeon, Dr. Undavia. This was the third such blunder since my BP-9 & BP-10 complaints were filed.

I was examined by Dr. Drezner. He again stated that it was essential for me to recheck with Dr. Undavia. Dr. Drezner prescribed a powerful antibiotic, Ciprofloxacin (Exhibit: 17), but the Fort Dix Health Services failed to issue the medication to me.

[48]    Also on August 21, 2015 I submitted another written complaint to the Fort Dix Medical Service HSA (Exhibit: 22). In that filing, I again complained that my medical appointments were not being scheduled appropriately. And I again requested that I be scheduled with Dr. Undavia, my surgeon, for the recheck exam. HSA Wilk responded to my complaint, "There is no guarantee you will see the same doctor who performed your surgery."

Mr. Wilk knew very well that Dr. Drezner, Dr. Shah, and the staff at Princeton Eye & Ear were directing, over and over, that I needed to recheck with Dr. Undavia. Still, Mr. Wilk chose to leave to chance which MD I would see, instead of simply picking up the phone and calling Princeton Eye & Ear to request an appointment specifically with Dr. Undavia.

[49]    On or about September 7, 2015 I received a response from the FBOP Central Office (National Appeals) to the BP-11 complaint which I filed (Exhibit: 4). Despite being fully informed of my concerns, Administrator Connors defended the actions of the defendants, as well as their practice & policies. In an attempt at damage control, Mr. Connors denied the obvious refusals of treatment and medication. Mr. Connors ignored the repeated treatment delays and refusals which are clearly outlined here, and in my medical notes. Mr. Connors ignored the Fort Dix Medical Service's staff failures to perform the appropriate diagnostics at the appropriate times, and he ignored the staff's repeated failures to follow-up on abnormalities found on diagnostics. Despite being fully informed, Mr. Connors intentionally ignored the obvious fact the Dr. Sood and the Fort Dix Health Services staff repeatedly denied necessary treatments and medications for my serious medical condition, and that these individuals exhibited a clear pattern of intentional failures to properly treat my serious illnesses (before and after my hospitalization) in a manner which meets current and acceptable medical standards of care for the civilized world.

Mr. Connors was quick to point out the I was seen by an ENT, but he ignored the very real fact that it took far too long for me to recheck with my surgeon (in fact, on the day Mr. Connors signed the BP-11 response [September 2, 2015] I had not yet seen Dr. Undavia).

[50]    On September 15, 2015 I was examined by Dr. Sood. Once again, we discussed my ailments – the chronic sinus and pulmonary disease. My clinical signs had not changed, and I had yet to recheck with Dr. Undavia. Only one change was made to my treatment – Dr. Sood discontinued the acid-blocker (Ranitidine) which he negligently prescribed to me in March

21

2014, when he exhibited plain incompetence and a complete ignorance by claiming that I had chronic esophageal reflux disease instead of a life-threatening septic infection.

[51]    On November 9, 2015 I was taken to Princeton Eye & Ear. For the fourth consecutive time, the defendant failed to schedule my recheck appointment with my surgeon, Dr. Undavia. I was seen by Dr. Drezner, who once again stated that Alexis "Needs to F/u with Dr. Undavia who did the first surgery to see if additional surgery is needed" (Exhibit: 17). Once again, I was sent back to Fort Dix with no treatment.

[52]    Dr. Sceusa examined me on November 25, 2015. We discussed my concerns and my illnesses at length. I clearly relayed my concern to Dr. Sceusa that Dr. Sood and the Fort Dix Health Services staff had not treated my medical and surgical conditions properly or in a timely manner. Dr. Sceusa voiced his concern that I had not been rechecked by my ENT surgeon, Dr. Undavia, and he agreed that this needed to be immediately corrected.

## V. FACTUAL STATEMENT
## FACTS DIRECTLY RELEVANT TO COMPLAINT
## AND TO LEGAL CLAIMS

[53]    On February 11, 2016 I was finally examined by Dr. Undavia. This was the first time since my hospitalization, a long 22 months prior, where I was rechecked by my surgeon. Dr. Undavia expressed his grave concern that I had not been brought in for any post-operative

22

rechecks in 2014. He states that this aftercare was essential in order to minimize scar tissue formation and post-operative problems.

Dr. Undavia performed a minor procedure inside my right nostril to remove scar tissue. His medical record states, "Synechia were noted from the posterior septum to inferior turbinate. Synechia were incised with a 15 blade scalpel" (Exhibit: 17).

Dr. Undavia stated that he believed the synechia (scar tissue/adhesions) were the cause of my discomfort. He commented that I "Should notice a big difference now," after removal of the adhesions. He then ordered a nasal/sinus CT scan, and directed the I recheck with him immediately upon its completion (Exhibit: 17).

[54]   On April 6, 2016 I had a CT scan done of my sinus at Fort Dix. The radiology report, written by Charles Muchnak, MD clearly shows evidence of right maxillary sinus pathology, including "Diffuse mucosal thickening right maxillary sinus," (Exhibit: 23).

[55]   On September 12, 2016, after waiting over 5 months for my post-CT scan recheck with Dr. Undavia, I submitted another complaint to HSA Wilk (Exhibit: 24). I clearly voiced my concern that my serious medical needs were not being addressed in a timely manner, and also about the numerous and constant delays in treatment. I then continued to wait, as the defendant(s) continued to delay in arranging for my care with Dr. Undavia – due to disorganization, laziness, cost-savings and retaliation, the necessary recheck with Dr. Undavia did not occur until December 1, 2016 (10 long months after my February 11, 2016 office call).

23

[56]   On December 1, 2016 I was again examined by Dr. Undavia (Exhibit: 17). After reviewing the CT scan from April 6, 2016, and after examining my nasal cavity, Dr. Undavia and I discussed the option of pursuing a second sinus surgery. We discussed the pros and cons of such a procedure. Concerns about additional scarring were discussed at length – we were both concerned that I had not been brought in to do the routine pose-operative rechecks in 2014. If there was a repeat of that failure, there would be even further scarring with a second surgery. We also discussed the severity of my symptoms – the severe congestion, sinus pressure and pain, headaches, inability to sleep well, prolonged & frequent nose bleeding, and the stress & anxiety. These clinical symptoms had plagued me for 31 months at the time of this discussion.

It was during this appointment when Dr. Undavia recommended that I should have a second surgery, in order to alleviate my suffering.

[57]   On March 9, 2017 I was taken to Princeton Eye & Ear for the pre-operative office call (Exhibit: 17). Unfortunately, for the 5th time in 7 visits, the defendant(s) failed to schedule my appointment specifically with my surgeon, Dr. Undavia.

I was seen by Aleen Lee, MD, who advised that I needed to see Dr. Undavia for my pre-operative visit. I was again sent back to Fort Dix without treatment.

[58]   On April 27, 2017 I saw Dr. Undavia for my pre-operative exam (Exhibit: 17). Dr. Undavia scheduled me for a second sinus surgery. He prescribed Prednisone (an anti-inflammatory corticosteroid), and Keflex (an antibiotic).

24

[59]    On May 4, 2017 I was taken to Saint Francis Medical Center for my second sinus surgery. Dr. Undavia clearly states in his surgery report that I "Had endoscopic sinus surgery, septoplasty & inferior turbinate reduction with me a few years ago.  He was unable to follow up. Postoperatively, he developed significant scar banding & recurrence of nasal polyps."  Dr. Undavia had informed me on February 11, 2016 in his Lawrenceville office that it is essential (for surgical procedures like the one I had on April 27, 2014) for the patient (me) to recheck with him early and often post-operatively, in order to avoid such scarring, and further pain and medical complications.

Unfortunately, as I've shown here in my complaint, the defendant failed (on no less than five occasions) to arrange for these vital recheck appointments with my operating surgeon, Dr. Undavia, leaving me untreated and in pain.


Dr. Undavia also commented that I "Forgot to bring his [my] CT.  Because of this, I felt it was difficult to perform the operation."  Once again, the defendant failed to provide a specialist with necessary diagnostic test results.  This results in my surgery being an, "Extremely difficult case."  In fact, when I read Dr. Undavia's surgery report, It is clear that, because he wasn't given my most recent CT at the time of surgery, Dr. Undavia contemplated cancelling/rescheduling my surgery (Exhibit: 25).

Intra-operatively, Dr. Undavia encountered extensive scar tissue formation.  And this scarring was a direct result of the defendant's repeated, intentional, delays and denials of my

25

treatments and medications.  The care which the defendant did provide to me, did not meet current and acceptable medical standards.

In the surgery report, which I received years later, Dr. Undavia also noted, "I was unable to see the opening of the maxillary sinus," and he went on to report, "The maxillary sinus antrum was then probed.  There was no opening. A surgical opening using a ball tipped seeker probe was made.  Then, thick purulent material was expressed from this area."  And he notes that, "The ethmoid air cells had extensive scar tissue" (Exhibit: 25).  These significant changes are proof that my complaints to the defendant, month after month for a period of 3 years, were genuine, and a serious medical need.  Unfortunately, the defendant(s) refused to perform their duty.  The constant, intentional, treatment delays and denials of care lead directly to me experiencing an enormous amount of pain and suffering, and caused permanent injuries and disabilities.

For 3 years, I lived in pain with a pus-filled (infected) right Maxillary Sinus.  In no way does this level of care meet any acceptable civilized standards of care.  I remember saying to HSA Travers when he called me to medical to discuss my BP-9 complaint, "I may be an inmate, but I'm still a human being".

[60]    When I awoke in the recovery room on May 4, 2017, Dr. Undavia came in to speak with me.  He informed me that the right maxillary sinus was completely obstructed, and that upon creating a surgical opening he found that the sinus was, "Filled with inspissated pus."  Dr. Undavia did also mention that he encountered, "Extensive scar tissue."  He stated that by

26

opening the obstructed sinus and removing the pus, I would soon feel better. The scar tissue, he said, was a "Permanent change."

[61]   On December 8, 2017 I finally received the thoracic surgery report from Saint Francis Medical Center. I had attempted previously (on numerous occasions since late 2014) to obtain this report, but was not successful (Exhibits: 26). When I obtained a copy of my medical records from the Fort Dix Medical Service (approximately 2015), this report was intentionally withheld from me.

[62]   On May 30, 2018 I was notified through the inmate Tru-Links computer system that my June 2018 recheck with Dr. Undavia was disapproved and would not be scheduled. The notification stated:

> "The consultation request submitted by
> Sood, Ravi MD on 11/21/17 for
> Otolaryngology, ENT follow up was
> Disapproved on 5/30/18. Your Sinusitis
> Has been addressed previously by the
> Ear Nose & Throat subspecialist.
> Consequently, this consult is not
> Medically necessary at this time."

This recheck was already approved last Summer, after my June 15, 2017 post-operative exam with Dr. Undavia (the approval notice was posted on the same Tru-Links, a few weeks after June 15th).

At the June 15, 2017 post-operative exam, Dr. Undavia documented abnormalities and symptoms of, "Nasal obstruction & facial pressure," & he clearly recommended that I, "Follow up in 1 year" (Exhibit: 17). Dr. Undavia had not "Resolved" the Chronic Sinusitis in his medical notes. It's still an active medical problem which needed his expert medical attention (Exhibit: 17).

The May 30, 2018 decision by the defendant to cancel an already approved recheck appointment with my surgeon just days after I notified the BOP that I filed a lawsuit in Camden District Court (I mailed the BOP Office of Internal Affairs a letter on May 16, 2018), is clearly intentional retaliation against me for exercising my Constitutional Rights. And clearly this action resulted in additional treatment delays/refusals. In this respect, the defendant claimed that I, "Had post-surgical follow-up on June 15, 2017, at which time it was noted his [Alexis's] condition had resolved," (Exhibit: 29).

[63]   On August 11, 2018 I notified New Jersey Senator Cory A. Booker of my plight. On September 4, 2018, Warden Ortiz responded to Senator Booker's contact with the BOP, saying that "It was noted his [Alexis's] condition had resolved," (Exhibit: 27). And on October 24, 2018, Warden Ortiz again responded to Senator Booker, saying "The ENT's impression was that his problem was resolved and no further intervention [is/was] required" (Exhibit: 28).

When one examines Dr. Undavia's medical notes from that June 15, 2017 post-operative recheck (Exhibit: 17), it is quite clear that Warden Ortiz intentionally lied to Senator Booker in an attempt to cover up, and facilitate, the treatment delays and refusals committed by the defendant(s).

28

Dr. Undavia's notes clearly state:

A) "Follow up in 1 year."

B) "Deviated nasal septum." (a minor problem)

- "Plan: Resolved"

C) "Sinusitis, chronic."

- Followed by a detailed plan/treatment, with absolutely no comment

that this (my major problem) is resolved.

D) "Synechia of nasal cavity." (a minor problem)

- "Plan: Resolved"

As one can easily see, the sinusitis had not been resolved.  And the defendant clearly

intentionally failed to treat my serious medical & surgical illness.

[64]    On July 23, 2018 I wrote directly to the BOP Director, Hugh Hurwitz (Exhibit: 29).  This

letter was sent to him so that he would understand my situation, and so that he would have the

opportunity to ensure that I would not lose the much needed continuity of care with my

surgeon, after the defendant's intentional decision to ignore my need for continued medical

and surgical care.

[65]    On July 27, 2018 I finally received all of my medical records from Princeton Eye & Ear.

This was after multiple requests over a period of approximately 3 years, and only with the help

of the New Jersey Board of Medical Examiners (Exhibit: 26).

[66]    On November 30, 2018 I was removed from my 2-man preferred housing into a 12-man

cell.  I had not received any incident report.  As I complained to counselor Bautiste about the

move, he stated to me that he moved me because of my lawsuits. Once again, I experienced clear retaliation because of my pursuing my legal rights through the Court.

[67]   On Thursday May 2, 2019 I was taken to see Dr. Undavia at Princeton Eye & Ear. This recheck was 11 months overdue because of the above detailed acts of the defendant. Dr. Undavia ordered a different nasal spray medication, and he placed me on a 6-day course of Prednisone (a corticosteroid, to control the inflammation). The Prednisone instantly helped relieve the pressure and burning sensation, so that I was more comfortable.

Dr. Undavia did have a discussion with me about my having a third nasal sinus surgery, in order to remove additional scar tissue. Unfortunately, he felt as though this procedure would have to be performed by a Nevada ENT, since I was scheduled to be released to a Nevada halfway house that Autumn. He would not be able to perform the procedure because of the 11-month, intentional, delay in my recheck appointment (originally scheduled for June 2018).

The new nasal spray medication (Azelastine) was deliberately withheld from me by the defendant(s). I was denied this necessary medication on at least 4 occasions, leaving me again untreated and in pain. A full *eighty days* after Dr. Undavia prescribed my medication, on July 21, 2019, I was finally issued the medication, but with zero refills (Exhibit: 31). I ran out of the medication after approximately 4 weeks. The defendant(s) refused to refill the medication, despite having the full knowledge that Dr. Undavia wanted me on the nasal spray regularly.

30

[68]    Medical ethics, good business practices, and legislation dictate that, when a patient requests a copy of their medical records, it should be provided within a certain, reasonable, time-frame.  For quite some time, I did not understand why my requests for copies of my medical records (sent to Saint Francis Medical Center and Princeton Eye & Ear) went unanswered.  Until now...

On July 12, 2019, a phone call was placed to the Medical Records Department at Princeton Eye & Ear.  A medical records technician named Lisa stated that their records did <u>not</u> show any requests submitted by Vincent Alexis for copies of his medical record(s) during 2019.

This is alarming because I mailed written requests to Princeton Eye & Ear for a copy of my medical record from the May 2, 2019 exam with Dr. Undavia, on four different occasions:

1) My first request was written and placed in the 5803 unit mailbox immediately after I returned to Fort Dix from the May 2nd exam (I was unable to copy this letter because the Law Library copy machines were not working, and my Unit Counselor refused to help);
2) My second request was written and placed in the 5803 unit mailbox on the evening of May 20, 2019 (Exhibit: 30);
3) My third request was written and placed in the 5803 unit mailbox on the evening of June 20, 2019 (Exhibit: 30);
4) My fourth request was written and placed in the 5803 unit mailbox on the evening of July 5, 2019 (Exhibit: 30).

It seems that not one of my mailings sent from Fort Dix prison reached its destination.  That July 12, 2019 phone call exposed the defendant's deceitful actions.  My requests for medical records, sent through the Fort Dix inmate mail system, were methodically and deliberately intercepted by Fort Dix staff/the BOP.  This foolish, and illegal, practice would most

certainly explain why I had such incredible difficulties in obtaining medical records from Saint Francis Medical Center and from Princeton Eye & Ear. And this deception made it impossible for me to be educated enough that I could make timely, accurate, decisions about my options – particularly my legal options, as I filed two actions in this Honorable Court.

I am most confident that ample evidence of this deception and corruption will surface through the Discovery process, and through interviews of Princeton Eye and Ear medical records department staff and management.

[69]    On September 18, 2019, Plaintiff Alexis was released from FCI Fort Dix into the custody of the Las Vegas Community Corrections Center (a Las Vegas halfway house).

[70]    On September 24, 2019, Plaintiff was examined by my Antonino Gumina, MD (his long-time, Las Vegas physician). Dr. Gumina is now treating Plaintiff's chronic illnesses. He's placed him on a number of medications, which he now receives without interruption, including Meloxicam 15mg once daily, and Dymista nasal spray (a combination of Azelastine & Flonase).

[71]    On January 20, 2020 Plaintiff was informed by the halfway house case manager that the defendants would not allow him to see his physician, Dr. Tony Gumina. I explained to my case manager that I had a recheck exam scheduled with Dr. Gumina on January 22nd, but my community movement pass was denied. I was left with no choice but to cancel my recheck appointment with Dr. Gumina.

[72]    On February 12, 2021, and on March 30, 2021, Plaintiff Alexis was seen by Dr. Sina Nasri (a Las Vegas Nevada ENT specialist).  Dr. Nasri explained to me that the damage to my right Maxillary sinus is indeed permanent because the uncontrolled infection resulted in destruction of the tissues in that sinus responsible for humidification.  He explained that I would need life-long treatment for the condition.

## VI. LEGAL CLAIMS – EIGHTH AMENDMENT CONSTITUTIONAL RIGHTS VIOLATIONS

Medical and Non-Medical staff repeatedly, intentionally, violated
Plaintiff's Eighth Amendment Constitutional Rights:

[73]    Constitutional Violations

Violations of the Eighth Amendment's proscription against cruel and unusual punishment constitute a cause of action under Bivens v. Six Unknown Fed. Narcotics Agents, 403 U.S. 388 (1971).  In Estelle v. Gamble, the Supreme Court held that deliberate indifference to a prisoner's serious medical needs constituted cruel and unusual punishment and gave rise to a civil rights cause of action, regardless of whether the indifference was manifested by prison doctors or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with treatment once prescribed, 50 L.Ed 2d 251 (1976).  See also Ziglar v. Abbasi, 198 L.Ed 2d (2017).

To state a claim for deliberate indifference, a prisoner must make (1) a subjective showing that the defendants were deliberately indifferent to his or her medical needs, and (2) an objective showing that those needs were serious.  Brathwaite v. Warden Phelps, 734 Fed.Appx. 114 (3rd Cir. 2018).

As for the Fifth Amendment violations, "prisoners enjoy the protection of due process." Hudson v. Palmer, 82 L Ed 2d 393 (1994).  Acts of retaliation, intimidation, various forms of cover-ups, fabrications, false statements, obstructionism and similar malicious acts by the prison officials alleged herein, all calculated to prevent plaintiff from pursuing his legitimate medical, personal injury and other grievances, are clear violations of the Fifth Amendment's Due Process Clause and legitimate cause of action under Bivens, particularly when directly affecting prisoner's ability to file of prosecute his Bivens claim.  Also, "in the prison environment, a specific incident might be symptomatic rather than aberrational." Porter v. Nussle, 152 L Ed 2d 12 (2002).

[74]    Serious Medical Need – Objective Factors (For All Claims)

A serious medical need is one that has been diagnosed by a physician as mandating treatment, or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.  Gutierrez v. Peters, 111 F.3d 1364 (7th Cir. 1997).

34

In certain cases there is not even need for expert testimony. "Expert testimony is not required to demonstrate serious medical needs where the prisoner can show that his medical need is one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention." Brathwaite v. Warden Phelps, 734 Fed. Appx. 114 (3d Cir 2018).

Just "the (mere) threat of tangible residual injury can establish deliberate indifference to a prisoner's medical needs." Spruill v. Gillis, 372 F.3d 218 (3d Cir. 2004), comment added.

Unfortunately, in this matter, the issue is more than just a "threat" and particularly more than just a mere threat of tangible injury. The injuries suffered by the Plaintiff, due to the defendant's refusal to provide medical care, and other Constitutional violations listed below, are very serious and permanent. As for a need to be diagnosed by a physician, as detailed in the Factual Statement above, the Plaintiff went through no less than four major surgical procedures (including lung surgery), blood transfusions, 45 days of hospitalization, and had numerous treatment plans mandated by the hospital physician(s), the operating ENT surgeon, and other specialist physicians (see Factual Statement and Exhibits).

[75]    **CLAIM ONE** – Complete Denial of Medical Care (Subjective Factors)

[76]    **CLAIM TWO** – Delay in the Provision of Medical Services for Various Non-Medical Reasons

[77]    **CLAIM THREE** – Intentional Infliction of Wanton, Completely Unnecessary, Inhumane Physical Pain and Suffering and Extrajudicial Punishment

[78]    **CLAIM FOUR** – Systemic Failure to Provide Adequate, Civilized, Medical Care

[79]    **CLAIM FIVE** – Denial of Any Medications

[80]    **CLAIM SIX** – Intentional Interference with a Prescribed Plan of Treatment and Medical Schedule

[81]    **CLAIM SEVEN** – Retaliation, Cover-Up, Procedural and Substantive Due Process Violations

[82]    **CLAIM EIGHT** – Direct Involvement of Non-Medical Higher Prison Officials and Their Knowledge of Constitutional Violations

## ALLEGATIONS ABOUT EACH DEFENDANT

[83]   **Defendant Ravi Sood, MD** – - Defendant Sood, in his role as Plaintiff's physician, failed to schedule necessary recheck examinations for Plaintiff ENT surgeon (Dr. Samir Undavia) on multiple occasions.  On numerous occasions (including March 9, 2017, point 57), Plaintiff was taken to Princeton Eye & Ear only to be turned away, untreated, by their staff because Defendant Sood failed to ensure that Plaintiff's recheck appointment(s) were appropriately scheduled with his ENT surgeon as clearly, repeatedly, directed by the doctors and staff at Princeton Eye and Ear (Exhibit: 17). Plaintiff's initial, essential, recheck with the ENT surgeon was delayed for approximately 20 months, not occurring until February 11, 2016 (point 53). Plaintiff also had an essential post-CT Scan recheck examination delayed for approximately 10 months.  That examination did not occur until December 1, 2016 (point 56).  Lastly, Plaintiff had an essential post-operative exam (which was scheduled for June of 2018) cancelled just weeks before the appointment when Plaintiff was told that the recheck examination was "Not medically necessary at this time," (point 62), despite the Defendant having full knowledge that the ENT surgeon needed to examine the Plaintiff in June of 2018 (point 63, Exhibit: 17).  That examination did not occur until May 2, 2019 (point 67).  This lengthy, 11-month, delay resulted in even further delays in Plaintiff's medical and surgical care, because Dr. Undavia was then unable to offer me further surgical care since I was scheduled to depart that Autumn for a Las Vegas, Nevada, Half-way house (point 67).

Defendant Sood deliberately refused to treat my very serious medical and surgical conditions on numerous occasions.  He refused to issue medications for my very serious sinus

37

infection repeatedly, despite the obvious fact that there was fresh blood draining from my right nostril. Defendant Sood refused to issue prescribed medications:

- Flonase nasal spray on/about December 17, 2018;

- Azelastine nasal spray on May 2, 2019.

When Plaintiff's ENT surgeon prescribed a different, stronger (and more expensive), Nasal Spray Medication (Azelastine HCl, point 67), Defendant Sood refused to issue the medication to the Plaintiff for a full eighty days, and then left the Plaintiff with no refills, and again untreated, after the medication was used up by early August 2019.

It is very clear that Defendant Sood participated in a Systemic Failure to Provide Adequate, Civilized, Medical Care (CLAIM FOUR, point 78). His Intentional Interference with a Prescribed Plan of Treatment and Medical Schedule (CLAIM SIX, point 80) directly resulted in Denial of Medications (CLAIM FIVE, point 79), Complete Denial of Medical Care (CLAIM ONE, point 75), and Delay(s) in the Provision of Medical Services for Various Non-Medical Reasons (CLAIM TWO, point 76). Plaintiff was left with a pus-filled right Maxillary Sinus for well over 1.5 years (point 59), and this uncontrolled infection continued to damage essential sinus tissue resulting in permanent damage and significant pain and suffering - acts which are clearly Intentional Infliction of Wanton, Completely Unnecessary, Inhumane Physical Pain and Suffering and Extrajudicial Punishment Resulting in Permanent Injuries and Disabilities (CLAIM THREE, point 77).

38

[84]   **Defendant N. Turner-Foster, MD/Medical Director** - Defendant Turner-Foster, in her role as Fort Dix Medical Services Clinical Director, ignored the treatment denials of her subordinates and she ignored their refusal to follow BOP Policy and Procedure.  She failed to schedule necessary recheck examinations for Plaintiff Alexis's ENT surgeon (Dr. Samir Undavia) on multiple occasions.  On numerous occasions (including March 9, 2017, point 57), Plaintiff was taken to Princeton Eye & Ear only to be turned away, untreated, by their staff because Defendant Turner-Foster failed to ensure that Plaintiff's recheck appointment(s) were appropriately scheduled with his ENT surgeon as clearly, repeatedly, directed by the doctors and staff at Princeton Eye and Ear (Exhibit: 17). Plaintiff's initial, essential, recheck with the ENT surgeon was delayed for approximately 20 months, not occurring until February 11, 2016 (point 53).  Plaintiff also had an essential post-CT Scan recheck examination delayed for approximately 10 months.  That examination did not occur until December 1, 2016 (point 56).  Lastly, Plaintiff had an essential post-operative exam (which was scheduled for June of 2018) cancelled just weeks before the appointment when Plaintiff was told that the recheck examination was "Not medically necessary at this time," (point 62), despite the Defendant having full knowledge that the ENT surgeon needed to examine the Plaintiff in June of 2018 (point 63, Exhibit: 17).  That examination did not occur until May 2, 2019 (point 67).  This lengthy, 11-month, delay resulted in even further delays in Plaintiff's medical and surgical care, because Dr. Undavia was then unable to offer me further surgical care since I was scheduled to depart that Autumn for a Las Vegas, Nevada, Half-way house (point 67).  Moreover, the ENT surgeon prescribed for the Plaintiff a different, stronger (and more expensive), Nasal Spray Medication (Azelastine HCl,

point 67), which Defendant Turner-Foster failed to ensure that Plaintiff Alexis received in a timely and consistent manner (point 67).

It is very clear that Defendant Turner-Foster participated in a Systemic Failure to Provide Adequate, Civilized, Medical Care (CLAIM FOUR, point 78). Her Intentional Interference with a Prescribed Plan of Treatment and Medical Schedule (CLAIM SIX, point 80) directly resulted in Denial of Medications (CLAIM FIVE, point 79), Complete Denial of Medical Care (CLAIM ONE, point 75), and Delay(s) in the Provision of Medical Services for Various Non-Medical Reasons (CLAIM TWO, point 76). Plaintiff was left with a pus-filled right Maxillary Sinus for well over 1.5 years (point 59), and this uncontrolled infection continued to damage essential sinus tissue resulting in permanent damage and significant pain and suffering - acts which are clearly Intentional Infliction of Wanton, Completely Unnecessary, Inhumane Physical Pain and Suffering and Extrajudicial Punishment Resulting in Permanent Injuries and Disabilities (CLAIM THREE, point 77).

[85] **Defendant David Ortiz, Warden FCI Fort Dix** – Defendant Ortiz intentionally lied to New Jersey Senator Cory A. Booker on two separate occasions, September 4, 2018 and October 24, 2018 (point 63). Defendant Ortiz did so as retaliation after I notified the BOP (May 16, 2018) that I filed a lawsuit in Camden District Court, and because I had complained to the Fort Dix Health Services Administrators that my June 2018 recheck exam with my surgeon was cancelled (point 62). Defendant Ortiz's cancelling of Plaintiff Alexis's June 2018 recheck with his ENT surgeon, and his blatant lies to Senator Booker, had no medical justification whatsoever. As

40

shown in the Factual Statement, Defendant Ortiz was well aware of my serious medical and surgical needs, but he chose to orchestrate and participate in a Systemic Failure to Provide Adequate, Civilized, Medical Care (CLAIM FOUR, point 78), as well as Direct Involvement of Non-Medical Higher Prison Officials and Their Knowledge of Constitutional Violations (CLAIM EIGHT, point 82). His actions were a clear Retaliation, Cover-Up, Procedural and Substantive Due Process Violation (CLAIM SEVEN, point 81). And his intentional actions denied my necessary ENT care for 11 months, a clear Delay in the Provision of Medical services for Various Non-Medical Reasons (CLAIM TWO, point 76), resulted in Denial of Medications (CLAIM FIVE, point 79), and a Complete Denial of Medical Care (CLAIM ONE, point 75), and were clearly an Intentional Interference with a Prescribed Plan of Treatment and Medical Schedule (CLAIM SIX, point 80). His actions resulted in Plaintiff Alexis experiencing Intentional Infliction of Wanton, Completely Unnecessary, Inhumane Physical Pain and Suffering and Extrajudicial Punishment (CLAIM THREE, point 77).

[86]   **Defendant J. Hollingsworth, Warden FCI Fort Dix** – Defendant Hollingsworth deliberately ignored the treatment denials and delays of his staff, as well as their refusal to follow BOP Policy and Procedure, despite having full knowledge of my very serious medical and surgical needs. He failed to schedule necessary recheck examinations for Plaintiff's ENT surgeon (Dr. Samir Undavia) on multiple occasions. On numerous occasions (including March 9, 2017, point 57), Plaintiff was taken to Princeton Eye & Ear only to be turned away, untreated, by their staff because Defendant Hollingsworth failed to ensure that Plaintiff's recheck appointment(s) were appropriately scheduled with his ENT surgeon as clearly, repeatedly,

41

directed by the doctors and staff at Princeton Eye and Ear (Exhibit: 17). Plaintiff's initial, essential, recheck with the ENT surgeon was delayed for approximately 20 months, not occurring until February 11, 2016 (point 53). Plaintiff also had an essential post-CT Scan recheck examination delayed for approximately 10 months. That examination did not occur until December 1, 2016 (point 56). Lastly, Plaintiff had an essential post-operative exam (which was scheduled for June of 2018) cancelled just weeks before the appointment when Plaintiff was told that the recheck examination was "Not medically necessary at this time," (point 62), despite the Defendant having full knowledge that the ENT surgeon needed to examine the Plaintiff in June of 2018 (point 63, Exhibit: 17). That examination did not occur until May 2, 2019 (point 67). This lengthy, 11-month, delay resulted in even further delays in Plaintiff's medical and surgical care, because Dr. Undavia was then unable to offer me further surgical care since I was scheduled to depart that Autumn for a Las Vegas, Nevada, Half-way house (point 67).

It is very clear that Defendant Hollingsworth participated in a Systemic Failure to Provide Adequate, Civilized, Medical Care (CLAIM FOUR, point 78), as well as Direct Involvement of Non-Medical Higher Prison Officials and Their Knowledge of Constitutional Violations (CLAIM EIGHT, point 82). His Intentional Interference with a Prescribed Plan of Treatment and Medical Schedule (CLAIM SIX, point 80) directly resulted in Denial of Medications (CLAIM FIVE, point 79), Complete Denial of Medical Care (CLAIM ONE, point 75), and Delay(s) in the Provision of Medical Services for Various Non-Medical Reasons (CLAIM TWO, point 76). Plaintiff was left with a pus-filled right Maxillary Sinus for well over 1.5 years (point 59), and this uncontrolled infection continued to damage essential sinus tissue resulting

in permanent damage and significant pain and suffering - acts which are clearly Intentional Infliction of Wanton, Completely Unnecessary, Inhumane Physical Pain and Suffering and Extrajudicial Punishment Resulting in Permanent Injuries and Disabilities (CLAIM THREE, point 77).

[87]   **Defendant Haczynski, Head Health Services Administrator FCI Fort Dix** – Defendant Haczynski, in his role as Head Health Services Administrator at Fort Dix, failed to schedule necessary recheck examinations for Plaintiff Alexis's ENT surgeon (Dr. Samir Undavia) on multiple occasions.  On numerous occasions (including March 9, 2017, point 57), Plaintiff was taken to Princeton Eye & Ear only to be turned away, untreated, by their staff because Defendant Haczynski failed to schedule the recheck appointment appropriately with the Plaintiff's ENT surgeon as clearly, repeatedly, directed by the doctors and staff at Princeton Eye and Ear (Exhibit: 17). Plaintiff's initial, essential, recheck with the ENT surgeon was delayed for approximately 20 months, not occurring until February 11, 2016 (point 53).  Plaintiff also had an essential post-CT Scan recheck examination delayed for approximately 10 months.  That examination did not occur until December 1, 2016 (point 56).  Lastly, Plaintiff had an essential post-operative exam (which was scheduled for June of 2018) cancelled just weeks before the appointment when Plaintiff was told that the recheck examination was "Not medically necessary at this time," (point 62), despite the Defendant having full knowledge that the ENT surgeon needed to examine the Plaintiff in June of 2018 (point 63, Exhibit: 17).  That examination did not occur until May 2, 2019 (point 67).  This lengthy, 11-month, delay resulted in even further delays in Plaintiff's medical and surgical care, because Dr. Undavia was then

unable to offer me further surgical care since I was scheduled to depart that Autumn for a Las

Vegas, Nevada, Half-way house (point 67).  Moreover, the ENT surgeon prescribed for the

Plaintiff a different, stronger (and more expensive), Nasal Spray Medication (Azelastine HCl,

point 67), which Defendant Haczynski refused to issue to the Plaintiff for a full eighty days, and

then left the Plaintiff with no refills and again untreated, after the medication was quickly used

up.

It is very clear that Defendant Haczynski participated in a Systemic Failure to Provide

Adequate, Civilized, Medical Care (CLAIM FOUR, point 78).  His Intentional Interference with a

Prescribed Plan of Treatment and Medical Schedule (CLAIM SIX, point 80) directly resulted in

Denial of Medications (CLAIM FIVE, point 79), Complete Denial of Medical Care (CLAIM ONE,

point 75), and Delay(s) in the Provision of Medical Services for Various Non-Medical Reasons

(CLAIM TWO, point 76).  Plaintiff was left with a pus-filled right Maxillary Sinus for well over 1.5

years (point 59), and this uncontrolled infection continued to damage essential sinus tissue

resulting in permanent damage and significant pain and suffering - acts which are clearly

Intentional Infliction of Wanton, Completely Unnecessary, Inhumane Physical Pain and

Suffering and Extrajudicial Punishment Resulting in Permanent Injuries and Disabilities (CLAIM

THREE, point 77).

[88]    **Defendant J. Wilk, Health Services Administrator FCI Fort Dix** – Defendant Wilk, in his

role as Health Services Administrator at Fort Dix, failed to schedule necessary recheck

examinations for Plaintiff Alexis's ENT surgeon (Dr. Samir Undavia) on multiple occasions.  On

44

numerous occasions, (including March 9, 2017, point 57), Plaintiff was taken to Princeton Eye & Ear only to be turned away, untreated, by their staff because Defendant Wilk failed to schedule the recheck appointment appropriately with the Plaintiff's ENT surgeon as clearly, repeatedly, directed by the doctors and staff at Princeton Eye and Ear (Exhibit: 17). Plaintiff's initial, essential, recheck with the ENT surgeon was delayed for approximately 20 months, not occurring until February 11, 2016 (point 53). Plaintiff also had an essential post-CT Scan recheck examination delayed for approximately 10 months. That examination did not occur until December 1, 2016 (point 56). Lastly, Plaintiff had an essential post-operative exam (which was scheduled for June of 2018) cancelled just weeks before the appointment when Plaintiff was told that the recheck examination was "Not medically necessary at this time," (point 62), despite the Defendant having full knowledge that the ENT surgeon needed to examine the Plaintiff in June of 2018 (point 63, Exhibit: 17). That examination did not occur until May 2, 2019 (point 67). This lengthy, 11-month, delay resulted in even further delays in Plaintiff's medical and surgical care, because Dr. Undavia was then unable to offer me further surgical care since I was scheduled to depart that Autumn for a Las Vegas, Nevada, Half-way house (point 67). Moreover, the ENT surgeon prescribed for the Plaintiff a different, stronger (and more expensive), Nasal Spray Medication (Azelastine HCl, point 67), which Defendant Wilk refused to issue to the Plaintiff for a full eighty days, and then left the Plaintiff with no refills, and again untreated after the medication was quickly used up.

It is very clear that Defendant Wilk participated in a Systemic Failure to Provide Adequate, Civilized, Medical Care (CLAIM FOUR, point 78). His Intentional Interference with a Prescribed Plan of Treatment and Medical Schedule (CLAIM SIX, point 80) directly resulted in

Denial of Medications (CLAIM FIVE, point 79), Complete Denial of Medical Care (CLAIM ONE, point 75), and Delay(s) in the Provision of Medical Services for Various Non-Medical Reasons (CLAIM TWO, point 76). Plaintiff was left with a pus-filled right Maxillary Sinus for well over 1.5 years (point 59), and this uncontrolled infection continued to damage essential sinus tissue resulting in permanent damage and significant pain and suffering - acts which are clearly Intentional Infliction of Wanton, Completely Unnecessary, Inhumane Physical Pain and Suffering and Extrajudicial Punishment Resulting in Permanent Injuries and Disabilities (CLAIM THREE, point 77).

[89]    **Defendant J.L. Norwood, Regional Director Federal Bureau of Prisons** – in his role as Regional Director of the U.S. Federal Bureau of Prisons (Northeast Operations) Defendant Norwood deliberately ignored the treatment denials and delays of his staff, as well as their refusal to follow BOP Policy and Procedure, despite having full knowledge of my very serious medical and surgical needs (Exhibit: 3). Defendant Norwood failed to schedule necessary recheck examinations for Plaintiff Alexis's ENT surgeon (Dr. Samir Undavia) on multiple occasions. On numerous occasions (including March 9, 2017, point 57), Plaintiff was taken to Princeton Eye & Ear only to be turned away, untreated, by their staff because Defendant Norwood failed to ensure that Plaintiff's essential recheck appointments were appropriately scheduled with his ENT surgeon as clearly, repeatedly, directed by the doctors and staff at Princeton Eye and Ear (Exhibit: 17). Plaintiff's initial, essential, recheck with the ENT surgeon was delayed for approximately 20 months, not occurring until February 11, 2016 (point 53). Plaintiff also had an essential post-CT Scan recheck examination delayed for approximately 10

46

months. That examination did not occur until December 1, 2016 (point 56). Lastly, Plaintiff had an essential post-operative exam (which was scheduled for June of 2018) cancelled just weeks before the appointment when Plaintiff was told that the recheck examination was "Not medically necessary at this time," (point 62), despite the Defendant having full knowledge that the ENT surgeon needed to examine the Plaintiff in June of 2018 (point 63, Exhibit: 17). That examination did not occur until May 2, 2019 (point 67). This lengthy, 11-month, delay resulted in even further delays in Plaintiff's medical and surgical care, because Dr. Undavia was then unable to offer me further surgical care since I was scheduled to depart that Autumn for a Las Vegas, Nevada, Half-way house (point 67). Moreover, the ENT surgeon prescribed for the Plaintiff a different, stronger (and more expensive), Nasal Spray Medication (Azelastine HCl), which Defendant Norwood failed to ensure that Plaintiff Alexis received in a timely and consistent manner (point 67).

It is very clear that Defendant Norwood participated in a Systemic Failure to Provide Adequate, Civilized, Medical Care (CLAIM FOUR, point 78), as well as Direct Involvement of Non-Medical Higher Prison Officials and Their Knowledge of Constitutional Violations (CLAIM EIGHT, point 82). His Intentional Interference with a Prescribed Plan of Treatment and Medical Schedule (CLAIM SIX, point 80) directly resulted in Denial of Medications (CLAIM FIVE, point 79), Complete Denial of Medical Care (CLAIM ONE, point 75), and Delay(s) in the Provision of Medical Services for Various Non-Medical Reasons (CLAIM TWO, point 76). Plaintiff was left with a pus-filled right Maxillary Sinus for well over 1.5 years (point 59), and this uncontrolled infection continued to damage essential sinus tissue resulting in permanent damage and significant pain and suffering - acts which are clearly Intentional Infliction of Wanton,

47

Completely Unnecessary, Inhumane Physical Pain and Suffering and Extrajudicial Punishment Resulting in Permanent Injuries and Disabilities (CLAIM THREE, point 77).

[90]   **Defendant Ian Connors, Administrator Federal Bureau of Prisons** – in his role as Administrator within the BOP's Central Office, Defendant Connors deliberately ignored the treatment denials and delays of his staff, as well as their refusal to follow BOP Policy and Procedure, despite having full knowledge of my very serious medical and surgical needs (Exhibit: 4).  Defendant Connors failed to schedule necessary recheck examinations for Plaintiff Alexis's ENT surgeon (Dr. Samir Undavia) on multiple occasions.  On numerous occasions (including March 9, 2017, point 57), Plaintiff was taken to Princeton Eye & Ear only to be turned away, untreated, by their staff because Defendant Connors failed to ensure that Plaintiff's essential recheck appointments were appropriately scheduled with his ENT surgeon as clearly, repeatedly, directed by the doctors and staff at Princeton Eye and Ear (Exhibit: 17). Plaintiff's initial, essential, recheck with the ENT surgeon was delayed for approximately 20 months, not occurring until February 11, 2016 (point 53).  Plaintiff also had an essential post-CT Scan recheck examination delayed for approximately 10 months.  That examination did not occur until December 1, 2016 (point 56).  Lastly, Plaintiff had an essential post-operative exam (which was scheduled for June of 2018) cancelled just weeks before the appointment when Plaintiff was told that the recheck examination was "Not medically necessary at this time," (point 62), despite the Defendant having full knowledge that the ENT surgeon needed to examine the Plaintiff in June of 2018 (point 63, Exhibit: 17).  That examination did not occur until May 2, 2019 (point 67).  This lengthy, 11-month, delay resulted in even further delays in Plaintiff's

medical and surgical care, because Dr. Undavia was then unable to offer me further surgical care since I was scheduled to depart that Autumn for a Las Vegas, Nevada, Half-way house (point 67). Moreover, the ENT surgeon prescribed for the Plaintiff a different, stronger (and more expensive), Nasal Spray Medication (Azelastine HCl), which Defendant Connors failed to ensure that Plaintiff Alexis received in a timely and consistent manner (point 67).

It is very clear that Defendant Connors participated in a Systemic Failure to Provide Adequate, Civilized, Medical Care (CLAIM FOUR, point 78), as well as Direct Involvement of Non-Medical Higher Prison Officials and Their Knowledge of Constitutional Violations (CLAIM EIGHT, point 82). His Intentional Interference with a Prescribed Plan of Treatment and Medical Schedule (CLAIM SIX, point 80) directly resulted in Denial of Medications (CLAIM FIVE, point 79), Complete Denial of Medical Care (CLAIM ONE, point 75), and Delay(s) in the Provision of Medical Services for Various Non-Medical Reasons (CLAIM TWO, point 76). Plaintiff was left with a pus-filled right Maxillary Sinus for well over 1.5 years (point 59), and this uncontrolled infection continued to damage essential sinus tissue resulting in permanent damage and significant pain and suffering - acts which are clearly Intentional Infliction of Wanton, Completely Unnecessary, Inhumane Physical Pain and Suffering and Extrajudicial Punishment Resulting in Permanent Injuries and Disabilities (CLAIM THREE, point 77).

[91]   **Defendant Hugh Hurwitz, Director Federal Bureau of Prisons** – Defendant Hurwitz, as shown in the above Factual Statement, was well aware of Plaintiff Alexis's serious medical and surgical needs. This Defendant was directly notified by the Plaintiff by U.S. Mail on/about July

25, 2018 (Point 64). In his role as Director of the Federal Bureau of Prisons, Defendant Hurwitz participated in a Systemic Failure to Provide Adequate, Civilized, Medical Care (CLAIM FOUR, point 78), as well as Direct Involvement of Non-Medical Higher Prison Officials and Their Knowledge of Constitutional Violations (CLAIM EIGHT, point 82). He deliberately elected to ignore my complaint, and intentionally ignored his staff's egregious, intentional, and continual Interruptions of Prescribed Plans of Treatment. His action/inaction was itself Interference with Prescribed Plans of Treatment (CLAIM SIX, point 80), and left me without treatment and directly resulted in my experiencing an enormous amount of pain and suffering.

[92] Loss of Qualifies Immunity: Plainly Incompetent or Knowingly Violating the Established Law

Qualified immunity protects all but plainly incompetent or those who knowingly violate the law. An officer might lose qualified immunity even if there is no reported case directly on point. Ziglar v. Abbasi, 198 L Ed 2d 290 (2017). Government officials are shielded from liability for civil damages insofar as "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Rouse v. Plantier, 182 F.32 192 (3d Cir. 1999). The doctrine of qualified immunity shields officials from civil liability so long as their conduct does not violate clearly established constitutional rights of which a reasonable person would have known. "The dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Hernandez v. Mesa, 198 L Ed 2d 625 (2017).

No defendant here is entitled to qualified immunity. As shown in the Factual Statement, each and every defendant exhibited conduct which violated clearly established statutory or constitutional rights of which a reasonable person would have known. And these defendants did so with full knowledge that such actions (or omissions) would most certainly result in a denial and/or delay in provision of medical or surgical care for my very serious medical/surgical condition(s), and would directly result in my experiencing an enormous amount of pain and suffering;

[93]   Statute of Limitations

All of the Claims stated in this Bivens Complaint occurred after February 8, 2016. Therefore, Plaintiff's complaint is timely and withing the Statute of Limitations.

[94]   Further Discoveries Request

As the plaintiff is still "in the dark" concerning numerous medical matters and issues in this matter, pursuant to the applicable provisions of the Fed.R.Civ.P., the plaintiff requests the following discovery:

## VII. DISCOVERY

[95]     Further Discoveries Request

As the Plaintiff is still in the dark concerning numerous medical issues in this matter, pursuant to the applicable provisions of the Fed.R.Civ.P., the Plaintiff requests the following discovery:

Federal Bureau of Prisons/FCI Fort Dix/U.S. Department of Justice:

A. Alexis's medical records from the Fort Dix Medical Service and the Federal Bureau of Prisons from January 1, 2017, through March 10, 2020;

B. Copies (on disc or radiology film, unaltered and original image) of all radiographs taken of me at FCI Fort Dix from March 6, 2014 through September 18, 2019;

C. Copies of any and all correspondences between the FBOP/Warden/U.S. Dep't of Justice and New Jersey Senator Cory A. Booker regarding my health care/illness;

D. Any and all documents or records generated or referenced between June 1, 2017 and June 30, 2018 related to the cancellation of my already approved recheck exam with Dr. Samir Undavia, which was scheduled for June of 2018;

E. A copy of the May 16, 2018 letter which I sent to the BOP Office of Internal Affairs, in which I complained of my concerns regarding my medical care at FCI

Fort Dix and notified their office of my filing of a Bivens complains (docket #18-cv-02099-RBK-KMW);

F. A copy of any and all communications within the BOP/Department of Justice in regards to/in response to my July 23, 2018 letter to BOP Director Hurwitz. This includes, but is not limited to: e-mail, fax, text, recorded phone calls, video conferences, online video, etc.

G. Any and all BOP/U.S. Department of Justice records which relate to Dr. Ravi Sood's disciplinary history with the BOP/U.S. Department of Justice/Fort Dix;

H. Any and all BOP/U.S. Department of Justice records which relate to Administrative Remedy Action (BP-8, BP-9, BP-10, BP-11, and SF-95) taken against Dr. Sood by inmates;

I. Any and all BOP/U.S. Department of Justice records which relate to any legal action/lawsuits (regardless of the outcome), which were filed in Federal Court, naming Dr. Sood as a defendant;

J. A complete copy of the BOP/Fort Dix Mail Room Policy and Procedure Program Statement;

K. Copies of any and all BOP/Fort Dix Mail Logs with the following (for the time period from March 5, 2014 through September 18, 2019):

    a. All regular inmate outgoing mail sent by Vincent Alexis;

    b. All regular inmate incoming mail sent to Vincent Alexis;

    c.  All outgoing legal mail sent by Vincent Alexis;

    d.  All incoming legal mail sent to Vincent Alexis;

L.  A complete copy of the BOP Formulary, listing "approved" BOP medications, from March 5, 2014 through March 10, 2020 (this should include any and all updates/changes, to reflect the addition &/or deletion of medications over the 67-month time period);

M. A complete copy of the BOP Policy regarding "chronic care" inmates and their medical care;

N.  The dates during which Warden Hollingsworth was in charge at FCI Ft. Dix;

O.  The dates during which Warden Ortiz was in charge at FCI Ft. Dix.

<u>Princeton Eye & Ear</u>:

A.  A complete copy of any and all records in the possession of Princeton Eye & Ear which show any and all requests for copies of medical records, by Vincent Alexis, from March 1, 2014 through September 18, 2019;

B.  The full name of the following Princeton Eye & Ear employees, during the time period of January 1, 2015 through September 18, 2019:

    a.  Office Manager(s);

    b.  All Medical Records Technicians;

C.  Copies of any and all photographs taken of me while I was hospitalized at Saint Francis Medical Center and underwent nasal sinus surgery with Dr. Undavia in March/April of 2014 and on May 4, 2017 (including any and all endoscopic video/photographs);

Saint Francis Medical Center:

A.  Copies of any and all photographs taken of me during my hospitalization from March 22, 2014 through May 5, 2014 and on May 4, 2017 (including any and all endoscopic video/photographs).

## VIII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays that this Court enters judgement granting Plaintiff the following relief:

**Order,** Defendants to hand over all Discovery supporting Alexis's above claims within 30 days of this Court's Order;

**Order,** this case to proceed to a Civil Jury Trial, to further the administration of justice;

**Order**, Medical Defendants [point 5] and Non-Medical Defendants [point 6] to pay Compensatory Damages in the amount of $3,000,000.00 against each Defendant, jointly and severally, as per Schedule in Exhibit:32.

**Order**, Medical Defendants [point 5] and Non-Medical Defendants [point 6] to pay Punitive Damages in the amount of $4,000,000.00 against each Defendant, jointly and severally;

**Order**, Defendants to pay Plaintiff's costs in this complaint in the amount of $5,000.00 for copies, printing costs, and law library assistance & legal fees, etc.;

**Order**, Defendants to pay any and all costs associated with future nasal sinus medical care and surgery (which may be necessary to remove additional scar tissue);

**Order**, Defendants to provide Alexis with free, life-long, health insurance/ Medicaid/Medicare, in order to cover all costs associated with future medical and surgical care for his permanent injuries;

**Order**, any additional relief this Honorable Court deems just, proper and equitable.

## CERTIFICATION

Pursuant to the provisions of 28 Section 1746(2),

I hereby declare under the penalty of perjury that the foregoing

Is true and correct.

Respectfully Submitted,

VINCENT P. ALEXIS
1401 Watercreek Drive
N. Las Vegas, Nevada 89032

## VERIFICATION

I have read the foregoing complaint and hereby verify that the matters alleged therein are true, except as to matters alleged on information and belief, and as to those, I believe them to be true. I certify under the penalty of perjury that the foregoing is true and correct.

Executed at North Las Vegas, Nevada, on April __7__, 2021.

_VINCENT P. ALEXIS_

VINCENT P. ALEXIS
1401 Watercreek Drive
N. Las Vegas, Nevada 89032

58