UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| VINCENT P. ALEXIS,<br><br>        Plaintiff,<br><br>    v.<br><br>IAN CONNORS, et al.,<br><br>        Defendants. | Civil Action<br>No. 18-2099 (CPO) (MJS)<br><br>**OPINION** |

**O'HEARN, District Judge.**

Before the Court are the remaining Defendants' motions to dismiss the Second Amended Complaint, (ECF No. 30), pursuant to Federal Rule of Civil Procedure 12(b)(6), and for summary judgment pursuant to Federal Rule of Civil Procedure Rule 56.[1] (ECF No. 51.) For the following reasons, the Court will grant Defendants' motion for summary judgment and deny their motion to dismiss as moot.

## I.     BACKGROUND

As the parties are intimately familiar with the facts of this case, and because the Court has already set forth the background of this matter in earlier Opinions, (ECF Nos. 5, 28), the Court will only set forth the background necessary to address the instant motions. The remaining Defendants are: (1) Plaintiff's doctor at Federal Correctional Institution Fort Dix, Dr. Ravi Sood, (2) Fort Dix chief medical doctor and director, Dr. Nicoletta Turner-Foster, (3) former warden of Fort Dix, David Ortiz, (4) head health service administrator, Travis Haczynski, (5) associate health service administrator, Jeff Wilk, (6) former Bureau of Prisons ("BOP") northeast regional director,

---

[1] As Defendants raised the affirmative defense of exhaustion, which may require consideration of matters outside of the pleadings, the Court advised the parties that it would consider the issue of exhaustion in the context of summary judgment. (ECF No. 54.)

Joe Norwood, (7) BOP national inmate appeals coordinator, Ian Connors, and (8) former BOP director Hugh Hurwitz.

Judge Kugler previously set forth the relevant background as follows:

> This case arises from Plaintiff's medical treatment while incarcerated at FCI Fort Dix, for his septic sinus infection and chronic Lyme disease. According to the complaint, Plaintiff became ill with a septic sinus infection on March 19, 2014. Plaintiff, who holds a doctorate in veterinary medicine, alleges that he sought treatment for the infection, but through a series of misdiagnoses, delays, and refusals to send him to the hospital, his infection remained untreated, until it significantly worsened.
>
> Prison officials ultimately sent Plaintiff to Defendant Saint Francis Medical Center on March 22, 2014, where his diagnostic tests revealed that a bacterial infection had spread through his body. In order to gain control over the sepsis, hospital physician Dr. Samir Undavia performed sinus surgery to remove the infection sites and establish drainage on March 27, 2014. Dr. Undavia encountered tremendous inflammation and observed that the 'case became very difficult given how much necrotic tissue was everywhere,' as a result of the earlier misdiagnoses and delays in Plaintiff's treatment.
>
> While recovering at the hospital, on March 31, 2014, both of Plaintiff's lungs collapsed, requiring hospital staff to install emergency chest tubes. Plaintiff contends that the staff member negligently positioned the chest tubes, which required a second procedure to reposition those tubes. The repositioning failed and required Plaintiff to undergo major thoracic surgery. The hospital discharged Plaintiff on May 5, 2014.
>
> According to Plaintiff, from the date of his discharge until September 15, 2015, prison officials and medical staff misdiagnosed his residual sinus issues and Lyme disease, withheld medical documents, and negligently failed to prescribe antibiotics on a number of occasions. Additionally, Plaintiff takes issue with the staff's failure to schedule some of his post-surgery follow-ups with Dr. Undavia, instead 'negligently' scheduling him to meet with other ear, nose, and throat specialists.
>
> In response to those failures, Plaintiff filed his grievances and appeals thereof, on November 6, 2014, November 20, 2014, January 12, 2015, and March 5, 2015, amending his appeal each time to include new alleged failures of prison officials and medical staff.

> He received a response to each of those appeals on November 17, 2014, January 6, 2015, February 25, 2015, and September 7, 2015, from a number of the Defendant wardens, directors, and administrators, who ultimately concluded that Plaintiff received proper and adequate medical care and treatment and denied the appeals.
>
> Plaintiff finally met with Dr. Undavia for his first post-operative check on November 9, 2015 but contends that prison officials and medical staff unnecessarily delayed two of four subsequent meetings with Dr. Undavia. During those meetings, Dr. Undavia recommended that Plaintiff undergo a second surgery to alleviate his residual sinus and related issues. Dr. Undavia performed the second surgery on May 4, 2017.
>
> Although the second surgery alleviated some of Plaintiffs afflictions, he alleges that he still experiences difficulty draining his sinuses, trouble sleeping, and nosebleeds. Additionally, he experiences significant pain and restrictions on activity, as a result of the thoracotomy after his first sinus surgery.

(ECF No. 5, at 2–4 (citations omitted).)

Plaintiff asserted Eighth Amendment deliberate indifference claims, alleging that Defendants refused to provide proper treatment, delayed necessary treatment, prevented him from receiving treatment, or some combination thereof. (*See generally*, ECF No. 1.) The Court dismissed the majority of the initial complaint on statute of limitations grounds. (ECF No. 5, at 6-7.)

Plaintiff filed a proposed amended complaint in August of 2021. (ECF No. 27-2). Plaintiff argued that the Court should excuse his late filing because: (1) under the discovery rule, he only discovered the extent of his injuries on December 8, 2017, and (2) because Defendants deliberately withheld his medical records at various times. (ECF No. 27-2, at 47, 76–78.) The Court rejected Plaintiff's arguments, but allowed Plaintiff to amend, and then dismissed with prejudice all claims that began to accrue prior to February 8, 2016, as time barred. (ECF No. 28, at 12–13.) The Court then directed Plaintiff to file a proposed second amended complaint. (ECF No. 29.)

In April of 2021, Plaintiff filed a motion to amend and his proposed Second Amended Complaint (hereinafter "Complaint"), which is the operative complaint. (ECF No. 30.) The Court denied Plaintiff's attempt to add official capacity claims against the individual Defendants but allowed the remainder of the Complaint to proceed. (ECF No. 31.)

In the Complaint, after separating the events that led to his remaining claims, (ECF No. 30, at 5–22), Plaintiff set forth the factual statement for his claims that began to accrue on or after February 8, 2016. (*Id.* at 22–34.) According to Plaintiff, on February 11, 2016, his surgeon, Dr. Undavia, checked him for the first time since his hospitalization, twenty-two months prior. (*Id.*) Dr. Undavia is not a party in this case. Dr. Undavia expressed grave concern that the BOP did not bring Plaintiff in for post-operative care since 2014 and emphasized that aftercare was essential to minimize post-operative problems. (*Id.*)

Dr. Undavia performed a minor procedure in Plaintiff's right nostril to remove scar tissue, ordered a computer tomography ("CT") scan, and directed Plaintiff to follow up with him immediately after the scan. (*Id.* at 23.) On September 12, 2016, after waiting more than five months for his CT scan follow-up, Plaintiff submitted another complaint to Defendant Wilk. (*Id.*) Plaintiff voiced his concerns that the BOP was not addressing his serious medical needs, and Defendants continued to delay the follow up "due to disorganization, laziness, cost-savings and retaliation." (*Id.*)

Ten months later, Plaintiff was able to meet with Dr. Undavia, and they discussed the option of pursuing a second sinus surgery. (*Id.* at 24.) The two discussed their concerns about additional scarring at length, and the BOP's failure to bring Plaintiff for routine post-operative checks in 2014 and 2015. (*Id.*) Plaintiff contends that his symptoms, "the severe congestion, sinus pressure and pain, headaches, inability to sleep well, prolonged & frequent nose bleeding, and the

4

stress & anxiety," continued to persist and plagued him for the past thirty-one months. (*Id*.) Dr. Undavia recommended that Plaintiff undergo the second sinus surgery, to alleviate his suffering. (*Id*.)

On May 4, 2017, Plaintiff went to Saint Francis Medical Center for his second surgery. (*Id*.) In his surgery report, Dr. Undavia noted that Plaintiff was unable to follow up from his 2014 surgery, and "[p]ostoperatively . . . developed significant scar banding & recurrence of nasal polyps." (*Id*.) Additionally, Dr. Undavia wrote that Defendants forgot to bring Plaintiff's CT scan, and because of that, it "was difficult to perform the operation." (*Id.* at 25.) Dr. Undavia also noted that because of Plaintiff's extensive scar tissue, he "was unable to see the opening of the maxillary sinus" and had to create a new opening, which expelled "thick purulent material." (*Id.* at 26.) Plaintiff expressed vindication in discovering that he had in fact been living in pain for three years "with a pus-filled (infected) right Maxillary Sinus." (*Id.*) Plaintiff had a post-operative exam on June 15, 2017, and Dr. Undavia recommended a follow-up in one year. (*Id.* at 28.)

On May 30, 2018, the BOP denied Plaintiff's request for the recommended 1-year follow-up with Dr. Undavia and advised that the BOP would not reschedule the appointment as it was "not medically necessary at this time." (*Id.* at 27–28.) The BOP cancelled the appointment a few days after Plaintiff filed this lawsuit against the Defendants. (*Id.* at 28.) Plaintiff contends that the BOP retaliated against him for exercising his constitutional rights. (*Id*.) On November 30, 2018, staff moved Plaintiff from his preferred two-man housing into a twelve-man cell. (*Id.* at 29.) Plaintiff complained to a counselor, who stated that the move was "because of [his] lawsuits." (*Id.* at 29–30.)

Nearly a year later, and eleven months overdue, staff took Plaintiff to see Dr. Undavia on May 2, 2019, who prescribed Plaintiff medications that alleviated his symptoms. (*Id.* at 30.) The

5

two also discussed the benefits of Plaintiff having a third nasal surgery, in order to remove additional scar tissue. (*Id*.) Dr. Undavia expressed, however, that a Nevada surgeon would have to perform the surgery as Plaintiff was to be released to a half-way house in Nevada that autumn. (*Id*.) Dr. Undavia explained that he would not be able to perform the procedure because of the 11-month delay in Plaintiff's follow-up. (*Id*.)

Subsequently, BOP staff denied Plaintiff his new nasal spray medication, on at least four occasions. (*Id*.) After eighty days, BOP staff finally issued the medication but with zero refills, causing Plaintiff to run out after approximately four weeks. (*Id*.) BOP staff refused to refill the medication, despite Dr. Undavia's instructions. (*Id*.) In July of 2019, Plaintiff discovered that four of his most recent requests for medical records did not reach their destination, and that staff were deliberately intercepting his mail (*Id.* at 31.)

In September of 2019, Plaintiff was released to a halfway house, and began seeing his long-time doctor, Antonino Gumina. (*Id.* at 32.) In July of 2020, staff would not allow Plaintiff to see Dr. Gumina. (*Id*.) In February and March of 2021, Plaintiff saw a Las Vegas ear nose and throat ("ENT") specialist, Dr. Nasri, who explained that the damage to his "right Maxillary sinus is . . . permanent because the uncontrolled infection resulted in destruction of the tissues in that sinus [which are] responsible for humidification." (*Id.* at 30.) Dr. Nasri advised that Plaintiff's condition would need lifelong treatment. (*Id.* at 33.)

With regard to his administrative remedies, "Plaintiff filed numerous grievances and appeals from November of 2014 through March of 2015, alleging, *in impressive detail*, that Defendants denied, delayed, and prevented medical treatment, resulting in substantial suffering." (ECF No. 28, at 12 (emphasis in original) (citing ECF No. 1, at 32, 34, 39, 42; ECF No. 27-4).) Plaintiff received a denial as to the last of those appeals on September 7, 2015. (*Id*.) As to events

after February 8, 2016, however, Plaintiff filed only one administrative remedy, a BP-10, regarding his sinus issues on October 30, 2019. (ECF No. 51-2, at 3 ¶ 9.)  The BOP's regional office rejected the BP-10 because Plaintiff did not first pursue a BP-9 at the institutional level. (*Id.* ¶ 10.)  Plaintiff did not appeal that edecision, nor did he file any other grievances after February 8, 2016. (*Id.* ¶ 11.)  Plaintiff does not dispute this chain of events. (*See generally*, ECF Nos. 52, 56.)

Defendants now move to dismiss under Rule 12(b)(6), or in the alternative, for summary judgment, under Rule 56. (ECF No. 51.)  Plaintiff filed an Opposition, (ECF No. 52), and Defendants filed a Reply (ECF No. 53).  Thereafter, the Court issued an Order pursuant to *Paladino v. Newsome*, 885 F.3d 203 (3d Cir. 2018), to provide the parties with additional notice and an opportunity to respond before deciding factual disputes, such as exhaustion, on summary judgment. (ECF No. 54.)  The parties filed submissions in response to the *Paladino* notice. (ECF Nos. 55, 56.)

## II.      STANDARDS OF REVIEW

### A. Motions to Dismiss Under Rule 12(b)(6)

Federal Rule of Civil Procedure 12(b)(6) allows a court to dismiss an action for failure to state a claim upon which relief can be granted.  When evaluating a motion to dismiss, "courts accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (quoting *Phillips v. County of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008)).  In other words, a complaint survives a motion to dismiss if it contains sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

To make this determination, a court conducts a three-part analysis. *Santiago v. Warminster Twp.*, 629 F.3d 121, 130 (3d Cir. 2010). First, the court must "tak[e] note of the elements a plaintiff must plead to state a claim." *Id.* (quoting *Iqbal*, 556 U.S. at 675). Second, the court should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* at 131 (quoting *Iqbal*, 556 U.S. at 680). Finally, "where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief." *Id*.

### B. Motions for Summary Judgment Under Rule 56

A court should grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Tolan v. Cotton,* 572 U.S. 650, 656–57 (2014). In deciding a motion for summary judgment, a court must construe all facts and inferences in the light most favorable to the nonmoving party. *See Cotton,* 572 U.S. at 657. The moving party bears the burden of establishing that no genuine issue of material fact remains. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23 (1986). "[W]ith respect to an issue on which the nonmoving party bears the burden of proof," the moving party may discharge its burden "by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

If the moving party meets its threshold burden, the opposing party must present actual evidence that creates a genuine issue as to a material fact for trial. *See Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 248 (1986); *see also* Fed. R. Civ. P. 56(c) (setting forth types of evidence that may show that genuine issues of material fact exist). The non-moving party must at least present probative evidence from which the jury might return a verdict in his favor. *Anderson*, 477 U.S. at

8

257. Where the non-moving party fails to "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," the movant is entitled to summary judgment. *Celotex*, 477 U.S. at 322. "[U]nsupported allegations . . . and pleadings are insufficient to repel summary judgment." *Schoch v. First Fid. Bancorporation,* 912 F.2d 654, 657 (3d Cir. 1990).

## III. DISCUSSION

Defendants argue that summary judgment is appropriate because Plaintiff has failed to exhaust his administrative remedies and therefore, the Prison Litigation Reform Act ("PLRA"), codified as 42 U.S.C. § 1997e, bars his claims. (ECF No. 51-1, at 15–18.) Alternatively, Defendants contend that the Complaint fails to state claim. (*Id.* at 18–29.) As explained below, the Court finds that Plaintiff has failed to exhaust his administrative remedies and will therefore grant Defendants' motion for summary judgment.

The PLRA precludes a prisoner from contesting prison conditions in federal court until he has exhausted "all avenues of relief available to [him] within their prison's inmate grievance system." *Spruill v. Gillis*, 372 F.3d 218, 227 (3d Cir. 2004). Specifically, the PLRA provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a).

The "PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002); *see also Coulston v. Glunt*, 665 F. App'x 128, 132 (3d Cir. 2016). A plaintiff must pursue to completion all available

administrative remedies, even if they are not "plain, speedy, and effective," do "not meet federal standards," or could not result in the requested relief. *Porter*, 534 U.S. at 524.

These requirements serve three important functions: "(1) allowing the appropriate agency to develop a factual record and apply its expertise facilitates judicial review; (2) permitting agencies to grant the relief requested conserves judicial resources; and (3) providing agencies the opportunity to correct their own errors fosters administrative autonomy." *Moscato v. Fed. Bureau of Prisons*, 98 F.3d 757, 761–62 (3d Cir. 1996); *see also Gambino v. Morris*, 134 F.3d 156, 171 (3d Cir. 1998); *Lyons v. U.S. Marshals*, 840 F.2d 202, 205 (3d Cir. 1988).

Failure to exhaust is an affirmative defense, and as such, defendants have the burden to plead and prove that a plaintiff has failed to exhaust. *Small v. Camden Cty.*, 728 F.3d 265, 268 (3d Cir. 2013). To determine whether a prisoner has exhausted his administrative remedies, the Court looks to the agency's applicable grievance procedures and rules, in this case, the BOP. *See Jones v. Bock*, 549 U.S. 199, 218 (2007). Pursuant to the BOP's administrative remedy program, an inmate must generally attempt to informally resolve the issue by presenting it to staff through a BP-8 form. *See* 28 C.F.R. § 542.13. If that fails to informally resolve the issue, then the inmate may submit a BP-9 form to the warden. *See* 28 C.F.R. § 542.14. An inmate who is dissatisfied with the warden's response may appeal to the regional director with a BP-10, and an inmate who is dissatisfied with the regional director's decision may appeal to the general counsel in the central office, through a BP-11. *See* 28 C.F.R. § 542.15(a). An appeal to the general counsel is the final level of administrative appeal. *Id.*

The Third Circuit has not addressed the issue of the exact level of specificity necessary in a grievance but has noted that "[t]he primary purpose of a grievance is to alert prison officials to a problem." *Williams v. Beard*, 482 F.3d 637, 640 (3d Cir. 2007); *see also Mack v. Warden Loretto*

*FCI*, 839 F.3d 286, 295 (3d Cir. 2016) (explaining that because the BOP is "silent or vague" regarding the level of detail required in a grievance . . . [the] grievance must at least . . . alert prison officials to a problem" and the nature of the wrong (internal quotation marks omitted)).

This language has led courts in this District to find "that a grievance suffices if it alerts the prison to the nature of the wrong for which redress is sought." *Turner v. Doe*, No. 15-5942, 2016 WL 7341708, at *3 (D.N.J. Dec. 19, 2016) (quoting *Olivares v. United States*, No. 07–3476, 2010 WL 5251429, at *4 (D.N.J. Dec. 16, 2010)), *aff'd sub nom. Turner v. Scott*, 781 F. App'x 47 (3d Cir. 2019); *see also Friedland v. Zickefoose*, No. 12-6010, 2020 WL 4345325, at *5 (D.N.J. July 29, 2020), *aff'd*, 841 F. App'x 361 (3d Cir. 2021).

Finally, where an administrative procedure is "available," plaintiffs seeking to challenge prison conditions must fully and properly exhaust their administrative remedies prior to filing suit, and exceptional circumstances will not excuse their failure to exhaust. *E.g.*, *Ross v. Blake*, 578 U.S. 632, 639–41 (2016) ("But aside from [where an administrative procedure is unavailable], the PLRA's text suggests no limits on an inmate's obligation to exhaust—irrespective of any 'special circumstances.' And that mandatory language means a court may not excuse a failure to exhaust, even to take such circumstances into account."); *Neal v. Powell*, No. 17-4768, 2023 WL 4118347, at *3 (D.N.J. June 22, 2023). Indeed, both the "Supreme Court and [the Third Circuit] have rejected judge-made exceptions to the PLRA." *Downey, v. Pa. Dep't of Corr.*, 968 F.3d 299, 305 (3d Cir. 2020).

Rather, as the statute provides, it is only where the administrative procedure is "unavailable," that a court may excuse the failure to exhaust. *Ross*, 578 U.S. at 642. Generally, an administrative procedure is not available: (1) "when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently

11

unwilling to provide any relief";[2] (2) when the procedure is "so opaque that it becomes, practically speaking, incapable of use"; and (3) when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misinterpretation, or intimidation." *Id.* at 642–44.

With those principles in mind, the Court finds that Plaintiff has failed to exhaust his administrative remedies as to his remaining claims. Pursuant to the Court's earlier rulings on the statute of limitations, the only claims that remain in this case are those that began to accrue on or after February 8, 2016. (ECF No. 28, at 12–13.) After February 8, 2016, however, Plaintiff filed only one administrative grievance, a BP-10, regarding his sinus issues on October 30, 2019. (ECF No. 51-2, at 3 ¶ 9.) The BOP's regional office rejected his BP-10 because Plaintiff did not first pursue a BP-9 at the institutional level. (*Id.* ¶ 10.) Plaintiff did not appeal that decision, nor did he file any other grievances after February 8, 2016. (*Id.* ¶ 11.) Again, Plaintiff does not dispute this chain of events. (*See* ECF Nos. 52, 56.)

In response to the Court's *Paladino* notice, Plaintiff contends that he did exhaust his administrative remedies. (ECF No. 56, at 2.) He appears to argue that his 2014 administrative grievance and appeals covers his claims that began to accrue on or after February 8, 2016. (ECF No. 52, at 2; ECF No. 56, at 2.) Plainly, however, Plaintiff's administrative remedies regarding events in 2014 could not "alert prison officials" to problems that occurred on or after February 8, 2016, as those events had not yet occurred. *Williams*, 482 F.3d at 640. Accordingly, Plaintiff has failed to exhaust his remaining claims.

---

[2] As the Supreme Court explained, "[s]uppose, for example, that a prison handbook directs inmates to submit their grievances to a particular administrative office—but in practice that office disclaims the capacity to consider those petitions. The procedure is not then 'capable of use' for the pertinent purpose." *Ross*, 578 U.S. at 643.

To the extent Plaintiff argues that his post February 8, 2016, claims are "continuing violations" of issues that he listed in 2014, the Court disagrees. (*See* ECF No. 1-3, at 1–2 (BP-8), 8–12 (BP-9), 16–18 (BP-10), 33–35 (BP-11).) "The continuing violations doctrine" is traditionally an "equitable exception [in] the statute of limitations" context. *Spencer v. Courtier*, 552 F. App'x 121, 123 (3d Cir. 2014). The doctrine postpones the running of the statute of limitations "when a defendant's conduct is part of a continuing practice." *Randall v. City of Philadelphia L. Dep't*, 919 F.3d 196, 198 (3d Cir. 2019) (quoting *Brenner v. Local 514, United Bhd. Of Carpenters & Joiners of Am.*, 927 F.2d 1283, 1295 (3d Cir. 1991)). "If a defendant's conduct constitutes a continuing practice, the entire claim may be timely if the last act of the practice falls within the statute of limitations." *Spencer*, 552 F. App'x at 123 (citing *Cowell v. Palmer Twp.*, 263 F.3d 286, 292 (3d Cir. 2001)); *see also Randall*, 919 F.3d at 197.

In order to establish that a defendant's conduct was part of a continuing practice, a plaintiff must demonstrate that "the defendant's conduct was more than isolated or sporadic acts." *Spencer*, 552 F. App'x at 123. To make this determination, courts consider two factors: "(1) whether the violations were related in subject matter and (2) whether the acts were recurring." *Bennett v. Susquehanna Cnty. Child. & Youth Servs.*, 592 F. App'x 81, 84 (3d Cir. 2014); *Smith v. Twp. of Warren*, No. 14-7178, 2016 WL 7409952, at *14 (D.N.J. Dec. 22, 2016). The Third Circuit has cautioned, however, that "the continuing violations doctrine is not a substitute for a plaintiff's awareness of and duty to assert his/her rights in a timely fashion." *Bennett*, 592 F. App'x at 85 (internal quotation marks omitted). Consequently, "the doctrine does not apply when plaintiffs are aware of the injury at the time it occurred." *Id.* (internal quotation marks omitted).

That said, this Court is not aware of any case in this Circuit to apply the doctrine to "excuse[] compliance with the PLRA exhaustion requirement."[3] *Whitenight v. Elbel*, No. 16-552, 2019 WL 7284251, at *4 (W.D. Pa. Dec. 27, 2019); *see Obataiye v. Lanigan*, No. 14-5462, 2019 WL 4727943, at *5 n.5 (D.N.J. Sept. 27, 2019) (noting that even if plaintiff "had filed earlier grievances, it is unclear that such grievances regarding claims that necessarily fell before statute-of-limitations cutoff could function to exhaust administrative remedies as to subsequently accruing claims"). Indeed, courts have shown a clear "reluctance to invoke equitable reasons to excuse [an inmate's] failure to exhaust as the [PLRA] requires." *Davis v. Warman*, 49 F. App'x 365, 368 (3d Cir. 2002); *Fonseca v. Berdanier*, No. 19-1427, 2021 WL 916202, at *3 (M.D. Pa. Mar. 10, 2021); *see also Downey*, 968 F.3d at 305 ("Both the Supreme Court and this Court have rejected judge-made exceptions to the PLRA.").

Some Courts of Appeal, however, have applied the continuing violations doctrine in the exhaustion context and held that where there is "'one, continuing harm' or a single course of conduct (which can lead to discrete incidents of harm), filing repeat grievances is unnecessary." *See Morgan v. Trierweiler*, 67 F.4th 362, 369–70 (6th Cir. 2023) (quoting *Siggers v. Campbell*, 652 F.3d 681, 693 (6th Cir. 2011)); *Turley v. Rednour*, 729 F.3d 645, 649–50 (7th Cir. 2013); *Parzyck v. Prison Health Servs., Inc.*, 627 F.3d 1215, 1218–19 (11th Cir. 2010); *Howard v. Waide*, 534 F.3d 1227, 1244 (10th Cir. 2008); *Johnson v. Johnson*, 385 F.3d 503, 519–21 (5th Cir. 2004). In those cases, the Courts inquired as to whether the "the same condition of confinement" at issue in the prisoners' grievances had "continued." *Morgan*, 67 F.4th at 370 (quoting *Johnson*, 385 F.3d at 520). Under these cases, "prisoners need not file multiple, successive grievances raising the

---

[3] Arguably, rather than "excuse" compliance, the continuing violations doctrine uses the earlier grievance to encompass future claims, so as to "satisfy" the PLRA's exhaustion requirement.

same issue (such as prison conditions or policies) if the objectionable condition is continuing." *Turley*, 729 F.3d at 650 (citing *Parzyck*, 627 F.3d at 1219 (finding that the prisoner was "not required to initiate another round of the administrative grievance process on the exact same issue each time" a deprivation occurred)).

Rather, separate grievances "about particular incidents are only required if the underlying facts or the complaints are different." *Turley*, 729 F.3d at 650; *see, e.g.*, *Siggers*, 652 F.3d at 692–93 (finding that plaintiff's earlier grievance did not cover subsequent events, because although the acts involved rejecting mail, the rejections were discrete and based on different reasons and circumstances); *Moore v. Bennette*, 517 F.3d 717, 728–29 (4th Cir. 2008) (finding that plaintiff's earlier grievance did not cover subsequent events, because although both problems involved inadequate medical care, the earlier grievance complained of inadequate medical care for Hepatitis C but not for gout). Consequently, "once a prison has received notice of, and an opportunity to correct, a problem, the prisoner has satisfied the purpose of the exhaustion requirement." *Turley*, 729 F.3d at 650.

For example, in *Morgan*, 67 F.4th at 370, the Sixth Circuit held that the plaintiff's earlier grievance covered subsequent, continuing violations, because the grievance complained "that he was denied Halal food continuously, not just at particular meals, in violation of his free exercise rights." In *Turley*, the Seventh Circuit similarly held that Plaintiff's earlier grievance covered the initial lockdown at issue, and subsequent lockdowns, because the grievance challenged the same lockdown policy that caused each lockdown. *Turley*, 729 F.3d at 650 (finding that "one occurrence of notice from Turley was sufficient to give the prison a chance to correct the problems"). Likewise, in *Parzyck*, the plaintiff "was not required to initiate another round of the administrative

grievance process on the exact same issue each time another request for an orthopedic consultation was denied." *Parzyck*, 627 F.3d at 1218–19.

In the present case, although the complaints in Plaintiff's 2014 administrative remedies and appeals were broadly related to his sinus issues, they involved specific and discrete treatment issues. (*See* ECF No. 1-3, at 8–11.)  In particular, Plaintiff generally complained about: (1) his lungs collapsing on March 31, 2014, which required major thoracic surgery; (2) the six-month delay in diagnostics after his May 14, 2014, chest X-Rays; (3) his June 25, 2014, sinus infection that the staff's antibiotics failed to resolve; (4) four denials of antibiotics in November of 2014; (5) his desire to see a doctor other than Dr. Sood; (6) to see an ear, nose and throat ("ENT") specialist; and (7) to receive appropriate diagnostics. (*Id.* at 9.)

According to Plaintiff's exhibits, Plaintiff received additional diagnostics such as a CT scan in January of 2015 (*Id.* at 15), and a chest x-ray in June of 2015 (*Id.* at 35.)  Plaintiff also saw a new pulmonologist, Dr. Steeger, in January, March, and July of 2015 (*Id.* at 23–31), and an ENT doctor in March of 2015, and June of 2016 (*Id.* at 34–35).

In contrast, Plaintiff's complaints as to events after February 8, 2016, involved: (1) the five-month delay in providing a CT scan follow up with Dr. Undavia after the February 2016 CT scan; (2) the failure to bring Plaintiff's CT scan to his second surgery in May of 2017; (3) cancelling Plaintiff's one year follow up in May of 2018; (4) retaliating against Plaintiff by moving him to a twelve-man cell in November of 2018; (5) the eleven month delay preceding May of 2019, for Plaintiff's one year follow up after his second surgery; (6) the refusal to provide him with new medication in the summer of 2019; (7) the interception of his mail in the months prior to July of 2019; and (8) the refusal to allow Plaintiff to see Dr. Gumina in July of 2020. (ECF 30, at 23–32.)

Although these events are broadly related to Plaintiff's sinus issues, the Court finds that Plaintiff's claims that accrued on or after February 8, 2016, are distinct and discrete events that do not involve "the same issue[s]," as those in Plaintiff's 2014 administrative remedies. *Parzyck*, 627 F.3d at 1218–19. As seen above, Plaintiff did not face "one, continuing harm" or a "single course of conduct." *Morgan*, 67 F.4th at 369–70. Staff did not, for example, continue to refuse to address a harm at issue in 2014, such as Plaintiff's need for an ENT doctor or a pulmonologist. (*Compare* ECF No. 1-3, at 8–9, *with* ECF No. 1-3, at 23–31, 34–35); *See generally*, *Parzyck*, 627 F.3d at 1218–19 (finding that the doctrine applied where staff continued to refuse to provide the plaintiff with an orthopedic consultation). Nor did staff continue to deprive Plaintiff of diagnostic tests such as x-rays or CT-scans. (*Compare* ECF No. 1-3, at 8–9, *with* ECF No. 1-3, at 15, 35.) In that sense, the facts of this case are distinguishable from *Parzyck*, 627 F.3d 1215, 1218–19 (11th Cir. 2010)

On this record, the Court cannot find that the "same condition[s] of confinement" in Plaintiff's 2014 administrative remedies "had . . . continued" beyond February 8, 2016. *Morgan*, 67 F.4th at 370 (quoting *Johnson*, 385 F.3d at 520). Although the grievances were generally related, the circumstances around each alleged violation were different and discrete. *See Siggers*, 652 F.3d at 692 (finding that plaintiff's earlier grievance did not cover subsequent events, because although the acts involved rejecting mail, the rejections were different, discrete, and were rejected for different reasons). As a result, Plaintiff's 2014 administrative remedies and appeals were not sufficient to alert prison officials as to problems beyond February 8, 2016, or the nature of those wrongs. *Mack*, 839 F.3d 286, 295; *Williams*, 482 F.3d at 640. Indeed, had Plaintiff successfully completed the administrative remedies he initiated in October of 2019, he might have alerted prison officials to these new issues and properly exhausted most of these claims. (*See* ECF No. 51-

17

2, at 3 ¶¶ 9–11; ECF No. 51-2, at 21.) Plaintiff offers no reason as to why he ceased pursuing his 2019 administrative remedies, or why he failed to file any other grievances after 2016. (*See* ECF Nos. 52, 56.)

Additionally, even under the Third Circuit's continuing violations analysis, which ordinarily applies in the statute of limitations context, the doctrine would not apply in this case. Once again, in order for the doctrine to apply, Plaintiff must establish, among other things, that the acts at issue were part of a "continuing practice." *Randall*, 919 F.3d at 198; *see also Spencer*, 552 F. App'x at 123. In order to establish that a defendant's conduct was part of a continuing practice, a plaintiff must demonstrate that "the defendant's conduct was more than isolated or sporadic acts." *Spencer*, 552 F. App'x at 123. Courts consider two factors: "(1) whether the violations were related in subject matter and (2) whether the acts were recurring." *Bennett*, 592 F. App'x at 84. First, as set forth above, the two groups of violations were only broadly related in subject matter, as generally related to Plaintiff's sinus issues. (*Compare* ECF No. 1-3, at 8–11, *with* ECF No. 1-3, at 23–32.) Second, no particular act was recurring between those two groups. (*Id.*)

Further, as explained above, and in Judge Kugler's earlier Opinion, Plaintiff was well aware of his injuries, through the excruciating pain he suffered throughout the events at issue. (ECF No. 5, at 9.) As Judge Kugler opined, because Plaintiff holds a doctorate in veterinary medicine, "determining when Plaintiff knew of or had reason to know of his Eighth Amendment injuries is a somewhat unusual task in light of Plaintiff's advanced medical knowledge." (*Id.*) Plaintiff's initial complaint and administrative grievances alleged, "in impressive detail, that Plaintiff notified the prison medical staff of issues arising from his surgeries . . . and then *advised them* of the proper course of medical treatment." (*Id.* (emphasis in original).) More specifically, Judge Kugler explained:

> For example, on a number of instances, Plaintiff received his medical test results, such as his radiographs, and alleges that he was able to properly diagnose himself and request the proper treatment. With his medical knowledge in mind, he explains that on many occasions over approximately eighteen months, until September 15, 2015, the medical staff refused to provide proper treatment, delayed necessary medical treatment, and prevented him from receiving medical treatment. (ECF No. 29–50) . . . .
>
> Plaintiff filed [his] grievances and appeals, on November 6, 2014, November 20, 2014, January 12, 2015, and March 5, 2015, complaining of the denied, delayed, and prevented treatment, in impressive detail. (ECF No. 1, at 32, 34, 39, 42). Thus, at the latest, Plaintiff was aware of his injury and had a complete cause of action as of March 5, 2015, as to his deliberate indifference claims preceding that date.

(ECF No. 5, at 9.) Consequently, as Plaintiff was well aware of his injuries near or "at the time [they] occurred," the continuing violations doctrine would not apply for that reason as well. *Bennett*, 592 F. App'x at 85 (stating that "the doctrine does not apply when plaintiffs are aware of the injury at the time it occurred").

For all those reasons, the Court finds that Plaintiff has failed to exhaust his claims that began to accrue on or after February 8, 2016, and the continuing violations doctrine did not render these claims exhausted. Nor has Plaintiff alleged that the BOP's administrative remedy program was unavailable as to any of these claims. (*See generally*, ECF Nos. 52, 56.) Accordingly, the PLRA bars Plaintiff's remaining claims, and the Court will grant Defendants' motion for summary judgment.

## IV.  CONCLUSION

For the foregoing reasons, the Court will grant Defendants' motion for summary judgment and dismiss Defendants' motion to dismiss as moot.  An appropriate Order follows.


Dated:  July 13, 2023

/s/ Christine P. O'Hearn
**Christine P. O'Hearn**
**United States District Judge**